UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

DERRICK HAMILTON,                                                    Docket No.

                                        Plaintiff,              **COMPLAINT**

            -- against --                                        Jury Trial Demanded


THE CITY OF NEW YORK, THE NEW YORK
CITY POLICE DEPARTMENT, DET. LOUIS
SCARCELLA, individually and in his capacity as
a New York City police officer; DET. FRANK
DeLOUISA, individually and in his capacity as a
New York City police officer, INV. JOSEPH
PONZI, individually and in his capacity as an
Investigator for the Kings County District
Attorney's office, JOHN/JANE DOE NOS. 1
through 10, being unknown employees of the
City of New York, THE CITY OF NEW HAVEN,
POLICE OFFICER BILLY WHITE, individually
and in his capacity as a New Haven police officer,
and JOHN/JANE DOE NOS. 11 through 20, being
unknown employees of the City of New Haven,

                                        Defendants.

-------------------------------------------------------------------------X

        Plaintiff DERRICK HAMILTON, by and through his attorney Edelstein & Grossman,

complaining of defendants CITY OF NEW YORK, THE NEW YORK CITY POLICE

DEPARTMENT, DET. LOUIS SCARCELLA, DET. FRANK DeLOUISA, INV. JOSEPH

PONZI, CITY OF NEW HAVEN, POLICE OFFICER BILLY WHITE, and JOHN/JANE DOE

NOS. 1 through 20, hereby alleges upon information and belief as follows:

## PARTIES, JURISDICTION AND VENUE

        1.      Plaintiff DERRICK HAMILTON is a natural person residing in Bucks County,

Pennsylvania.  At the times relevant to the lawsuit, he resided in Brooklyn and New Haven.

2.     Defendant CITY OF NEW YORK is, and was at all times relevant to this action, a municipal corporation existing under and by virtue of the laws of the State of New York, with the powers and duties imposed by law thereon

3.     Defendant NEW YORK CITY POLICE DEPARTMENT is, and was at all times relevant to this action, an agency of defendant CITY OF NEW YORK existing under and by virtue of the laws of the State and City of New York, with the powers and duties imposed by law thereon.

5.     Defendant DETECTIVE LOUIS SCARCELLA is a disgraced former officer of the New York City Police Department.  At all times relevant to this lawsuit, he was an officer of the New York City Police Department employed by defendant CITY OF NEW YORK, having the powers and duties imposed by law thereon.

6.     Defendant DETECTIVE FRANK DeLOUISA is a retired officer of the New York City Police Department.  At all times relevant to this lawsuit, he was an officer of the New York City Police Department employed by defendant CITY OF NEW YORK, having the powers and duties imposed by law thereon.

7.     Defendant INVESTIGATOR JOSEPH PONZI is a retired Investigator of the Kings County District Attorney's Office.  At all times relevant to this lawsuit, he was an Investigator of the Kings County District Attorney's Office employed by defendant CITY OF NEW YORK, having the powers and duties imposed by law thereon.

8.     Defendant CITY OF NEW HAVEN is a municipal corporation existing under and by virtue of the laws of the State of Connecticut, with the powers and duties imposed by law thereon.

9.     Defendant POLICE OFFICER BILLY WHITE is a disgraced former police

2

officer of the City of New Haven who is or has been incarcerated on Federal bribery and larceny charges.   At all times relevant to this lawsuit, he was an officer of the New Haven Police Department employed by defendant CITY OF NEW HAVEN, having the powers and duties imposed by law thereon.

10.     Defendants JOHN/JANE DOE NOS. 1 THROUGH 10 are, and were at all times relevant to this lawsuit, officers of the New York City Police Department employed by defendant CITY OF NEW YORK and having the powers and duties imposed by law thereon, whose identities are not presently known to plaintiff but who participated in the unlawful and/or unconstitutional acts alleged herein.

11.     JOHN/JANE DOE NOS. 11 THROUGH 20 are, and were at all times relevant to this lawsuit, officers of the New Haven Police Department employed by defendant CITY OF NEW HAVEN and having the powers and duties imposed by law thereon, whose identities are not presently known to plaintiff but who participated in the unlawful and/or unconstitutional acts alleged herein.

12.     At all times relevant to this lawsuit, defendants SCARCELLA, DeLOUISA, PONZI and JOHN/JANE DOE NOS. 1 through 10 were acting in the course and scope of their employment and were acting under color of New York State law.

13.     At all times relevant to this lawsuit, defendants WHITE and JOHN/JANE DOE NOS. 11 through 20 were acting in the course and scope of their employment and were acting under color of the law of New York and/or Connecticut.

14.     At all times relevant to this lawsuit, the defendants located in New York and the defendants located in New Haven conspired and acted in concert with each other.

15.     This is an action under Title 42, Sections 1983 and 1985 of the United States

Code in which plaintiff HAMILTON alleges that he was deprived under color of law of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States by reason of the defendants' subornation of perjury, coaching or coercion of false identification and false testimony, intimidation and threatening of defense witnesses, fabrication of evidence, failure to investigate exculpatory evidence and/or false discrediting of exculpatory evidence that resulted in him being incarcerated for more than 20 years for a murder he didn't commit.  Plaintiff also brings claims under New York State law for false imprisonment; malicious prosecution; negligent hiring, retention, training, discipline and supervision; and common-law negligence predicated upon the same acts and transactions as the aforesaid Federal constitutional claims.

16.     This Court has jurisdiction over the Federal claims pursuant to 28 U.S.C. § 1331 and over the related state law clams pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, and more particularly in the County of Kings.

<u>**NOTICE OF CLAIM**</u>

18.     A written Notice of Claim was filed with the CITY OF NEW YORK on January 20, 2015.  More than thirty days have elapsed since the filing of said Notices of Claim and these matters have not been settled or otherwise resolved.

19.     Plaintiff has submitted to an examination under oath pursuant to Section 50-h of the New York General Municipal Law and has complied with any and all other conditions precedent to suit against the CITY OF NEW YORK.

**JURY DEMAND**

20.     Plaintiff hereby demands trial by jury of all issues raised in this Complaint.

**OVERVIEW**

21.     This case arises from the shooting death of Nathaniel Cash in Brooklyn on January 4, 1991.

22.     At the time of the shooting – as attested by, *inter alia*, a decorated former New Haven police officer who now runs a cancer charity – plaintiff HAMILTON was in New Haven.

23.     The sole eyewitness to testify at trial, Jewel Smith, told defendant DeLOUISA that she did not see the shooter.

24.     Nevertheless, defendant DeLOUISA, at the behest of defendant SCARCELLA, took Ms. Smith into custody and transported her to a police precinct, where defendant SCARCELLA threatened and coerced her to identify plaintiff HAMILTON as the killer.  In particular, defendant SCARCELLA threatened to charge Ms. Smith with the murder if she did not identify Mr. HAMILTON, and also threatened to violate her parole (for consorting with Mr. Cash, a known felon) and take her children away if she did not accuse Mr. HAMILTON of the crime.

25.     In addition, defendant WHITE, at the behest and command of defendant SCARCELLA and acting in concert with defendant SCARCELLA, intimidated witnesses in New Haven who could have testified as alibi witnesses for the plaintiff by threatening *inter alia* that they would die in jail if they testified for Mr. HAMILTON.

26.     There was no other evidence against plaintiff HAMILTON, but he was arrested and convicted on the strength of Ms. Smith's coerced and perjured testimony.

27.     Ms. Smith recanted almost immediately, and soon after trial, gave a formal

affidavit of recantation to plaintiff's counsel.   A hearing was held at which defendant SCARCELLA falsely claimed that Ms. Smith's recantation was due to fear of plaintiff and/or his family.   On the strength of SCARCELLA's perjured testimony, the trial judge refused to set aside plaintiff's conviction, and instead sentenced him to 25 years to life in prison.

28.     Following plaintiff's transfer to prison, a steady stream of exculpatory evidence emerged, including numerous alibi witnesses as well as witnesses who identified the actual shooter.   Each time, these witnesses were falsely discredited by defendants SCARCELLA and/or WHITE, resulting in plaintiff remaining in prison under horrific conditions including a total of ten years in solitary confinement.

29.     Mr. Hamilton was released on parole on December 7, 2011, after the parole board considered evidence that he was actually innocent of his conviction.

30.     Beginning in 2013, it was revealed that defendant SCARCELLA committed misconduct in numerous homicide cases he investigated, including plaintiff's case.

31.     Subsequently, on January 15, 2014, the Appellate Division, Second Department, held that Mr. Hamilton was entitled to an evidentiary hearing on his claim of actual innocence. See People v. Hamilton, 115 A.D.3d 12 (2d Dept. 2014).

32.     As a result, the Kings County District Attorney's office agreed to reinvestigate the case and came to the conclusion that, *inter alia*, that the trial testimony of the sole eyewitness in the case, Jewel Smith, was untruthful and that plaintiff HAMILTON's due process rights had been violated.   The District Attorney's office accordingly agreed to vacate Mr. HAMILTON's conviction and dismiss the indictment.

33.     On January 9, 2015, the Kings County Supreme Court (Guzman, J.) granted plaintiff HAMILTON's C.P.L. § 440.10 motion and vacated defendant's conviction and

dismissed the indictment in its entirety.

34.     Plaintiff was and is innocent of the crime of which he was convicted and suffered conviction and incarceration solely due to the unlawful and unconstitutional acts of the Defendants herein.

## FACTUAL BACKGROUND

35.     On January 4, 1991, around 11 a.m., Nathaniel Cash was shot to death in Brooklyn.  At this time, plaintiff HAMILTON was in New Haven, Connecticut, meeting with talent agent Kelly Turner (who would later become a decorated New Haven police officer) and her assistant, Davette Mahan.

36.     Defendant DeLOUISA of the NYPD responded to the scene and encountered Mr. Cash's girlfriend Jewel Smith, who gave the name Karen Smith.  Ms. Smith was a professional shoplifter who was then on parole.  She  gave a statement to DeLOUISA saying she did not witness the shooting and that she was in a nearby store when the shots were heard.

37.     Also present at the crime scene when defendant DeLOUISA arrived was one Taseem Douglas.

38.     Defendant DeLOUISA did not attempt to ascertain whether Taseem Douglas had witnessed the shooting.

39.     Although Ms. Smith denied being a witness, she was then brought to an NYPD precinct by DeLOUISA at the request and command of defendant SCARCELLA.

40.     At the precinct, Ms. Smith was confronted by defendant SCARCELLA. Defendant SCARCELLA threatened, *inter alia*, to charge Ms. Smith with the murder if she did not identify plaintiff HAMILTON as the shooter.  Defendant SCARCELLA also threatened to violate her parole (for consorting with Mr. Cash, a known felon) and take her children away if

she did not accuse Mr. HAMILTON of the crime.

41.     The coercion of Ms. Smith continued through and to her grand jury testimony a few days later.  Every time she wavered, defendant SCARCELLA, aided by defendant PONZI (who was now involved in the case on behalf of the District Attorney's office, and who would later testify that it was part of his job to hold reluctant prosecution witnesses to their stories) and/or JOHN/JANE DOE NOS. 1 through 10, threatened to take her children away and send her to prison for parole violation if she did not testify that plaintiff HAMILTON committed the murder.  This coercion continued even after the defendants obtained the results of ballistics evidence from the crime scene, which was inconsistent with the story they had coerced Ms. Smith to tell.

42.     Through the coercion of Ms. Smith's perjured testimony before the grand jury, defendants SCARCELLA, PONZI and/or JOHN/JANE DOE NOS. 1 through 10 caused plaintiff HAMILTON to be indicted without probable cause and through manipulation and fraud.

43.     Further, through this coerced and false identification and the indictment fraudulently obtained thereby, defendant SCARCELLA, acting in concert with defendants WHITE and JOHN/JANE DOE NOS. 11 through 20, arranged for plaintiff HAMILTON to be arrested without probable cause, brought to Kings County, arraigned and incarcerated.

44.     In addition, defendant SCARCELLA commanded and importuned defendant WHITE and/or JOHN/JANE DOE NOS. 11 through 20 to visit and intimidate potential defense witnesses residing in New Haven.  Defendant WHITE and/or JOHN/JANE DOE NOS. 11 through 20, conspiring and acting in concert with defendant SCARCELLA, did in fact visit, threaten and intimidate potential alibi witnesses so that they would not testify on behalf of plaintiff HAMILTON.

45.     In particular, defendant WHITE, at the behest of and acting in concert with SCARCELLA, visited Alphonso Dixon, who could have attested to plaintiff's presence in New Haven, and threatened that he would die in prison if he testified for the plaintiff.  This threat carried great weight because Mr. Dixon was an informant for defendant WHITE, and defendant WHITE would thus have been able to charge him with numerous crimes.  This threat also intimidated Mr. Dixon's wife Mattie Dixon, who feared to testify for Mr. HAMILTON lest her husband be sent to prison for life.

46.     Defendant WHITE, at the behest of and acting in concert with defendant SCARCELLA, also visited, intimidated and threatened other potential alibi witnesses who resided in New Haven and who could have testified for the plaintiff.

47.     The People's case against Mr. HAMILTON began to fall apart even before he was arrested.  Notably, shortly after her initial interview with defendant SCARCELLA, Ms. Smith contacted George Sheinberg, Esq., and recanted.  She was forcibly brought back from her new place of residence under a material witness order, procured by SCARCELLA, PONZI and/or JOHN/JANE DOE NOS. 1 through 10, and threatened by SCARCELLA and/or PONZI with *inter alia* imprisonment and the loss of her children.  At any further point when Ms. Smith wavered, SCARCELLA and/or PONZI would repeat these threats.

48.     As a direct result of the aforesaid threats, Jewel Smith gave false and perjured testimony against plaintiff HAMILTON at his trial.  This testimony was the sole evidence against him: there were no other eyewitnesses, no admissions or confessions, no forensic evidence pointing to him, and no video footage.  In addition, as was well known to defendants SCARCELLA, PONZI and JOHN/JANE DOE NOS. 1 through 10, her trial testimony was contrary to scientific evidence: for instance, she claimed that Mr. Cash was shot in the narrow

9

vestibule of an apartment building, despite the fact that there was no blood spatter at that location.

49.     In addition, defendants DeLOUISA, SCARCELLA, PONZI and JOHN/JANE DOE NOS. 1 through 10 ignored, buried and failed to investigate evidence which would have exculpated plaintiff HAMILTON, including but not limited to the fact that the ballistics evidence from the crime scene did not match Ms. Smith's coerced account of the shooting, the fact that Taseem Douglas, who was known to be present, had seen someone else commit the crime, and the fact that "Money Will" Dawson, one of the actual shooters who was known to have been at the scene, had visited and threatened Jewel Smith shortly after the shooting.

50.     Plaintiff HAMILTON was convicted of the crime based solely on the perjured testimony of Ms. Smith which was coerced and fabricated by defendants SCARCELLA, PONZI and/or JOHN/JANE DOE NOS. 1 through 10.  Moreover, it was withheld from him until after trial that the "Karen Smith" who had told defendant DeLOUISA that she did not see the crime was in fact Jewel Smith.  Upon information and belief, DeLOUISA and/or SCARCELLA failed to inform the prosecutor that Jewel and Karen Smith were one and the same, in violation of their obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, resulting in the prosecutor failing to inform plaintiff's counsel of this fact. This enabled the prosecutor to argue that Ms. Smith had identified plaintiff HAMILTON as the shooter immediately at the crime scene, which was in fact a false story fabricated by defendants DeLOUISA, SCARCELLA, PONZI and/or JOHN/JANE DOE NOS. 1 through 10.

51.     After trial but before sentencing, Ms. Smith executed an affidavit recanting her trial testimony.  A hearing was held at which Ms. Smith testified under oath, as a People's witness, that her trial testimony was false, that Mr. HAMILTON did not commit the crime, and

10

that her testimony against him was the product of threats from defendants SCARCELLA and/or PONZI.

52.     Additionally, Felicia Shuler, a disinterested person, came before the court during the 330.30 hearing and testified that she and Jewel Smith were at the corner Key Food Supermarket on Nostrand and Monroe Avenues, when they heard gunshots.  After leaving the store, they went around the corner to discover Mr. Cash lying on the ground shot.  Ms. Shuler did not know Mr. HAMILTON or Mr. Cash and had no reason to lie about this case.  She simply knew that Ms. Smith had lied at trial, and came forth to advise the court that Ms. Smith could not have witnessed the murder because they were together out of sight of the shooting.  No evidence has been ever presented to discredit Ms. Shuler.

53.     Following Ms. Smith's testimony, defendant SCARCELLA falsely and perjuriously denied coercing her, and instead claimed falsely that her recantation was due to fear of plaintiff HAMILTON's family.  Notably, no evidence of actual threats was offered even by SCARCELLA.   The trial court nevertheless declined to vacate plaintiff's conviction and sentenced him to 25 years to life imprisonment.

54.     Following his conviction, plaintiff HAMILTON fought tirelessly to prove his innocence. On January 5, 1994, Mr. HAMILTON filed his first C.P.L § 440.10 motion to vacate his conviction, which was denied after a hearing on April 2, 1996.

55.     During this hearing, Taseem Douglas – who was indisputably present at the crime scene – testified that he saw the shooting and that the shooters were named "Money Will" Dawson (since deceased) and Amir Yaya Johnson, and not plaintiff HAMILTON.

56.     In response, defendants SCARCELLA and WHITE, acting in concert and conspiring with each other, fabricated evidence to discredit Mr. Douglas on a collateral matter

Case 1:15-cv-04574-CBA-VMS   Document 1   Filed 08/05/15   Page 12 of 33 PageID #: 12

and presented false testimony to the hearing court.

57.     On the basis of the perjury and fabrication by SCARCELLA and WHITE, the hearing court refused to credit Mr. Douglas and declined to vacate Mr. HAMILTON's conviction.

58.     Additionally, plaintiff HAMILTON brought forward the affidavits of Kelly Turner and Davette Mahan, who placed him in New Haven at the time of the crime; however, the hearing court refused to hear these witnesses on the ground that they had not been listed in the pretrial alibi notice.

59.     On September 3, 1998, plaintiff HAMILTON filed his second C.P.L. § 440.10 motion, which was denied after a hearing on November 22, 2000.  On June 2, 2000, Mr. HAMILTON filed his third C.P.L. § 440.10 motion to vacate his conviction, which was denied without a hearing on November 22, 2000 as well.

60.     On August 27, 1999, plaintiff HAMILTON perfected the direct appeal of his conviction.  The conviction was affirmed by the Second Department on May 22, 2000.  The Court of Appeals denied his application for leave to appeal on November 20, 2000.

61.     On March 16, 2001, plaintiff HAMILTON sought habeas corpus relief in federal court pursuant to 28 U.S.C. § 2254, which was subsequently denied on January 16, 2004.

62.     On April 19, 2005, plaintiff HAMILTON filed his fourth C.P.L. § 440.10 motion to vacate his conviction, which was denied on May 17, 2006.

63.     On April 1, 2008, plaintiff HAMILTON filed his fifth C.P.L. § 440.10 motion to vacate his conviction, which was also denied on September 16, 2008.

64.     Throughout this time, plaintiff HAMILTON languished in state prison under horrific conditions, including ten years of solitary confinement, causing him to suffer a

breakdown and attempt suicide.

65.     In each of the motions cited above, plaintiff HAMILTON presented evidence of his actual innocence, some of which was denied after a hearing and most of which was denied on procedural grounds without a hearing.  However, this evidence is both credible and corroborated.

66.     For instance, Taseem Douglas testified at the first C.P.L. § 440.10 hearing.  The Kings County Case Bureau information sheet has Mr. Douglas listed as an eye-witness to the Cash murder. At the hearing, Mr. Douglas identified Amir Yaya Johnson and Willie "Money-Will" Dawson as the individuals he saw shoot and kill Nathaniel Cash. Mr. Douglas' eyewitness testimony is corroborated by scientific proof – that is, reliable and consistent ballistics and crime-scene evidence that is reliable – to prove that Mr. Cash was shot with two guns, inside and outside of 215 Monroe Place. And, more interestingly, Cash was shot in the back as he fled the residence trying to escape his assailants, exactly as Mr. Douglas testified.

67.     Moreover, Mr. Douglas' eyewitness account has Willie "Money-Will" Dawson staying at the crime scene and informing the family of the deceased that Derrick Hamilton shot and killed Mr. Cash.  This is corroborated to a great extent by Jewel Smith and Detective DeLouisa, both of whom have acknowledged that Mr. Dawson was present at the crime scene when they arrived.

68.     Additionally, plaintiff HAMILTON presented affidavits in his post-conviction motions, which were dismissed on procedural grounds, that established that Mr. HAMILTON was in New Haven, Connecticut on January 4, 1991 when Nathaniel Cash was killed in Brooklyn.  The alibi is proven by reliable witnesses, namely: highly decorated former New Haven Police Officer Kelly Turner, who now operates a charity for cancer survivors, and Davette Mahan, an ordained minister, schoolteacher and actor.  In addition, Nathaniel Cash's own child

13

mother Kim Freeman, and several others all attest that Mr. Hamilton was in New Haven, not Brooklyn, when Mr. Cash was killed.

69.     Hotel receipts and proof of purchase, which have been presented to the District Attorney's office, show that a party was in fact held at the Quality Inn Hotel as attested by the alibi witnesses, and that a room had been rented by Alphonso Dixon who lived a few blocks away from the hotel for several days.  The combination of the credible alibi witnesses and the corroborating documentary proof further establishes that he is innocent of the murder of Nathaniel Cash.

70.     Moreover, credible allegations have come to light in the past two years that defendant SCARCELLA had engaged in a pattern of corrupt and unconstitutional police practice before and during the time he was the lead detective in the instant case.  The credible allegations against SCARCELLA include *inter alia,* coaching of witnesses, fabrication of confessions, coercion of testimony, and the use of an unreliable, crack-addicted witness in at least seven (7) unrelated homicides.  In fact, to date the Kings County District Attorney's Office has vacated at least seven (7) different convictions in which SCARCELLA played a role in the investigation of the underlying crime and is investigating no less than seventy (70) more convictions in which SCARCELLA played a role.

71.     On March 21, 2013, David Ranta's conviction was vacated and the underlying indictment dismissed for the 1990 shooting death of Rabbi Haskel Werzberger after it was revealed that a prosecution witness was coached by the detectives to identify Mr. Ranta as the shooter, other prosecution witnesses recanted their testimony, witnesses were given improper incentives in exchange for their testimony, and police officers perjured themselves at trial and suppressed exculpatory evidence.

72.     In particular,  it was revealed during the proceeding that one of the witnesses who identified Mr. Ranta as the shooter, Menachem Lieberman, now claims that immediately prior entering the lineup room in August of 1990, he was told by a detective to "pick the guy with the big nose."

73.     Defendant LOUIS SCARCELLA was one of the assigned detectives on the Ranta case. Former ADA Taylor Koss, who handled the Ranta investigation for the Brooklyn District Attorney's Conviction Integrity Unit stated in the CBS documentary series "Brooklyn DA," that Detective Scarcella had been the police officer who ran the lineup.

74.     Since Mr. Ranta has been released, the Kings Country District Attorney's Conviction Review Unit has opened investigations into approximately 70 homicide cases where Detective Scarcella directed or was involved in investigations that led to convictions.  Moreover, as a result, various investigations by the media have uncovered aspects of SCARCELLA'S investigation that cast serious doubt on both credibility and the integrity of the evidence submitted in various murder convictions.

75.     For instance, an article by Frances Robles entitled "Review of 50 Brooklyn Murder Cases Ordered," *The New York Times*, May 11, 2013, A1, reported that the testimony of Teresa Gomez, was used by the prosecution in six unrelated cases where defendant LOUIS SCARCELLA was the lead detective, including the prosecutions of Alvena Jennette, Darrell Austin and Robert Hill, all of whom have since been exonerated by the Kings County District Attorney's office.

76.     The article cites Neil Ross, a former district attorney who *prosecuted both cases* against Robert Hill and is now a Manhattan Supreme Court judge, who wrote, *inter alia*, in a 2000 internet post that ""It was near folly to even think that anyone would believe Gomez about

15

anything, let alone the fact that she witnessed the same guy kill two different people."

77.     Another New York Times investigation into defendant SCARCELLA'S cases found similar language was used in at least five confessions allegedly elicited by SCARCELLA, including the confession of David Ranta, who has always stated that he never confessed.  Francis Robles, "In Confession Detective Took, Shared Phrases," *The New York Times,* June 13, 2013, A1

78.     The New York Times also reported that the District Attorney's inquiry revealed that one witness, Sharon Ivory, says he was coaxed into giving a false identification of Sundhe Moses at a photo array in a SCARCELLA-related murder case.  Francis Robles, "Murder Witness Says Police Coached Lie in 1995," *The New York Times*, October 3, 2013, A1. Moreover, Moses has long asserted that his confession was coerced by physical abuse by SCARCELLA.

79.     Sundhe Moses was recently released on parole and his case is under continuing investigation by the Kings County District Attorney's Conviction Review Unit.

80.     In the interim, on July 7, 2009, Mr. Hamilton filed his final C.P.L. § 440.10 motion to vacate his conviction arguing that the cumulative effects of new evidence presented since his trial mandated vacatur of his conviction pursuant to C.P.L. § 440 (1)(g), and that he was further entitled to raise a free-standing claim of actual innocence.  Defendant was joined in his motion by Attorneys Jonathan Edelstein and Robert Grossman, who filed an amicus memorandum on his behalf that asserted, *inter alia,* that Mr. Hamilton had demonstrated a prima facie case that he was actually innocent and that he should be able to present his evidence at a hearing on a freestanding claim of actual innocence.

81.     Subsequently, on January 15, 2014, the Appellate Division, Second Department,

held that Mr. Hamilton was entitled to an evidentiary hearing on his claim of actual innocence. As a result, the Kings County District Attorney's office agreed to reinvestigate the case and came to the conclusion that, *inter alia*, Jewel Smith's trial testimony was untruthful and that plaintiff Hamilton's due process rights had been violated. The District Attorney's office accordingly agreed to vacate Mr. Hamilton's conviction and dismiss the indictment.

82.    On January 9, 2015, the Kings Country District Attorney, represented by Assistant District Attorney Mark Hale, stated the following in support of their conclusion that Mr. Hamilton's conviction should be vacated and his indictment be dismissed:

> As the court knows, the proceeding that was before the court was delayed for sometime because the Conviction Review Unit of the district attorney's office was investigating the case at the request of Mr. Hamilton. This investigation has taken the better part of the last year.
>
> As a result of that investigation, your Honor, we found that in this particular case, the sole eyewitness against Mr. Hamilton at trial, in analyzing her testimony and her statement, the Peope have determined – the Conviction Review Unit has determined that she is, as a whole, unreliable, incredible and for the most part untruthful. And because she was unreliable, untruthful, and incredible in her testimony against Mr. Hamilton being the sole eyewitness, they had to depend upon her credibility in order to convict Mr. Hamilton.
>
> Because of that, Mr. Hamilton's due process rights were violated by the use of this witness at trial because of the nature of her inconsistency and incredibility. As a result, the district attorney has determined the conviction against Mr. Hamilton cannot stand, it should be vacated.

83.    In addition, Mr. Hamilton moved to vacate his conviction "based on the totality of [the] 440 motion and subsequently, investigation by the People."

84.    The Kings County Supreme Court (Guzman, J.) then granted both plaintiff Hamilton's CPL § 440.10 motion and the People's application, vacated Mr. Hamilton's

conviction and dismissed the indictment, causing the claims herein to accrue.

**AS AND FOR A FIRST CAUSE OF ACTION: 42 U.S.C. §
1983 (DEFENDANTS SCARCELLA, DeLOUISA, PONZI,
WHITE AND JOHN/JANE DOE NOS. 1 THROUGH 20)**

85.     The allegations in paragraphs 1 through 84 of the complaint are repeated and realleged as if fully set forth herein.

86.     Defendants SCARCELLA, DeLOUISA, PONZI, WHITE and JOHN/JANE DOE NOS. 1 through 20 deprived plaintiff HAMILTON of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States by manner and means including but not limited to the following:

a.     Fabricating the alleged identification of plaintiff HAMILTON by Jewel Smith by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that Ms. Smith identify plaintiff as the shooter;

b.     Inducing, suborning, coercing and/or allowing Ms. Smith to perjure herself at the grand jury and during the plaintiff's trial;

c.     Intimidating, threatening and/or coercing potential defense witnesses in New Haven;

d.     SCARCELLA's perjurious testimony regarding his interaction with Ms. Smith and alleged threats to Ms. Smith by plaintiff and/or his family;

e.     Fabrication of evidence and presentation of perjurious testimony to discredit Taseem Douglas;

f.     Failure to disclose exculpatory material, including but not limited to the fact that the "Karen Smith" who had told defendant DeLOUISA that she did not see the shooting was the same person as Jewel Smith, to both the

District Attorney's Office and ultimately to the defense;

g.      Failure to investigate, obtain and/or follow up on exculpatory evidence of which they knew or should have known, including but not limited to the presence of Taseem Douglas and "Money Will" Dawson, threats made by "Money Will" to Ms. Smith, and/or ballistics evidence inconsistent with their theory of the case, and which would have proven Plaintiff's total innocence.

87.     In effecting each of the above deprivations, defendants SCARCELLA, DeLOUISA, PONZI and JOHN/JANE DOE NOS. 1 through 10 acted under color of New York State law.

88.     In effecting each of the above deprivations, defendants WHITE and JOHN/JANE DOE NOS. 11 through 20 acted under color of New York and/or Connecticut law.

89.     In effecting each of the above deprivations, defendants SCARCELLA, DeLOUISA, PONZI, WHITE and JOHN/JANE DOE NOS. 1 through 20 were deliberately indifferent to the constitutional rights of the Plaintiff.

90.     Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion and/or the willful failure to investigate exculpatory evidence, there was no probable cause to arrest, prosecute and convict the plaintiff.

91.     Because the plaintiff's conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, any probable cause that may arguably have existed at the time of the arrest was vitiated by the time of indictment, trial and/or conviction.

92.     Because the plaintiff's arrest and conviction was obtained through fraud, perjury,

coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, no presumption of regularity attaches to any act of the Defendants.

93.     Plaintiff's injuries were proximately caused by the aforesaid constitutional deprivations and conduct of the Defendants.

94.     By reason of the foregoing, defendants SCARCELLA, DeLOUISA, PONZI, WHITE and JOHN/JANE DOE NOS. 1 through 20 are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANTS CITY OF NEW YORK AND NEW YORK CITY POLICE DEPARTMENT)**

95.     The allegations in paragraphs 1 through 94 of the complaint are repeated and realleged as if fully set forth herein.

96.     The aforesaid constitutional violations were proximately caused by one or more policies, practices and/or customs of defendants CITY OF NEW YORK and/or NEW YORK CITY POLICE DEPARTMENT, including but not limited to fabricating false identifications either through unlawful coaching, suggestion, threats and/or coercion; fabricating evidence; perjury; intimidation of defense witnesses; failure to investigate exculpatory evidence; and failing to disclose exculpatory material.

97.     It was further the policy, practice and/or custom of defendant CITY OF NEW YORK and/or NEW YORK CITY POLICE DEPARTMENT to fail to train, discipline and/or supervise police officers so as to prevent them from fabricating false identifications either through unlawful coaching, suggestion, or coercion, fabricating evidence, perjuring themselves at trial, relying on witnesses known to be untruthful, failing to investigate exculpatory evidence, and failing to disclose exculpatory material

98.     The CITY OF NEW YORK and/or NEW YORK CITY POLICE DEPARTMENT knew to a moral certainty that its police officers would confront situations conducive to fabricating false identifications either through unlawful coaching, suggestion, or coercion suggestive identification procedures, fabrication of evidence, perjury, reliance on witnesses known to be untruthful, failure to investigate exculpatory evidence and/or failure to disclose exculpatory material.

99.     The CITY OF NEW YORK and/or NEW YORK CITY POLICE DEPARTMENT knew that such situations would lead to difficult choices of the type that training, supervision and/or discipline would help to resolve.

100.    The CITY OF NEW YORK and/or NEW YORK CITY POLICE DEPARTMENT knew that, in the event of an incorrect choice, a constitutional deprivation was highly likely to occur.

101.    There are many facts and circumstances from which these policies, patterns, practices and/or customs may be inferred.  To begin with, defendant SCARCELLA had already used perjured testimony in the prior homicide trials of Robert Hill, Alvena Jennette, Darrell Austin  and David Ranta despite clear notice that such testimony was false as well as fabricating other evidence against these defendants, coaching and/or suborning perjury from other witnesses, and withholding exculpatory evidence.  The prosecution of plaintiff HAMILTON was far from a one-time-only matter on SCARCELLA's part.

102.    Defendant SCARCELLA's manipulative tactics were remarked upon even prior to plaintiff HAMILTON's arrest.  During the trial of David Ranta, Judge Francis X. Egitto of the Kings County Supreme Court stated to counsel that, *inter alia*, SCARCELLA and other detectives had "taken it upon themselves to be judge, jury and partial executioner."  At the earlier

trial of James Jenkins in 1987, Judge Egitto condemned SCARCELLA's manipulative conduct of an identification procedure, including but not limited to allowing witnesses to mingle together and telling the witnesses "We have the guy who committed the murder."

103.    Also, SCARCELLA was a high-profile detective in Brooklyn during the 1980s and was considered a hero or "rock star" within the department.  His fame extended outside the NYPD, and he was profiled by *inter alia* Mike Lupica as a detective who could obtain confessions in difficult cases.  It may be inferred from this that his proclivities were well known within the department and that his superiors tolerated, acquiesced in and even encouraged them so long as they got results.

104.    Defendant SCARCELLA himself recently testified, during the CPL § 440.10 motion hearing of Shabaka Shakur (a defendant who alleges that SCARCELLA fabricated his confession), that there was essentially no oversight and supervision of Brooklyn homicide detectives in the 1980s, and that they could take on cases as they wished and investigate them in whatever manner they desired.  This constitutes an admission of that a policy, pattern, practice and/or custom of failure to supervise homicide detectives and ignoring their constitutional violations existed at the times relevant to this lawsuit.

105     Defendant SCARCELLA further stated during an interview on the Dr. Phil Show in 2007 that he had no rules when dealing with bad guys.  Again, given his high profile within the NYPD, it may be inferred that his lack of regard for "rules," including but not limited to constitutional protections, was well known within the department during the period he was active, including the 1980s, and that a policy, pattern, practice and/or custom of tolerating, failing to correct and even encouraging such disregard for the rules existed as long as the desired results were obtained.

106.    Further, defendant SCARCELLA's failure to follow police documentation, including the requirement to make notes and reports of so-called breakthroughs in the case, was readily apparent to any supervisor reviewing it at the time, and upon information and belief, this chronic failure to document infected the whole of the NYPD.

107.    Defendant SCARCELLA would ultimately be implicated in more than fifty (50) wrongful convictions involving coerced testimony, fabricated confessions, coaching of witnesses, perjury, knowing reliance on false witness testimony, failure to investigate and/or suppression of exculpatory evidence, and other improprieties.  There were seven (7) unrelated cases in which SCARCELLA used the testimony of Teresa Gomez alone.  Again, the sheer scope of defendant SCARCELLA's impropriety and the fact that he was able to get away with it for so long evinces acquiescence, failure to supervise, failure to train and/or even active encouragement by his superiors up to and including City policymakers.

108.    Indeed, in granting the 440.10 motion of Rosean Hargrave, who was wrongfully convicted of a crime occurring before the shooting of Nathaniel Cash and who was tried before plaintiff's trial, Judge ShawnDya L. Simpson of the Kings County Supreme Court stated *inter alia* that "[t]he pattern and practice of SCARCELLA's conduct… manifest[s] a disregard for rules, law and the truth."

109.    Similar findings were recently made by Judge Desmond Greene of the Kings County Supreme Court in vacating the conviction of Louis Holmes a/k/a Shabaka Shakur, who also was arrested and tried prior to the plaintiff's arrest and trial.

110.    Additional proof of a culture of unconstitutional conduct in the NEW YORK CITY POLICE DEPARTMENT at that time exists in the form of other Brooklyn cases, *not* involving defendant SCARCELLA, in which similar misconduct occurred, including but by no

means limited to:

  a.  The prosecution of Jabbar Collins, in which a witness was threatened into testifying against the defendant (Mr. Collins was exonerated by the Kings County District Attorney's office in 2010);

  b.  The prosecution of Derrick Deacon in 1989, in which a witness was coerced into lying by threats to take her children away (Mr. Deacon was acquitted at a 2013 retrial);

  c.  The prosecution of Jonathan Fleming in 1989, in which the sole eyewitness was charged with a crime and questioned for several hours before identifying the defendant and having the charges against her dismissed; and

  d.  The prosecution of William Lopez, also in 1989, in which there was no physical evidence and the sole eyewitnesses, two crack addicts, were coerced by the police (Mr. Lopez was exonerated in 2013).

The fact that a significant number of Brooklyn homicide detectives felt free to act in a similar manner to SCARCELLA during this period supports a clear inference that such tactics were considered normal, acceptable and to be encouraged within the Brooklyn homicide squad, and thus rose to the level of a pattern, practice and/or custom.

  111. Further evidence of an unconstitutional policy, pattern, practice and/or custom comes from the hearing testimony of defendant PONZI, who testified that it was part of his job to keep reluctant witnesses in line, indicating that it was an officially sanctioned and tolerated investigative practice to threaten and coerce witnesses who attempted to recant, regardless of the truth of their recantations.

  112. The existence of unconstitutional policies, patterns, practices and/or customs

within the NEW YORK CITY POLICE DEPARTMENT can be further inferred through the conclusions of the July 7, 1994 Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), which covered the period of the 1980s as well as the early 1990s, and which included *inter alia* a finding that perjury and falsification of evidence was widespread within the NYPD.   Among the report's conclusions was that corruption within the NYPD was "characterized by brutality, theft, abuse of authority and active police criminality."

113.    Further, the unconstitutional policies, patterns, practices and/or customs of the City, as stated above, may be inferred from the following cases in which constitutional violations similar to those in the instant case occurred:

a.    People v. Lumpkins, 141 Misc. 2d 581 (Sup. Ct. Kings Co. 1988) (finding that, during 1986 investigation, Brooklyn homicide detective withheld an exculpatory DD5 in bad faith);

b.    People v. Llewelyn, 136 Misc. 2d 525 (Sup. Ct., Kings Co. 1987) (knowing presentation of false evidence to a Kings County grand jury);

c.    People v. Pilotti, 127 A.D.2d 23 (1st Dept. 1987) (withholding of Brady material);

d.    People v. Hopper, 87 A.D.2d 193 (1982) (withholding of Brady material);

e.    People v. Figueroa, 167 A.D.2d 101 (1st Dept. 1990) (perjury in 1987-88 criminal proceeding);

f.    People v. Thompson, 71 N.Y.2d 918 (1988) (withholding of Brady material);

g.    People v. Alexander, 136 A.D.2d 332 (1st Dept. 1988) (grand jury testimony that was, at minimum, "misleading and inaccurate," and likely perjurious);

h.    People v. Springer, 122 A.D.2d 87 (2d Dept. 1986) (suppression of Brady

material by Queens police officers);

i.  People v. Karpowski, 99 A.D.2d 118 (1st Dept. 1984) (use of evidence incredible as a matter of law);

j.  People v. Auletta, 88 A.D.2d 867 (1st Dept. 1982) (use of evidence incredible as a matter of law);

k.  People v. Miller, 121 A.D.2d 335 (1st Dept. 1986) ("patently tailored" police testimony);

l.  People v. Pantino, 106 A.D.2d 412 (2d Dept. 1984) (failure to preserve Brady material);

m.  Maxwell v. City of New York, 156 A.D.2d 28 (1st Dept. 1990) (perjury in connection with 1981 arrest; court found that police officer's sworn statements regarding identification by complainants were "a complete fabrication");

n.  People v. Robinson, 133 A.D.2d 859 (2d Dept. 1987) (withholding of Brady material);

o.  People v. Lebron, 184 A.D.2d 784 (2d Dept. 1992) (in connection with 1987-88 Kings County prosecution, finding that police testimony was incredible as a matter of law);

p.  People v. Tejada, 143 A.D.2d 51 (1st Dept. 1988), reinstated, 147 A.D.2d 367 (1st Dept. 1989) (withholding of Brady material);

q.  People v. Cardona, 138 A.D.2d 617 (2d Dept. 1988) (withholding of Brady material in Kings County case);

r,  Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992) (finding that, as to triable issues as to *inter alia*, whether policy of failure to train police officers

regarding perjury existed within the NYPD).

114.    It should be noted that the above, which are reported decisions, are only the tip of the iceberg, and that each represents dozens or even hundreds of other cases in which misconduct was not detected or in which it was detected but did not lead to a reported decision (due, for instance, to an acquittal or dismissal).

115.    Upon information and belief, ample other evidence of the above-stated unconstitutional patterns, practices, policies and/or customs exists, which is within the sole and exclusive knowledge of the defendants herein and which may be obtained through discovery.

116.    By reason of the foregoing, defendants CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 (AGAINST DEFENDANT CITY OF NEW HAVEN)

117.    The allegations in paragraphs 1 through 116 of the complaint are repeated and realleged as if fully set forth herein.

118.    The aforesaid constitutional violations were proximately caused by one or more policies, practices and/or customs of defendant CITY OF NEW HAVEN, including but not limited to fabricating false identifications either through unlawful coaching, suggestion, threats and/or coercion; fabricating evidence; perjury; intimidation of defense witnesses; failure to investigate exculpatory evidence; and failing to disclose exculpatory material.

119.    It was further the policy, practice and/or custom of defendant CITY OF NEW HAVEN to fail to train, discipline and/or supervise police officers so as to prevent them from fabricating false identifications either through unlawful coaching, suggestion, or coercion, fabricating evidence, perjuring themselves at trial, relying on witnesses known to be untruthful,

27

failing to investigate exculpatory evidence, and failing to disclose exculpatory material

120.     The CITY OF NEW HAVEN knew to a moral certainty that its police officers would confront situations conducive to fabricating false identifications either through unlawful coaching, suggestion, or coercion suggestive identification procedures, fabrication of evidence, perjury, reliance on witnesses known to be untruthful, failure to investigate exculpatory evidence and/or failure to disclose exculpatory material.

121.     The CITY OF NEW HAVEN knew that such situations would lead to difficult choices of the type that training, supervision and/or discipline would help to resolve.

122.     The CITY OF NEW HAVEN knew that, in the event of an incorrect choice, a constitutional deprivation was highly likely to occur.

123.     Facts from which the existence of the aforesaid policies, practices and/or customs may be inferred include the fact that, after rising to the rank of lieutenant, defendant BILLY WHITE was at the center of a massive police corruption scandal going back to the 1980s and 90s.  It was shown that WHITE, as well as numerous other members of the New Haven Police Department, sold their offices corruptly by taking official action in return for payment or favors. Upon information and belief, it was similar payment and/or favors that induced WHITE to intimidate witnesses on behalf of SCARCELLA and/or PONZI in the instant case.

124.     Earlier, in the 1970s, WHITE had been accused of planting false evidence in a New Haven narcotics case.

125.     Another New Haven corruption scandal involved celebrated detective Cinvent Raucci, who was revealed to have fabricated evidence in a number of murder cases, including through coercion and/or coaching of witnesses.  These allegations, documented in a 187-page FBI report, also date back to the early 1990s.

126.     The New Haven Independent has also reported that in the 1980s and early 1990s, racism and corrupt practices were common in the New Haven Police Department.

127.     Upon information and belief, ample other evidence of the above-stated unconstitutional patterns, practices, policies and/or customs exists, which is within the sole and exclusive knowledge of the defendants herein and which may be obtained through discovery.

128.     By reason of the foregoing, defendant CITY OF NEW HAVEN is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION: 42 U.S.C. § 1985 (AGAINST DEFENDANTS SCARCELLA, WHITE AND JOHN/JANE DOE NOS. 11 THROUGH 20)

129.     The allegations in paragraphs 1 through 128 of the complaint are repeated and realleged as if fully set forth herein.

130.     Defendants SCARCELLA, WHITE and/or JOHN/JANE DOE NOS. 11 through 20 conspired, by force, intimidation and/or threat, to prevent defense witnesses from attending court and testifying on behalf of plaintiff HAMILTON.

131.     Defendants SCARCELLA, WHITE and/or JOHN/JANE DOE NOS. 11 through 20 conspired, by force, intimidation and/or threat, to deprive plaintiff HAMILTON of his civil rights as alleged in the causes of action aforesaid.

132.     This cause of action is not barred by the intracorporate doctrine because defendant SCARCELLA on the one hand, and defendants WHITE and JOHN/JANE DOE NOS. 11 through 20 on the other hand, were employed by different police agencies.

133.     By reason of the foregoing, defendants SCARCELLA, WHITE and JOHN/JANE DOE NOS. 11 through 20 are liable to Plaintiff pursuant to 42 U.S.C. §§ 1985(2) and (3) for damages in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION: FALSE IMPRISONMENT

134.     The allegations in paragraphs 1 through 133 of the complaint are repeated and realleged as if fully set forth herein.

135.     By reason of the foregoing, defendants and each of them are liable to Plaintiff for false imprisonment in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION: MALICIOUS PROSECUTION

136.     The allegations in paragraphs 1 through 135 of the complaint are repeated and realleged as if fully set forth herein.

137.     By reason of the foregoing, defendants and each of them are liable to Plaintiff for malicious prosecution in an amount to be determined at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION: NEGLIGENCE

138.     The allegations in paragraphs 1 through 137 of the complaint are repeated and realleged as if fully set forth herein.

139.     Defendants, their employees, agents and/or servants were careless, reckless and/or negligent in failing to investigate exculpatory evidence of which they knew or should have known; failing to implement policies, practices and/or procedures to ensure that unconstitutionally fabricated identifications would not occur; failing to implement policies, practices and/or procedures to ensure that evidence would not be fabricated against criminal defendants; failing to implement policies, practices and/or procedures to ensure that police officers would not perjure themselves at criminal trials; failing to implement policies, practices and/or procedures to ensure that exculpatory evidence would not be withheld; failing to implement policies, practices and/or procedures to ensure that defense witnesses would not be

30

intimidated; failure to exercise proper oversight, supervision and/or control to ensure that police officers and investigators did not run roughshod over the civil rights of the people of the city; and in otherwise being careless, reckless and/or negligent.

140.    Plaintiff's injuries and each of them were proximately caused by the aforesaid carelessness, recklessness and/or negligence of the defendants.

141.    By reason of the foregoing, defendants and each of them are liable to Plaintiff for negligence in an amount to be determined at trial.

**AS AND FOR AN EIGHTH CAUSE OF ACTION: NEGLIGENT HIRING, RETENTION AND/OR SUPERVISION (AGAINST DEFENDANTS CITY OF NEW YORK AND NEW YORK CITY POLICE DEPARTMENT)**

142.    The allegations in paragraphs 1 through 141 of the complaint are repeated and realleged as if fully set forth herein.

143.    Defendants CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT were on actual and constructive notice prior to plaintiff's arrest and trial that LOUIS SCARCELLA and JOSEPH PONZI were unfit to serve as law enforcement officers.

144.    Nevertheless, defendants CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT hired, retained and promoted SCARCELLA and PONZI in law enforcement capacities in which they were unfit to serve.

145.    Defendants CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT further failed to exercise adequate and reasonable supervision, oversight and/or control over defendants SCARCELLA and PONZI, thus enabling them to pursue their unconstitutional practices and objectives.

146.    Plaintiff's injuries and each of them were proximately caused by the conduct of defendants CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT as

31

aforesaid.

147.    By reason of the foregoing, defendants and each of them are liable to Plaintiff for

negligent hiring, retention and/or supervision in an amount to be determined at trial.

## **ATTORNEYS' FEES**

148.    Pursuant to 42 U.S.C. § 1988, in the event that they prevail in this action, plaintiff

is entitled to attorneys' fees in an amount to be determined by this Court.

WHEREFORE, plaintiff demands judgment against defendants jointly and severally in an

amount to be determined at trial together with costs, disbursements, attorneys' fees and such

other and further relief as this Court may deem just and proper.

Dated: New York, NY
       August 5, 2015


                Respectfully Submitted,


                /s/ Jonathan I. Edelstein_____
                JONATHAN I. EDELSTEIN
                Attorney for Plaintiff
                Edelstein & Grossman
                501 Fifth Avenue, Suite 514
                New York, NY 10017
                (212) 871-0571
                (Counsel to be Noticed)


                /s/ Ilya Novofastovsky_____
                ILYA NOVOFASTOVSKY
                Attorney For Plaintiff
                Novo Law Firm, P.C.
                299 Broadway, 17th Floor
                New York, NY 10007
                (212) 233-6686

/s/ Scott Brettschneider
SCOTT BRETTSCHNEIDER
Attorney for Plaintiff
125-10 Queens Blvd., Suite 6
Kew Gardens, NY 11415
(516) 987-3616