UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


DERRICK HAMILTON,              *     Case No. 15-CV-4574(CBA)
                              *
            Plaintiff,        *     Brooklyn, New York
                              *     April 19, 2016
     v.                       *
                              *
CITY OF NEW YORK, et al.,     *
                              *
            Defendants.       *
                              *
* * * * * * * * * * * * * * *

          TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
               BEFORE THE HONORABLE VERA M. SCANLON
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            JONATHAN ISIDOR EDELSTEIN, ESQ.
                              Edelstein and Grossman
                              271 Madison Avenue
                              New York, NY  10016


For the Defendant,            JEFFREY LOPERFIDO, ESQ.
 New York City Police Dept.:  ANGHARAD K. WILSON, ESQ.
                              New York City Law Department
                              Special Federal Litigation
                               Division
                              100 Church Street
                              Room 3-197
                              New York, NY  10007


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES:  (Cont'd.)

For the Defendant,                    RICHARD ERNEST SIGNORELLI, ESQ.
 Det. Louis Scarcella:                Law Office of Richard E.
                                        Signorelli
                                      799 Broadway, Suite 539
                                      New York, NY  10003

                                      BRIAN HA, ESQ.
                                      405 Tarrytown Road, #1244
                                      White Plains, NY  10607


For the Defendant,                    SCOTT MICHAEL KARSTEN, ESQ.
 Police Officer Billy White:          Karsten & Tallberg, LLC
                                      500 Enterprise Drive, Suite 4B
                                      Rocky Hill, CT  06067

1          (Proceedings commenced at 12:02 p.m.)

2          THE COURT:  This is Judge Scanlon.  Thanks for

3     holding.  So we're on the line for a telephone conference in

4     Hamilton vs. The City of New York, 15-CV-4574.

5          If we could start with plaintiff's counsel's

6     appearance first.

7          MR. EDELSTEIN:  Jonathan Edelstein for the

8     plaintiff.  Good morning, Your Honor.

9          THE COURT:  Good morning. And then for Defendant

10    Scarcella.

11         MR. SIGNORELLI:  Richard Signorelli and Brian Ha.

12    Good morning, Your Honor.

13         THE COURT:   Good morning. All right.

14         MR. LOPERFIDO:  For the New York City defendants,

15    you have Jeff Loperfido and Angharad Wilson.

16         THE COURT:  Okay.

17         MR. KARSTEN:  And for the City of New Haven

18    defendants you have Scott Karsten.  Good morning, Your Honor.

19         THE COURT:  Good morning.  Okay.  We've got

20    everybody.  All right.  So we're picking up from discovery

21    from the other day.  Any progress on any of these issues

22    between and among yourselves?

23         MR. SIGNORELLI:  Your Honor, this is Richard

24    Signorelli on behalf of Detective Scarcella.

25         If I may, I'd like to briefly address an item in

1    your prior order regarding the index type documents.

2            Again, I'm at a limitation, which I hope is

3    temporary, in that I have not seen any of these documents.  So

4    I'm not aware of their content.  So I could only speak

5    generally.

6            But our position is that to the extent certain

7    underlying information concerning his disciplinary record, if

8    any, personnel related files, to the extent any of that is not

9    otherwise discoverable, either because of staleness or not

10   being related enough to the allegations in this particular

11   case, the same principles should apply to summary type

12   information for those items.

13           And we would like -- you know, very simply, we don't

14   want to make the decision as to what the plaintiff should get

15   or not and -- but we would like the opportunity before these

16   things are ordered to be turned over wholesale to the

17   plaintiff's counsel, we would like the opportunity of arguing

18   to Your Honor that certain items, if any, should not be

19   disclosed for those two reasons, whether summary items or the

20   underlying information relating to the summary items.  And

21   that could also involve an in camera inspection as well.

22           And this is something that we respectfully believe

23   is very important in order to allow plaintiff access to

24   everything their entitled to under the law, but no more than

25   that.

1          THE COURT:  All right.  For the --

2          MR. SIGNORELLI:  And that would be item three in

3     your prior order, Your Honor.

4          THE COURT:  Right.  Plaintiff's argument.

5          MR. EDELSTEIN:  Your Honor, Jonathan Edelstein for

6     the plaintiff.  This was discussed at last week's conference

7     and the court ruled, and I would submit properly, that there's

8     not going to be a preliminary stage of review of the summary

9     or indexed documents.

10          And first of all, this is proper because there's a

11     confidentiality stipulation in effect in this case and,

12     therefore, there's no risk that information in these indexed

13     documents are going to be disseminated beyond the circle of

14     counsel and their clients.

15          And second of all, these index documents, from what

16     I understand, essentially are indexes.  They don't contain

17     detailed information.  They basically identify what the

18     documents in the file are.

19          And I don't think there is anything about that that

20     would go beyond what the plaintiff is entitled to receive.

21          Certainly, when it comes to whether the particular

22     underlying documents that are listed on the index should be

23     disclosed, some of those things the plaintiff might not want.

24     Others of those things may become subject of litigation, but I

25     don't see any reason for this to apply to indexes themselves

1    and I don't think there's any reason for the further delay in

2    discovery that would be required if we're going to argue over

3    the index before there's even any disclosure as to what

4    documents are in these files. I think it's an unnecessary and

5    wasteful layer of review.

6            MR. SIGNORELLI:  Just a brief reply, Your Honor.

7    This is not a matter of information going beyond the case and

8    I would hope plaintiff's counsel would not be disseminating

9    information outside this lawsuit.  This is a matter of what is

10   the plaintiff entitled to receive and not entitled to receive

11   under the law in this district with regard to these matters.

12           And if the matters are old or unrelated, they're not

13   entitled to this information within the confines of this

14   lawsuit and that's our position.

15           And again, we're not asking Your Honor to give us

16   permission to choose ourselves.  We're asking for the ability

17   to argue the point before Your Honor, including an in camera

18   review of the documents so this is done properly, so that

19   plaintiff gets what they're entitled to and so that the

20   defendant's rights are also protected here.

21           And we don't want the plaintiff to receive things

22   that they're not entitled to received here.

23           THE COURT:  All right.  Look. The motion for

24   reconsideration, which is how I'm going to view this, is

25   denied.

1           We're talking about CCRB files, IAB files, other

2    similar types of indices.  And we already got to the point

3    that you're trying to make that there might be underlying

4    personal information, a carve out for the personal records and

5    you're going to be allowed to look at them and we'll see where

6    it goes.  If you have some objection, you can raise it before

7    they're turned over.

8           But all of these documents it would appear to relate

9    to the defendant's conduct in their professional capacity as

10   employees of the New York City Police Department. I understand

11   there's the DOE issue, but it's completely possible that all

12   of this material is relevant to the many, many issues that

13   come up in this case.

14          And this case is more complicated than your more run

15   of the mill 1983 case there.  And that's not to diminish those

16   folks -- you know, other plaintiff's claims.

17          It's just that they're simpler to administer the

18   litigation in cases that don't spend this kind of time.  That

19   do not have claims that the defendant engaged in a history and

20   a pattern of unlawful conduct and the point that was made last

21   time well, look.  They're looking for material that comes

22   after the point in time when the alleged violations happened

23   in this case.  And there's argument about whether the

24   violations continued after date certain that the defendants

25   were arguing for.

1          But it's certainly possible that these materials

2     include information that would be fair game for impeachment,

3     for other lines of investigation and we already -- let me step

4     back.

5          I don't necessarily think that any of this is

6     confidential or at least something that the plaintiff should

7     be precluded from seeing because this is the history of

8     someone's employment as an officer of with the police

9     department.

10          And they had -- that person, each of the defendants

11     had obligations that they should have abided by, maybe they

12     did, maybe they didn't.  I know we're dealing with New Haven

13     as well, but you know, the same general principles apply.

14          So the protection that the defendants are seeking,

15     which is that you don't dig too deeply into things that maybe

16     the -- sorry.  The defendant will be able to make an argument

17     about relevance because of timing, you're already getting that

18     protection by looking at the indices first.

19          And whether you're even entitled to it I think is an

20     open question, but we don't need to answer it because we can

21     start with the indices.  Try to make this a practical exercise

22     by knowing what the complaints are about.

23          I just don't know enough about who complained about

24     these officers, what was investigated, which body looked into

25     it and maybe each of the defendants would know the individual

1    situation.  I don't know how much the plaintiff knows.

2         But this is fair game.  It's absolutely potentially

3    relevant and the point of looking at the indices is less about

4    thinking that really there is any privacy here and more about

5    thinking how do we make this something manageable for

6    everybody.

7         So that's not to preclude you from making arguments

8    about privacy or relevance, but the federal rules, they're

9    very broad.  There's certainly a need to make this practical.

10        There is the, I suppose, re-emphasis on

11   proportionality in the restructuring of the federal rules that

12   happened late last year, but I think that this is absolutely

13   something that plaintiff is at least entitled to know what the

14   lay of the land is and go from there.

15        So these indices need to be produced.  Then you can

16   have your respective conversations about what is actually in

17   the materials and then if you can work it out, great.  And if

18   you can't, come back to me and let me know as to the

19   particular materials, why you think they shouldn't be

20   produced.  But I'm absolutely not going to change what

21   happened last week.  So --

22        MR. SIGNORELLI:  Your Honor, are you ordering the

23   production of these files without giving us an opportunity to

24   present them for an in camera review first?

25        THE COURT:  I'm not getting an in camera review.

1   What we talked about last week and what I decided, I'm going

2   to read it.  "Defendants are to provide all index type

3   documents as to personnel file, CPI, CCRB, IAV and/or similar

4   files.

5        Counsel are to review the documents produced and

6   confer as to whether and if the underlying documents should be

7   produced.

8        As to the defendant's personnel file, defendant's

9   counsel may make an initial review to produce redactions of

10  personal family" —- it should have said information.  "Counsel

11  should consult as to the information to be redacted.  As to

12  personal information, the productions is to be completed by

13  5/13/16."  These indices need to produced.

14       Now if they have Social Security numbers, they have

15  telephone numbers that are not relevant, then the cities can

16  take out that information but there's no review on the

17  indices.  They're producing it.

18       You can designate it as confidential if you think it

19  satisfies the confidentiality agreement that you have.  You

20  know, I'm not taking a position on that, but we can't even

21  have a meaningful conversation about this without the

22  plaintiff having some idea of what the files are.

23       Knowing that somebody had a charge against him or

24  her, hypothetically, in any particular year is not any breach

25  of someone's confidentiality.

1           The only question is whether it's relevant,

2    potentially given the span of this case.  Maybe some things at

3    certain periods of time would not be relevant and so it's not

4    worth the effort.  It would be disportionate to the effort

5    required to have to go and track down these old files or the

6    more recent files.

7           But you've got to produce these indices so we can

8    move onto the substantive question of what files need to be

9    produced.

10           So picking up on what we were talking about last

11    week. I think we -- this is looking at the letter that's filed

12    on April 7th.

13           MR. LOPERFIDO:  Your Honor, if you don't mind me

14    interrupting.  This is Jeff Loperfido from the City.

15           THE COURT:  Yes.

16           MR. LOPERFIDO:  At our last call Mr. Edelstein had

17    prior to the call proposed a potential solution to the tax

18    authorization issue and we, the City, have considered that and

19    I informed him earlier this morning that it was not a workable

20    solution.

21           So we wanted to present that issue to you now either

22    now or at the end, whenever you deem is fit.

23           THE COURT:  All right.  So let's start with -- it's

24    your motion.  Defendant's want the tax return so let's hear

25    from you, then hear from plaintiff.  So you want the tax

1    returns and the IRS authorizations, right?  So --

2              MR. LOPERFIDO:  Correct.

3              THE COURT:  So what do you want?

4              MR. LOPERFIDO:  So with regards to tax

5    authorizations we have requested -- or the returns themselves,

6    we've requested materials five years prior to the incident and

7    going through his time in custody.

8              If we were forced to prioritize, we'd be seeking

9    information prior to the arrest and the reasoning here is that

10   plaintiff has indicated in the response to discovery request

11   and elsewhere that they will be pursuing economic damages in

12   the form of lost earnings.

13             Lost earnings, the way that lost earnings are often

14   calculated is by looking at prior earnings, education, age and

15   then through the use of an expert, usually vocational

16   economists.  They will make some calculations based on

17   different points of data and extrapolate the type of income

18   that was lost during the time of incarceration.

19             I recently did this in the *Fernando Bernitez* matter

20   in the Southern District and with regards to the vocational

21   economists this is a source of information that they look to

22   to make these calculations based on reason and substance.

23             The objection that plaintiff has raised with regard

24   to the relevance and the compelling need, now with regard to

25   relevance, I think they are clearly relevant as to the lost

1    earnings issue and I think they also speak to some of the

2    other issues, which I'll get to in a moment.

3         With regard to need, plaintiff's counsel has

4    indicated that Mr. Hamilton does not have records from that

5    time, not surprisingly. I doubt many of us do.

6         And add to the compelling need prong of the test for

7    the production of executed tax authorizations, if the

8    material's not available elsewhere, that can create compelling

9    need.

10        So with regard to relevance, again, we have the lost

11   earnings.  The Second Circuit recently in a 2015 opinion

12   commented on the appropriateness of looking to past earnings

13   for calculating future lost earnings.  So I think relevance is

14   met there.

15        But it also speaks to both the alibi that Mr.

16   Hamilton is purporting in this case and to his credibility.

17        He has testified in his 50(h) testimony in this case

18   that he was employed prior to his incarceration.  He was

19   employed at a gas station at one point in time.  He was

20   employed as a car garage attendant at another point in time.

21   He claims to have worked 40 hours a week.  He says he was

22   paid in cash.

23        So perhaps that's true.  We should have the ability

24   to authenticate that with the IRS and if he was paid in cash

25   and he didn't file his taxes, I think that speaks to

1    credibility as well.

2         There's also the issue of his existence in the New

3    Haven area after the alleged -- after the murder of Nathaniel

4    Cash in this case.

5         Mr. Hamilton was on parole due to a prior

6    manslaughter conviction.  He was likely in violation of his

7    parole while being in Connecticut, but he claims that he was

8    starting a business, a hair salon, in Connecticut and

9    presumably there would be records about his ability to have

10   taken investment into the company, hired employees.  He could

11   -- I know there -- her suggestions and it's going to be his

12   testimony that the business failed because of his arrest.

13        All of that goes to the issue that we shouldn't have

14   to take his word that he either didn't make any income or

15   never submitted his taxes, or whatever else he might want to

16   stipulate to.

17        We should be permitted to keep those authorizations

18   from the IRS, have a final and conclusive and authentic answer

19   and then go from there.

20        THE COURT:  What's the issue about the alibi?  I

21   don't understand, from what you said, how that tax returns

22   would be relevant to that.

23        MR. LOPERFIDO:  He claims that he was starting a --

24   he was a co-owner of a hair salon in the New Haven area.  He

25   was arrested at the hair salon in this case, in March, about

1      three months after the homicide in this matter.

2            And he claims that the matter failed because he was

3      arrested and he was, you know, co-owner and pulled from that

4      property, pulled from that business.

5            So I think to the extent -- giving him a proper

6      reason to be in New Haven as opposed to being in New Haven

7      because he had committed a crime and was trying to escape

8      prosecution I think it speaks to the issue of whether this

9      business existed, what stage it was in.  Whether there was any

10     government submissions that would substantiate the idea that

11     he was in this business.

12           And again, it speaks to alibi, but it also speaks to

13     any claimed loss of income, if that is going to be a source of

14     a 8.2 as something that went array due to his arrest.

15           THE COURT:  All right.  For plaintiff.

16           MR. EDELSTEIN:  Okay. Your Honor, first of all, I

17     would note that the City's argument has been directed to pre-

18     incarceration tax information, rather than post-release tax

19     information.

20           And I don't believe counsel has really spoken to the

21     relevance of the post-release tax returns that they've

22     demanded, and I would submit that they're not really relevant,

23     because they're occurring after Mr. Hamilton's life took a

24     very different turn from what it would have taken if not for

25     his arrest here.

1    And I don't think they're really that indicative of

2    what career path he would have taken or what he would have

3    learned, or what he would have earned, that is, but for the

4    arrest.

5    Now going to the pre-incarceration tax information,

6    we have offered to stipulate that Mr. Hamilton did not file

7    taxes prior to his incarceration because as he testified

8    during the 50(h) hearing, you know, he did have a job in

9    Brooklyn but it was off the books.

10    And the City could certainly make whatever

11    credibility arguments it seeks to make from that.  It would

12    have a stipulation that he worked, but didn't file taxes and

13    it could make any credibility arguments to the jury on that

14    basis.

15    And I would submit also that in terms of the

16    business in New Haven, which really was just getting off the

17    ground at the time of his arrest. I mean, on the date of his

18    arrest I believe his testimony at the 50(h) was that some

19    people were in there fixing up the store, you know, getting it

20    ready to be opened still.  I could be wrong about that.  I'm

21    sure counsel will correct me if I am.

22    But also I would submit that Mr. Hamilton testified

23    about who is co-owner was on the business, Alphonso Dixon, and

24    certainly the City could request from New Haven any business

25    license applications, permits, things like that, that were

1    filed either by Mr. Hamilton or Mr. Dixon during this relevant

2    period.

3                And if it finds that there were none, it can make

4    whatever arguments are to be made from that.  If it finds that

5    permits did exist, it can explore that issue further.

6                I would submit that tax information is not really

7    needed for this purpose and that, in fact, given that the

8    store either was just opening or hadn't opened, that tax

9    returns would be very little relevance and not informative.

10               THE COURT:  So that --

11               MR. EDELSTEIN:  With that said, I will abide by --

12   you know, the plaintiff will abide by whatever ruling was made

13   by the court.

14               THE COURT:  So is your client seeking lost income

15   for a period of what?  From his arrest forward to the present

16   lost income?  Is that what he's looking -- is that what he

17   wants?

18               MR. EDELSTEIN:  That's what he wants.

19               THE COURT:  Then you have to provide the IRS

20   authorizations for three years prior to his arrest, which

21   would give the defendants a baseline through the present.  All

22   right.

23               Next issue.  We should do it let's say in the next

24   ten days.

25               MR. EDELSTEIN:  Okay.  Within the next ten days IRS

1    authorizations for three years prior -- beginning three years

2    prior to the arrest through to the present.

3            THE COURT:  Yes.

4            MR. EDELSTEIN:  Is that a correct summation of the

5    ruling?

6            THE COURT:  Yes.  Okay.

7            All right.  Which issue would you like to deal with

8    next?

9            MR. LOPERFIDO:  The phone cut out.  I didn't hear

10   Your Honor's response to Mr. Edelstein.  Was that an accurate

11   --

12           THE COURT:  Yes.

13           MR. LOPERFIDO:  -- summary of the --

14           THE COURT:  Yes.  Three years prior to the arrest

15   through the present he's to provide the authorization for the

16   IRS records within the next ten days.

17           MR. EDELSTEIN:  Okay.  I guess, Your Honor, that the

18   next issue is the one below the -- bullet point below the

19   personnel files, which is our request for the files concerning

20   criminal cases that involved Detective Scarcella and in which

21   exonerations have occurred.

22           We're aware that as many as 70 cases may be under

23   review.  We're not asking for all of those files.  We're only

24   asking for the ones where there have been exonerations.  We're

25   willing to provide a list and we would also be willing to

1    limit our request for documents in those cases to those that

2    actually relate to Detective Scarcella.

3         And we submit that the relevance of this is very

4    similar to the relevance of the personnel files, which is that

5    these are cases which involved allegations of misconduct

6    against Detective Scarcella.  These are cases in which

7    exonerations have occurred.  So therefore, the allegations

8    would presumably be substantial.

9         These are also cases most of which bracket the time

10   period involved in this case, starting a few years prior to

11   Mr. Hamilton's arrest and going, I believe the most recent of

12   the exonerations involved the prosecution a few years after.

13        And that moreover these cases -- you know, because

14   the allegations against Detective Scarcella surfaced after his

15   retirement from the NYPD, we believe that they might not be

16   reflected in the personnel files, therefore, would not be

17   duplicative or redundant of the personnel files and this is

18   information that we believe to be relevant and to which we are

19   entitled.

20        I know that the City has raised the issue of whether

21   any of the files are sealed and if so, would that require an

22   authorization from the defendants involved.

23        We can certainly undertake to obtain such

24   authorizations. I don't believe it will be a great deal of

25   trouble to do so.

20

1            And I believe also that the sealing would apply only

2    to the court file and not to any internal files that the Kings

3    D.A. or that the NYPD might have.

4            And that for those reasons I would respectfully

5    submit that the courts order these files to be disclosed.

6            THE COURT:  So let me ask you, what exactly are you

7    looking for?  I mean, first, how many exonerations have there

8    been?

9            MR. EDELSTEIN:  I believe at the moment -- it's a

10    moving a target but I believe that the moment there have been

11    nine.

12            THE COURT:  Okay.  And are you looking for the full

13    underlying file.

14            Are you looking -- I understand you're saying you

15    just want Defendants Scarcella's information, but are you

16    looking for the file?  Are you looking for the exoneration

17    report?  Are you looking for the materials that support the

18    exoneration report?  What is it that you really want from

19    this?

20            MR. EDELSTEIN:  What we really want primarily is the

21    exoneration report and the materials that support the

22    exoneration report, specifically those that relate to the

23    investigation of the alleged acts of Detective Scarcella.

24            THE COURT:  Have these been released or I don't know

25    what's happened?  Were they exchanged in other cases?

Fiore Reporting and Transcription Service, Inc.   203-929-9992

1          MR. LOPERFIDO:  I can speak to that and the answer

2     is no.

3          These -- what has happened in the past is there is a

4     report, and we can all refer to the report that was produced

5     in this matter with regard to Mr. Hamilton.  And then there is

6     some sort of statement usually.

7          And this statement -- this case heard at a court

8     proceeding I think Mr. Edelstein was actually present at,

9     explaining the basis for the recommendation that in Hamilton's

10     case that his conviction be overturned.

11          These materials are not public.  They are sealed

12     pursuant to state statute.  In both the underlying materials,

13     the underlying criminal court file, the NYPD document, the

14     D.A. file. I've done some research in this area. I have never

15     seen a court order an unsealing -- make an unsealing order for

16     propensity evidence.

17          I've seen it in the context where a named defendant

18     has a criminal conviction that was sealed as a defendant the

19     plaintiff was pursuing those records and the court felt

20     because it related to the same activity that the 1983

21     litigation pertained to, that it was a relevant area of

22     discovery.

23          I've seen it in a class cert context, but I've not

24     seen a federal court balancing the important privacy interests

25     and strong policy autonomy between state and federal

1    sovereignties with regard to a state privilege to order the

2    unsealing of records that pertain to nobody in the case

3    without -- so perhaps that issue could be set aside if Mr.

4    Edelstein can chase down some of these other individuals who

5    have had their convictions overturned.

6              But with regard to the one -- with regard to these

7    matters being sealed pursuant to state law, that sort of is an

8    issue that we'd have to deal with at a (indiscernible).

9              THE COURT:  So your only objection is that there's a

10   160.50 sealing to the underlying facts.

11             MR. LOPERFIDO:  No, not at all.

12             THE COURT:  So what's -- all right.  Look.  There's

13   plenty of cases in which the federal court says that the state

14   court privilege doesn't trump the federal discovery rules.

15             So yes, it's correct. If the individuals are willing

16   to sign 160.50 releases, then that issue could be mooted out.

17             So what, if any, other objections do you have?

18             MR. LOPERFIDO:  Sure.  Let me start at the top.

19             And I want to draw a distinction from an argument

20   that was made at the last conference.

21             You made the argument that the IAB, the CCRB, the

22   CTI with no limitations, meaning through present day for these

23   individuals who had worked at NYPD or at the D.A. up until

24   2000 that seeking material from that live ray of time and

25   scope suggests that plaintiff was pursuing *Monell* discovery.

1  And I know that that argument wasn't received by Your Honor

2  and I understand that.

3          We did not make the argument that other stuff, you

4  know, prior to the incident or even subject matter related was

5  *Monell* discovery.

6          In this instance though I think there is a vast

7  difference in the types of material that we're talking about

8  and all you need to do to see that is refer to plaintiff's

9  complaint.

10          There's an allegation in the complaint, paragraph

11  101, and it describes these other incidents where it is

12  alleged that Detective Scarcella partook in some improper

13  conduct and that there's a direct line from the improper

14  conduct to the exoneration.   That's factually inaccurate, the

15  first part.

16          But even if that were true, the way he would proceed

17  to prove that -- and again this is a paragraph existing in the

18  complaint within the *Monell* section is to look at those

19  underlying files and see if through a course of conduct

20  reflected in those documents, which supervisors knew about

21  because the question with regard to *Monell* is noted, and

22  whether they ratified the behavior.

23          From those files you could make the argument that

24  the supervisors, the policy makers knew what he was doing.  He

25  was a rogue detective running wild and there's your *Monell*

1    claim.

2          That is the -- if these materials are relevant in

3    any respect it's that and *Monell* discovery has been stipulated

4    to be bifurcated and we think it's improper.

5          If the court were to hear that argument and find it

6    unconvincing, I think as to just relevance as to the files

7    themselves as it relates to Detective Scarcella and the impact

8    it would have in this case otherwise, plaintiff has not met

9    their burden in proving the relevance of this material, both

10   with regard to the particularity of specificity of what it is

11   they're actually requesting, putting specific cases before the

12   parties in this litigation so we could actually have a better

13   understanding of what the types of allegations are being

14   bandied about.

15         Plaintiff seems to be operating on a theory that

16   Detective Scarcella plus exonerations means he must have done

17   something wrong.  We have access to those files.  And I don't

18   think the rules of discovery or the case law in this area

19   would support that.

20         And to the extent that he's arguing that this

21   material is relevant with regard to 404(b) grounds, or

22   impeachment evidence, again, we would be looking to files

23   concerning criminal acts, homicides that had nothing to do

24   with the plaintiffs in this case that -- where Detective

25   Scarcella, he may have been the primary detective.  He may

1   have been a supporting detective. His involvement in the

2   specific matters may vary from case to case.

3          This isn't a case -- and I'll make a comparison that

4   some might be familiar with with regard to the allegations in

5   the news about Scarcella.  The notion that he used the same

6   homeless eyewitness in multiple cases.

7          This is not a Theresa Gomez case.  There is no

8   allegation that he used an improper witness.  The allegations

9   that Nathaniel Cash's girlfriend, who had spent the night at

10  his house and either was at the scene of the homicide or went

11  to the store and came back, he was killed.

12         This individual, Ms. Jewel Smith, had a history with

13  Derrick Hamilton.  Grew up in the same projects.  This is not

14  a case where we're pulling somebody else and you can kind of

15  tie -- like all three of the Gomez cases go together so you

16  should have discovery across those types of cases.  That's not

17  what we have here.

18         Even if the court were not persuaded by that, I

19  think the 160.50 issue raises an issue.  Beyond that, we then

20  have to discuss the burden in this case with regard to what

21  these files actually entail, and what we can use as a good

22  reference point and again, also that we haven't seen them and

23  the D.A. can't look at them because they are sealed in the

24  Derrick Hamilton matter.

25         What the files will show is that the CRU -- will

1    likely show.  Again, I don't know -- the CRU looked at the

2    underlying report. They spoke with all the witnesses again.

3    They looked at the original investigatory steps taken by

4    police and the district attorney.  They spoke to eyewitnesses.

5    They spoke to eyewitnesses who were fearful for their life.

6           They did a lot of case work that likely the majority

7    didn't actually deal with the detective on the case and

8    they've made some conclusions.

9           And those files are large.  They are dated and

10   they're being expensed both on the corralling and reviewing

11   aspect and a serious expense with -- and essentially you'd

12   have to be pulling somebody away from the Conviction Review

13   Unit, which was created very recently for a specific purpose,

14   to have them review these types of files just so that they can

15   be put into a litigation.

16          And you have to also question whether the fact that

17   this material becomes discoverable in a case like this makes

18   the Conviction Review Unit have a more challenging time doing

19   their job going forward, speaking to other witnesses.  Again,

20   speaking to witnesses who are fearful for their life because a

21   lot of these cases involve allegations of notorious drug

22   runners, essentially.

23          THE COURT:  So are there reports that may have lots

24   of attachments, but is there some document that has however

25   many pages within attachments and other material, but the

1    report has some sort of narrative summary of the discovery for

2    the case and the ultimate decision?

3            I mean, I don't know what these -- I don't know

4    what's been produced in terms of I haven't seen it in this

5    case, but can you tell me more about what there is, the

6    question being much like the indices, you know, is there a

7    place to start?  Because you're sort of dealing with your

8    grounds backwards.

9            You're starting to say that it would be an enormous

10   project and potentially take people who are working on

11   something  -- on matters that -- I suppose the implication is

12   that that may relate to the release of other individuals or at

13   least clearing the record as to whether convictions are valid

14   or not, and then have them deal with this case.

15           So in terms of summary materials, is there some kind

16   of summary report for each fo the cases that led to an

17   exoneration?

18           MR. EDELSTEIN:  Your Honor, if I may speak to that

19   with regard to this case, the CRU prepares -- in this case

20   prepared a final report of its investigation which detailed

21   many of the -- many or possibly all of interviews that it did,

22   the investigative steps that it took and then it generally

23   redacts the exact reasons for its exoneration, but it does

24   summarize the supporting evidence.

25           THE COURT:  Okay.  And does that kind of a report

1  exist for each of the nine cases that you said that there was

2  an exoneration in?

3          MR. LOPERFIDO:  I think we can only speculate at

4  this point because those matters are sealed and I could

5  perhaps confer with the client on whether as a practice that

6  is something that they do in the Conviction Review Unit.

7          But I can't say with any specificity.  Each case is

8  different.  And so the answer to your question I don't know.

9          THE COURT:  Okay.  And then for each side, I mean,

10 why isn't this the kind of material that would lead to an

11 examination about truthfulness or untruthfulness, given what

12 is suspected that these materials included?

13         I mean, I don't know about any particular case.  If

14 Detective Scarcella was a key player, an ancillary player,

15 someone who did -- I don't know what happened, but it would

16 seem like this would be potentially -- well, backing up.

17         Assuming that that is the kind of issue that's

18 discussed in these reports, that the material might be the

19 kind of material that would allow on cross examination at

20 trial for the plaintiff to inquire as to the witnesses

21 truthfulness or untruthfulness. And so you wouldn't introduce

22 the material, but you could ask about it.

23         And if you're -- hypothetically -- and I really

24 don't -- I don't know the particular ones he's looking at, but

25 if they said things about what Detective Scarcella had done

1    and it went to this concern, then wouldn't that be a

2    legitimate subject of cross examination?

3            I mean, from the plaintiff's perspective, and I

4    don't have a view as to what happened here or not.

5            But the plaintiff would say didn't you work on X

6    case. You worked on X case, correct?  And you were the lead

7    detective.  Correct.  And you interviewed X and the unit found

8    Y.  And then just keep doing that over and over again.  I

9    mean, obviously, that's the trial judge's decision whether

10    that could actually happen or not.

11            So first you have the objection is it's a burden.

12    So there's a question is there a narrative report that would

13    be a summary that would decide -- you know, help narrow the

14    effort.

15            Then you have the argument that this is *Monell*

16    discovery. I don't think it's Monell discovery because I think

17    at a minimum it goes to impeachment, depending what's in these

18    files.

19            So that relates to this particular case, plus you

20    don't have enough information, but plaintiff's point was that

21    these exonerations he's talking about bracket what went on

22    here.

23            So one could think that there would be other

24    theories to explore particularly related to this defendant and

25    then -- individual defendant -- and then you have the 160.50

1    issue, which I don't know which way I would rule on that

2    because I don't think it's necessary at this moment to do that

3    if the plaintiff thinks you can get the releases.

4            And then to the point there was some concern that

5    there may be issues addressed in those reports that might open

6    non-parties up to problems because of -- I don't know --

7    they're concerned about what the -- people who were the

8    defendants in the cases that they were addressing, you know, I

9    would think you could address that through some kind of

10   redaction of maybe those particularly sensitive issues.

11           I mean, that you could talk about when you've

12   actually seen these reports and figure out what the right way

13   to do this is.

14           So let me go back to the plaintiff and how likely or

15   what would your proposed schedule be that you could try to get

16   160.50 releases for the seemingly nine cases that you're

17   interested in.

18           MR. EDELSTEIN:  I know with respect to one of the

19   cases the defendant is deceased.

20           But there were -- he was prosecuted jointly with

21   another person who is alive.

22           I would guess that we would be able to get

23   authorizations within 30 days for at least the significant

24   majority of these cases.

25           THE COURT:  All right.  So I think that's where you

1       should start.

2               And on the defendant's side you should -- I guess,

3       the plaintiff you should let the defendants know which of the

4       individuals you are able to get the 160.50 releases for and,

5       obviously, get them and to the extent there are these kind of

6       summary reports in those files and the plaintiffs -- sorry.

7       The plaintiffs are able -- the plaintiff is able to get those

8       releases, then produce those reports.

9               If there are safety related concerns, you can have

10      whatever discussions you all need to have about them and

11      redact the potentially, I don't know, risk creating

12      information that's in there.

13              But we'll have to see how that plays out.  Maybe

14      plaintiff comes back and says I need that information.  I

15      don't know.

16              So I don't know A, whether these reports exist.  B,

17      what's in this.  E, if what's in them connects Detective

18      Scarcella in a way that would lead it to be relevant

19      information.

20              But if the people who are the subject of the reports

21      are willing to have those reports shared, and potentially the

22      underlying files shared, the it seems like this is certainly

23      something that can happen and then as to people who don't want

24      to sign their 160.50's, I think it would have a bit of a split

25      in that one -- at that point, hopefully, we'll have more

1   information about what the reports are and see if this is

2   actually fertile area of discovery, or futile, or too

3   burdensome, or whatever the objection would be, and we can

4   deal with the 160.50 question then.

5            So this is -- like the CPI and the questions about

6   the underlying materials a process, again, to make this

7   manageable but thorough.

8            So it's the 19th say plaintiff try to get the -- or

9   close 160.50's by May 20th.  Given them over to defendant's

10  counsel and then you see what you have.  And then within the

11  month produce them and with the redactions, if you need the

12  redactions and then we'll see where that leaves us off.

13           And then the question of whether you need the

14  underlying files, put it off for another day until you see

15  what the summaries say.

16           MR. LOPERFIDO:  Your Honor, if I could just comment

17  on that briefly.

18           THE COURT:  Sure.

19           MR. LOPERFIDO:  This is Jeff Loperfido again.

20           I think if plaintiff is able to provide 160.50's

21  that would be helpful in us all having a better understanding

22  of the files.

23           I just want to make clear for the record the report

24  itself, which is the most pivotal piece of work that that the

25  Conviction Review Unit does as an entity for which it was

1    created, is going to be the most hotly contested item in the

2    report.

3            Now if plaintiff is seeking perhaps the underlying

4    NYPD investigative files and he has a 160.50 that's a

5    discussion we could actually have.

6            But with regard to the -- it seems to suggest that

7    you were planning to issue an order producing the reports and

8    I think there is going to be, in addition to the objections

9    I've named and they're all outlined in our discovery

10   responses, there's likely going to be deliberative process

11   privileges --

12           THE COURT:  Well, why didn't you raise that -- I

13   just asked you what your objections were. You said *Monell*, you

14   said the 160.50.  You said burden.  You didn't talk about some

15   alleged privilege and what was discussed along the way was

16   that -- at least this is I think from plaintiffs, description

17   of the report in this case is that the recommendation

18   paragraph, which would be I assume it's the deliberative

19   decision, was redacted.

20           So I mean, here you are.  We've already gone through

21   this for the last 15 minutes and now you're telling me you

22   have other privilege objections to this?

23           MR. LOPERFIDO:  Yes, Your Honor.  And I apologize if

24   it's -- I guess, I didn't understand.  I was naming them all

25   at that opportunity, but I was identifying them in the order

1    in which -- you know, if you determine that they were *Monell*

2    discovery, then we're not even having this discussion.  If you

3    determine they're not relevant, we're not having this

4    discussion.

5         We had a little back and forth and I think you

6    commented that you believed that you could see a scenario

7    where information within these reports could speak to the

8    credibility of Detective Scarcella.

9         If we get to the point where production is being

10   ordered of these files, there's going to be attorney work

11   product, there's going to be deliberative process and we'll

12   have to -- again, we can't look at them but we'll have to --

13   until the 160.50 is provided, or until there's a court order

14   unsealing them, and then we'll have to assert those redactions

15   where appropriate.

16        MR. EDELSTEIN:  Your Honor, again, if I may speak to

17   that, the way the exoneration --

18        MR. LOPERFIDO:  Mr. Edelstein -- and there's perhaps

19   privacy interest and there are many, many objections

20   potentially, but with regard to Derrick Hamilton where were

21   can kind of look to an exemplar as instructing us on what we

22   might find in the future documents, there were redactions made

23   as to the privacy of non-parties, there was deliberative

24   process.  There was work product.  There were things of that

25   nature. I fully expect that to be the case in any other file,

1    especially with regard to the primary report prepared by this

2    unit.

3           MR. SIGNORELLI:  Your Honor, this is Richard

4    Signorelli.  Just for the record I just want to note that on

5    behalf of Detective Scarcella, we fully agree to adopt all the

6    arguments of the City with regard to this particular issue.

7           THE COURT:  All right.  Well, the way we're going to

8    leave it is you need to provide those reports and -- those

9    reports by -- assuming the plaintiff gets releases for the

10   cases in which he gets the releases by June -- and he's going

11   to provide them to you by May 20th, you need to provide the

12   reports to him by June 17th.

13          You can make the redactions that you think are

14   appropriate and provide a privilege log and we can argue about

15   it then.  But you have to not be over inclusive and actually

16   have a well grounded basis for making these objections.

17          Now there's this other possibility, which is if you

18   don't want to turn over the reports and you want to go down

19   the path of producing the whole file, we can hear from

20   plaintiff on that topic.

21          But it seems to me the report appears to have the

22   summary of the investigations are appropriate. And they were

23   turned over -- like it was turned over in this case, it sounds

24   like, so it seems that the materials have gone beyond the

25   D.A.'s office and the NYPD.

1          MR. LOPERFIDO:  Your Honor, not to interrupt, but

2     Derrick Hamilton signed a 160.50 release in this case and the

3     basis for his exoneration was a recommendation from the

4     Conviction Review Unit to have them released.

5          THE COURT:  Yes, but --

6          MR. LOPERFIDO:  I --

7          THE COURT:  All right.  But we're proceeding here to

8     talk about the files for which the plaintiff is able to get

9     160.50 releases.

10          So to the extent there are these privilege claims,

11     I'm not saying you can't raise them, although I'm not thrilled

12     about the order in which you raise them here because I asked

13     if there was anything else.

14          So you can produce the report with redactions, with

15     the privilege log and we can have the more informed discussion

16     about what should be produced, but obviously something to

17     consider in suggesting that there are privileges, which there

18     may be.  I don't know.  I haven't seen it.  Don't know the

19     context of these materials.

20          The question is going to be if the materials have

21     been shared beyond the NYPD and the D.A.'s office, then are

22     they still privileged.

23          But I think -- again, like the CCRB, the IAB files,

24     et cetera and dealing with the indices, you need to get this

25     moving.  Find out what there is.  See what the materials

1   involve, if they're at all relevant here, and figure out if

2   anybody's got any other rights that should be protected.

3           And so far I'm open to hearing if you have a better

4   suggestion, but I'm not hearing it, so let's start with these

5   160.50's and you get those materials out and we'll see where

6   to go.

7           Obviously, if the plaintiff is thinking that you

8   want to see the files and -- rather than the reports, or you

9   want to see the files as well as the report, there will also

10  be that question, especially if the 160.50's are signed.

11          And so it would be helpful for the next time we have

12  a discussion about all of this for the defendants to have some

13  idea of what the scope of the materials are.

14          And it may be these files are not huge.  It may be

15  that they're huge. It may be that they're lost in storage.  I

16  don't know.

17          But you know start to get a handle on what's going

18  on and probably what would be helpful is after this call for

19  you all to talk and plaintiff to make clear those folks who

20  you think you're asking for the reports about and the records

21  about.

22          So let's start there and then get this moving. You

23  get more information.  Figure out with more refinement what

24  your respective positions are and then go from there.  All

25  right.

1          So that's the one that was on the list underneath

2     the personnel files, which we already talked about.

3          And then now there's this next issue about Jewel

4     Smith and Alphonso Dixon and then you tabled it. So is that

5     still tabled or what's going on there?

6          MR. EDELSTEIN:  It's still tabled. I anticipate

7     that, you know, the depositions of Detective Scarcella and

8     Detective White may very well provide us with all of the

9     information that we need or are looking for on that issue.

10         So at the moment I am tabling the request for

11    documents on that issue in light of the objections of the

12    parties in the interest of things getting moving faster.

13         However, if it turns out that the depositions of

14    Detective Scarcella and White do not result in disclosure on

15    those issues. I am reserving my right.

16         THE COURT:  All right.  Are those two depositions

17    scheduled yet?

18         MR. EDELSTEIN:  There are no depositions scheduled

19    at the moment in light of the fact the document discover is

20    still ongoing. I would certainly anticipate that the plaintiff

21    will be deposed first.

22         THE COURT:  Okay.  All right.  So we're just putting

23    that on hold.  Smith and Dixon.

24         All right.  New Haven.  That's the next issue,

25    right?

1          MR. LOPERFIDO:  Your Honor, can I just -- can we

2     revisit briefly the CRU and NYPD underlying files issue?

3          And I just want to note for the record, you know,

4     Mr. Edelstein has known about this sealing issue for a while.

5          Had he proposed 160.50's, the ability to obtain

6     160.50 releases from these individuals, we could have had a

7     much more informed conversation today.

8          I understood this to be a joint status conference

9     and had he moved to compel these specific files and stated

10    with the necessary precision the specific items that he was

11    seeking, again, we could have had a better exchange as to what

12    our client's position is with regard to these files, with

13    respect to specific individuals and we could have outlined in

14    very clear and convincing fashion supported by case law the

15    bases for our various objections and privileges.

16         I feel a little caught off guard at the -- that

17    there's now going to be an order on the docket suggesting the

18    production of these files prior to counsel obtaining 160.50's

19    and suggesting that this is a proper area of discovery for

20    wrongful conviction cases going forward.

21         I think we would say it is not. I understand Your

22    Honor's position, but I would just ask perhaps we could do

23    this sequentially and see if -- what plaintiff could actually

24    produce with regard to a 160.50 and perhaps we can talk about

25    a solution that doesn't require current state of affairs.

1          THE COURT:  That's what I said.

2          MR. EDELSTEIN:  Your Honor, Jonathan Edelstein.

3          THE COURT:  No, no, no, no.  Hold on.  What I said

4     was plaintiff is going to try to get the 160.50's.  If he can

5     get the 160.50's, he's going to give them to defendant's

6     counsel.  The defendant's counsel can look at those files.

7          I suggested based on the conversation and

8     information you've given me, which in part was the information

9     about what exists in Mr. Hamilton's file, which is look at the

10    file.  You'll have the ones -- this is for defendant's

11    counsel.  Look at it.

12         It seems like the narrowest but potentially most

13    thorough document that would be included in the file would be

14    the report that led to the exoneration and exchange that.  But

15    you can make whatever privileged redactions you think are

16    appropriate.

17         I'm assuming, based on this conversation, I'm going

18    to hear from you all again about that, but I'm also saying

19    that you have to think about this in the context of where

20    those materials have already been circulated.

21         And if the people who are the subject of those

22    reports, meaning the particular individuals who are

23    exonerated, are willing to share the materials of Mr.

24    Hamilton, then it may be that they need to shared.

25         So that's not saying one way or the other that these

1   are materials that do need to be shared in exoneration cases.

2   They may well be.  But without knowing what's in them, it's

3   very hard to guess.

4          And if we can circumvent the issue of needing to

5   decide whether this particular case that state sealing statute

6   and it's application in this case doesn't trump the federal

7   discovery interests, then that's probably the most efficient

8   and effective way to get some handle on what the materials

9   are, whether they deal with Detective Scarcella in any detail.

10  Whether there really are privileges that prevent the

11  disclosure, et cetera.

12         I did not say that you can't raise these issues, but

13  I want you to really think about them given the history of

14  these cases.

15         So let's get going and at least have some file other

16  than Mr. Hamilton's to look at and given that plaintiff's

17  counsel thinks it's something that he can facilitate, then

18  that is probably the best way to do it.

19         So plaintiff, you've got a month to try to find

20  these documents, otherwise we're going to have to deal with

21  this through a different tact.

22         That's not to say that you won't have to produce

23  these reports down the line. It's not to say you will have to

24  produce them.  I don't know.

25         But what I do know is that there is a working,

1      possible, practical solution.  So let's start with that.

2             All right. So the New Haven defendants and your

3      issues.  That's -- what is it? The fourth full one on page 2

4      of the letter at 42 on the docket.

5             MR. KARSTEN:  Your Honor, this is Scott Karsten.

6      We've had some discussion with plaintiff's counsel about this

7      issue and I think that the difficulty that we have and that

8      we've interposed in our objection is primarily that we are not

9      and were not in the position to know who might be a

10     "prospective" witness in the Hamilton criminal case and all

11     its incarnations.

12            We're working on narrowing that language and I

13     suspect that there's a known universal potential of people

14     that we might be able to particularly identify.

15            And if we can do that -- and once we get the court

16     order required under the erasure statute then we can proceed

17     with responses to those.

18            MR. EDELSTEIN:  Your Honor, Jonathan Edelstein for

19     the plaintiff.

20            The narrowing language that I had actually offered

21     to the New Haven defendant was to narrow that demand to

22     involve only documents regarding communications with persons

23     who were known to the employees of New Haven to be prospective

24     witnesses.

25            So that -- I think that that would satisfy the issue

1    that Mr. Karsten raised and I do acknowledge that to be an

2    issue, by limiting the production to people who were known at

3    the time to be -- by the employees of the City of New Haven to

4    be prospective witnesses in the case.  It won't require any

5    kind of a fishing expedition on his part.

6         MR. KARSTEN:  I still struggle to know what that

7    means and how you can know that somebody is a prospective

8    witness.

9         I mean, either they're a list of witnesses that were

10   from New Haven somewhere or there aren't.  And it would be

11   certainly useful for our purposes to know who those folks

12   might be. I mean, obviously, there are a couple; Alphonso

13   Dixon, maybe Maddie Dixon. I don't know.  Maybe not Maddie

14   Dixon.

15        But other people that were prospective witnesses --

16   you know, Mr. Edelstein is a position to know that better than

17   we are at this point.

18        MR. EDELSTEIN:  Well, we can certainly give some

19   additional names.  Tashanika Watson and Kelly Turner, for

20   instance but -- and -- but we believe that the police in the

21   course of their investigating their case may have communicated

22   with some people we don't know about.

23        And if there are communications between the police

24   and people who they believe to be prospective witnesses in

25   the case but were not known to us, I think that that's

1       something that we would be entitled to to see if -- you

2       know, whether or not anything prevented those witnesses from

3       coming forward.

4               But if it would help Mr. Karsten I can certainly

5       provide a preliminary list of names of people who we know to

6       be prospective witnesses from New Haven and we just named

7       four of them. I believe there are a couple of more and I can

8       give those names to him.

9               THE COURT:  All right.  Look.  Two things.  This

10      is a telephone conference.  You can't start talking because

11      then you don't know what I'm interested in hearing about,

12      what I need to hear about.  You don't know what the other

13      people are saying.

14              You should be having this conversation offline.

15      It says in your letter that you were working on this.  It

16      seems like you should continue to work on it and if you

17      reach an absolute impasse, then let me know.  But have this

18      conversation offline.

19              And I understand from the last time we were on the

20      phone that there were questions that the New Haven parties

21      have about what the Connecticut requirements are for

22      revealing certain materials, and you were going to do

23      research and figure out where the right place to raise that

24      issue is.  So is there anything else I need to know about

25      that today?

1          MR. EDELSTEIN:  About that issue?

2          MR. KARSTEN:  No.

3          MR. EDELSTEIN:  Not from the plaintiff's side,

4    Your Honor.

5          THE COURT:  All right.

6          MR. KARSTEN:  No, Your Honor.  Not from New

7    Haven's side.

8          THE COURT:  All right.  So the last item on that

9    page you're dealing with.

10          And then -- all right.

11          So additional -- any other discovery issues that

12    are immediately before you all?

13          MR. EDELSTEIN:  None from the plaintiff's side,

14    Your Honor.

15          MR. KARSTEN:  Not from New Haven.

16          THE COURT:  The City?

17          MR. LOPERFIDO:  Nothing from the City.  Thank you.

18          THE COURT:  All right.  So you all are working on

19    these issues.  Get a handle on what the materials look like.

20    I will talk to my deputy and we'll schedule another follow

21    up discussion to make sure this is all moving ahead.

22          And I don't need to have a detailed conversation

23    about this, but is there any possibility of having

24    settlement discussions in this case?

25          MR. EDELSTEIN:  Your Honor --

1          MR. KARSTEN:  Not from New Haven, Your Honor.

2          MR. EDELSTEIN:  -- I'm not certain. I mean, the

3      plaintiff has made a demand.  We've indicated that the

4      demand is flexible, especially given the possibility of a

5      settlement in the state case.

6          At the moment it seems that a settlement in the

7      state case is likely in the fairly near future.  I can't say

8      it's a hundred percent.  I know that there have been serious

9      and productive discussions and that it has been written up

10     by the attorney general's office.

11         Our next court date in that is the 24th of May.

12     I'm hoping that there's some sort of firm offer by then and

13     possibly even a settlement.

14         At that point we would probably be in a position

15     to considerably revise our demand of these defendants and

16     whether we're close enough to the ballpark at this point to

17     have settlement discussions I think is a matter -- is within

18     their knowledge.

19         THE COURT:  How about for the City?

20         MR. LOPERFIDO:  We are in receipt of Mr.

21     Edelstein's demand and it is quite involved and we're

22     considering it, but I don't think settlement discussions at

23     this point in time make sense.

24         THE COURT:  Okay.  You have multiple options.  You

25     could have a conversation with me.  Judge Pohorelsky told me

1       had some time in his schedule and the upside of him over me

2       is that he has more time, besides whatever you all might

3       think.

4               But he has time in his schedule and could have

5       some longer discussions than either I or other colleagues

6       might be able to fit in and obviously, there's the court's

7       mediation -- court annex mediation program which has

8       experienced mediators and you could look on the court's

9       website to see if there's anyone who you think might be well

10      suited to serve as a mediator in the case.

11              The cost is modest, relative presumably to the

12      size of this case.  And if need be, you could ask that the

13      fees be waived or reduced.  So those are possibilities.  You

14      could do it yourselves or you could have an outside mediator

15      beyond the court's program work with you.   Whatever it is

16      that you think would help move things forward.

17              All right.  So there'll be a summary of these

18      orders and there'll also be a date for a follow up

19      discussion. Okay.  That's it.  Thank you very much.   Have a

20      good day.

21              MR. LOPERFIDO:  Thank you, Your Honor.

22              MR. KARSTEN:  Thank you, Your Honor.

23              THE COURT:  Bye.

24          (Proceedings concluded at 1:07 p.m.)

25

1          I, CHRISTINE FIORE, court-approved transcriber and

2     certified electronic reporter and transcriber, certify that

3     the foregoing is a correct transcript from the official

4     electronic sound recording of the proceedings in the above-

5     entitled matter.

6

7

8     _____          April 27, 2016

9          Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25