UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DERRICK HAMILTON,

              Plaintiff,

      -against-

CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT; DET. LOUIS
SCARCELLA, individually and in his capacity
as a New York City police officer; DET.
FRANK DELOUISA, individually and in his
capacity as a New York City police officer,
INV. JOSEPH PONZI, individually and in his
capacity as an investigator for the Kings County
District Attorney's office, POLICE OFFICER
BILLY WHITE, individually and in his
capacity as a New Haven City police officer,
CITY OF NEW HAVEN, JOHN/JANE DOES
NOS. 11–30, being unknown employees of the
City of New Haven,

              Defendants.
-------------------------------------------------------x

**FILED**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAR 19 2019   ★

BROOKLYN OFFICE

NOT FOR PUBLICATION
**ORDER**
15-CV-4574 (CBA) (SJB)

**AMON, United States District Judge:**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 2

BACKGROUND ........................................................................................................................... 3

    A.    January 4, 1991 ..................................................................................................... 3

    B.    The Investigation into Nathaniel Cash's Murder ........................................................ 4

    C.    The Evidence at Trial .................................................................................................. 9

    D.    Post-Conviction Evidence ......................................................................................... 11

    E.    The Second Department's Decision ........................................................................... 17

    F.    Vacatur of Hamilton's Conviction ............................................................................ 18

STANDARD OF REVIEW ......................................................................................................... 19

DISCUSSION .............................................................................................................................. 22

    I.    Absolute Immunity: Defendant Ponzi ....................................................................... 23

    II.    Denial of Right to a Fair Trial ................................................................................... 25

A.      Fabrication of Jewel Smith's Statements: Defendants DeLouisa and Scarcella ........ 26

B.      Intimidation of Defense Witnesses: Defendant White ................................................ 37

C.      Failure to Disclose Exculpatory Evidence under Brady: Defendants DeLouisa, Scarcella, and White .......................................................................................................................... 45

III.   Malicious Prosecution: Defendants DeLouisa and Scarcella ........................................... 53

A.      Initiation as to DeLouisa............................................................................................. 54

B.      Lack of Probable Cause............................................................................................... 56

C.      The Remaining Elements.............................................................................................. 60

IV.    Conspiracy: Defendants Scarcella and White.................................................................... 61

V.     Negligent Hiring, Supervision, and Retention: City of New York................................... 64

VI.    Remaining Matters............................................................................................................. 65

A.      Municipal Liability: City of New York and City of New Haven................................ 65

B.      Request to Unseal Exhibits.......................................................................................... 66

C.      Defendant White's Motion to Dismiss Official Capacity Claims as Duplicative ...... 66

CONCLUSION............................................................................................................................... 68

## INTRODUCTION

On July 17, 1992, Plaintiff Derrick Hamilton was convicted of second-degree murder based principally on the testimony of the government's sole purported eyewitness, Jewel Smith.   On January 9, 2015, after more than two decades of incarceration, Hamilton's conviction was vacated on the joint motion of Hamilton and the Kings County District Attorney's Office, which determined that Smith's testimony was unreliable, Hamilton's due process rights were violated by the use of Smith's testimony at trial, and it could not stand by the conviction.   Pursuant to 42 U.S.C. § 1983, Hamilton now alleges that Defendants—Detective Louis Scarcella and Detective Frank DeLouisa of the New York City Police Department; Investigator Joseph Ponzi of the Kings County District Attorney's Office; Police Officer Billy White of the City of New Haven Police Department; the City of New York; and the City of New Haven—violated his Fourth, Fifth, Sixth, and Fourteenth Amendment constitutional rights in securing his conviction.   He also brings related state law claims.   In three separate motions and supplemental motions, the individual defendants

2

now move for summary judgment on all claims against them.  (D.E. #s 89-1 ("New Haven Mem."),
90-1 ("Scarcella Mem."), 92-1 ("NYC Mem."), 107 ("New Haven Supp. Mem."), 108 ("NYC
Supp. Mem."), 109 ("Scarcella Supp. Mem."), 121 ("NYC Opp'n to Amicus"), 122 ("Scarcella
Opp'n to Amicus").  Plaintiff opposes.  (D.E. #s 93 ("Pl. Mem."), 112 ("Pl. Supp. Mem."); see
also D.E. # 118 ("Amicus Br.").)

For the following reasons, Scarcella's motion is granted in part and denied in part;
DeLouisa's motion is granted in part and denied in part; Ponzi's motion is granted in its entirety;
and White's motion is granted in part and denied in part.  The City of New York's motion for
summary judgment on Hamilton's negligent hiring, supervision, and retention claim is granted.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements and other documents
in the record, undisputed unless otherwise noted, and construed in the light most favorable to
Hamilton.

### A.  January 4, 1991

On January 4, 1991 at around 11:00 am, Nathaniel Cash was shot to death in front of his
residence on Monroe Street in Brooklyn, New York.  (D.E. # 92-2 ¶ 1 ("NYC 56.1").)  The parties
dispute Hamilton's whereabouts at the time of Cash's death.

According to Hamilton, the night before, on January 3, 1991, Hamilton traveled to New
Haven, Connecticut with Kim Freeman to attend a good-bye party for Lee Marvin hosted by
Alphonso Dixon and his wife Mattie Dixon at the Quality Inn in New Haven.  (D.E. # 93-1 ("Pl.
56.1 Counterstatement") ¶¶ 1–2).)  Alphonso Dixon reserved hotel rooms for his guests, including
Hamilton, and the party ended in the early morning hours of January 4.  (Pl. 56.1 Counterstatement
¶¶ 3–4.)  That morning at approximately 11:00 am, Hamilton was picked up from the Quality Inn

by Kelly Turner, an individual he met at the party, and they drove to Turner's talent agency in New Haven to discuss potential joint business ventures. (Pl. 56.1 Counterstatement ¶ 5.) At approximately 12:00 pm, Hamilton was picked up by Mattie Dixon and taken to Lee Marvin's home, where a group of friends said their final goodbyes to Lee Marvin. (Pl. 56.1 Counterstatement ¶ 6.)

According to Defendants, Hamilton was not in New Haven: instead, he was present at the scene of Cash's death in Brooklyn. (See D.E. # 92-40 ("NYC 56.1 Reply") ¶¶ 1–6; 91-1 ("Scarcella 56.1 Reply") ¶¶ 1–6.)

### B. The Investigation into Nathaniel Cash's Murder

In Brooklyn, DeLouisa from the 79th Precinct Detective Squad and Scarcella from the Brooklyn North Homicide Squad were assigned to investigate Cash's homicide, with DeLouisa arriving first on the scene. (D.E. # 90-2 ("Scarcella 56.1") ¶ 2; NYC 56.1 ¶ 8.) Cash's girlfriend, Jewel Smith, had spent the previous night with Cash. (NYC 56.1 ¶ 2.) At around 12:30 pm, Smith gave a statement to DeLouisa. (NYC 56.1 ¶ 9.) She identified herself as "Karen Smith." (NYC 56.1 ¶ 9.) She said that she spent the previous night at Cash's apartment, she was at the store on the corner at the time of Cash's murder, and Cash was lying on the ground when she returned from the store. (NYC 56.1 ¶ 9.) DeLouisa summarized the interview in his spiral notebook as follows:

> Karen Smith bailed Nat[e] out of jail. "Jew[e]l" in bedroom 215 Monroe. 1/4/91 1230 hr. I was here to see Nat[e], went to store on corner. Came back, he was on the floor. Two people were by him they said get an ambulance. I stood [sic] the night w/ him around 10:25 I went to the store. It was going on 11:00."

(D.E. # 92-8 ("NYC Ex. E") at 12–13.) Scarcella also interviewed Smith at the scene, and the parties dispute whether Smith ever told Scarcella that she did not witness Cash's shooting. (Compare Pl. 56.1 Counterstatement ¶ 13; D.E. # 92-4 ("Pl. Ex. 2") at 191:2–16, 209:2–7, with Scarcella 56.1 ¶ 6–7; D.E. # 90-4 Ex. D ("Scarcella Ex. D") at 119, Ex. G ("Scarcella Ex. G") at

4

136.).) Scarcella's spiral notebook does not contain a record of such a conversation with Smith. (See generally D.E. # 92-9 ("NYC Ex. F").)

After she was interviewed at the scene, Smith was taken to the 79th Precinct. (Pl. 56.1 Counterstatement ¶ 14.) Smith made a series of statements implicating Hamilton as the shooter, but the parties now dispute whether those statements were voluntary or coerced.

At approximately 1:15 pm, Smith was shown a photobook and positively identified Hamilton as the person who shot Cash to Scarcella. (Scarcella 56.1 ¶ 10, NYC 56.1 ¶ 13.) Scarcella summarized the interview in his spiral notebook as follows:

> 1-4-91 13:15 hrs. Smith positively IDed Derrick "Bush" Hamilton as the man who shot boyfriend Nat Cash many times—I was about 5' away—I know him all my life—ID made 79 RIP Book # 1 Page 39 Photo # 989.

(NYC Ex. F at 4.) Smith has since said that Scarcella coerced her into identifying Hamilton's photo as the shooter. (Pl. 56.1 ¶ 15; Pl. Ex. 2 at 36:18–37:12.)

At approximately 2:00 pm, Smith was interviewed by DeLouisa, who summarized Smith's statement in a report. (NYC Def. 56.1 ¶ 15; D.E. # 92-11 ("NYC Ex. H").) Smith said that she and Cash walked downstairs to meet a cab and encountered several individuals standing in front of the building, including "Bush." (NYC Ex. H.) She said that, after "Bush" and Cash exchanged words, an individual named "Sakuan passed Bush the gun" and "Bush said well I'm here and he started firing. He fired a lot of shots." (NYC Ex. H.) Smith has since said the entire statement was fabricated and coerced by the police officers. In particular, Smith denied making these statements, said that she told the detectives at the precinct that she went to the store and never saw the shooting, and was coerced into making statements fabricated by the detectives after they threatened to charge her with the crime and take her children away. (Pl. 56.1 Counterstatement ¶ 15; Pl. Ex. 2 at 207:3–209:19.)

At approximately 4:30 pm, Smith gave an approximately 22-minute audio recorded interview with Assistant District Attorney Thomas Luzio at the 79th Precinct, in the presence of Assistant District Attorney Jeff Mueller and DeLouisa. (NYC 56.1 ¶ 18; D.E. # 92-12 ("NYC Ex. I"), NYC Ex. J (audio recording).) According to the transcript of the audio statement, Smith again identified "Bush" as the shooter and identified an individual named "Sayquan" who passed "Bush" the gun. (NYC 56.1 ¶ 19; NYC Ex. I.) Smith also offered additional details, such as suggesting that Cash and Hamilton were at odds over the murder of Cash's friend "Ron Kay" in 1988 and that Cash felt "vibes" that something was going to happen. (NYC 56.1 ¶ 20; NYC Ex. I.) Smith now maintains that the audio interview was coerced, and that she never knew individuals by the name of Sayquan or Ron Kay. (Pl. Ex. 2 at 40:23–42:24.) In her deposition, Smith said, "Everything that they told me to say was coerced, recorded, memorize it." (Pl. Ex. 2 at 41:4–5.) "And when the tape recording come on, the questions we ask, you're going to remember what to say, and I remembered what to say." (Pl. Ex. 2 at 41:17–19.)

DeLouis and Scarcella both listed the names of other individuals in their spiral notebooks. In particular, both recorded the names of "Taseem Douglas" and "Will Johnson" in their spiral notebooks. (NYC Ex. E at 11, 19 ("Will Johnson" and "Tasweem Douglas"); NYC Ex. F at 9–10 ("Money Will Johnson" and "Taseem Douglas").)

On January 5, 1991, DeLouisa and Scarcella visited the home of a witness, whose identity continues to be protected by the Kings County District Attorney's Office. (NYC 56.1 ¶ 23.) The witness stated that before Cash's death, Cash said he was worried that "Bush" would kill him and that "Bush," Hamilton's brother, and an individual known as "Saquan" tried to get him into a car about two weeks ago. (NYC 56.1 ¶ 23.)

On January 6, 1991, at approximately 1:50 pm, Scarcella spoke to Smith, and she said she could not testify against Hamilton at the grand jury because "Bush" would kill her whole family. (Scarcella 56.1 ¶ 28; D.E. # 90-4 Ex. U ("Scarcella Ex. U"); NYC 56.1 ¶ 24; NYC Ex. F at 12.) Although Hamilton does not cite specific evidence refuting defendants' evidence that this call occurred, he cites Smith's deposition testimony explaining that "it was just one big coercion. It was what I was told to say, this is the script, and you stick to it." (Pl. Ex. 2 at 81:22–23; see also Pl. 56.1 Counterstatement to Scarcella 56.1 ¶ 28, NYC 56.1 ¶ 24.)

On January 9, 1991, Smith met with Ponzi and Assistant District Attorney Ann Gutmann of the King's County District Attorney's Office before testifying before the grand jury. (NYC 56.1 ¶ 28; D.E. # 92-18 ("NYC Ex. P") at 8:10–25.) Hamilton does not unequivocally dispute that Smith met with Ponzi and Gutmann, but contends that to the "extent such a conversation occurred," the purpose was to threaten and coerce Smith. (Pl. 56.1 Counterstatement to NYC 56.1 ¶ 28.) In her deposition, Smith said that both Ponzi and Gutmann told her to "[s]tick to the script," otherwise she would go to jail. (Pl. Ex. 2 at 270:5–23; see also id. at 235:14–22, 271:3–22.) Smith relocated to North Carolina after her grand jury testimony, but the parties dispute whether the King's County District Attorney's Office relocated her for her safety or whether Smith left because she had been forced to lie and feared the repercussions. (Compare NYC 56.1 ¶ 31, Scarcella 56.1 ¶ 39, D.E. # 92-20 ("NYC Ex. R"), with Pl. Ex. 2 at 48:2–49:15, 108:11–13.)

On January 11, 1991, Detective C.R. Duffy of the 79th Precinct Detective Squad received an anonymous call identifying the person who shot Cash as "Bush" and stating that "Bush" is Derrick Hamilton. (NYC 56.1 ¶ 33–34.) The caller also gave Hamilton's mother's home address, and stated that Hamilton lives in Lafayette Gardens, has a girlfriend named Kim, and drives a blue Suzuki Jeep. (NYC 56.1 ¶ 34.)

On January 14, 1991, Jerry Douglas was arrested in the 79th Precinct for criminal possession and disclosed that he had information about the shooting. (NYC 56.1 ¶ 36–37.) Douglas told DeLouisa that he was in a Pepsi delivery truck on the corner of Monroe Street and Nostrand Avenue when he heard gunshots. (NYC 56.1 ¶ 38.) He saw four black males walking down the sidewalk, one of whom handed off the gun to another person. (NYC 56.1 ¶ 39.) He identified that individual as Hamilton from a six-person photo array, and said he was sure he recognized Hamilton from making deliveries in Lafayette Gardens. (NYC 56.1 ¶ 41.) Douglas was later shot to death on May 27, 1992, shortly before Hamilton's trial. (NYC 56.1 ¶ 62; D.E. # 92-23 (NYC Ex. U, "CRU Report") at 6; D.E. # 90-4 Ex. Q ("Scarcella Ex. Q").)

Ponzi received information from multiple confidential sources that Hamilton was located in New Haven, Connecticut. (New Haven 56.1 ¶ 5.) After receiving White's name from law enforcement contacts, Ponzi contacted White with the information and requested that White undertake efforts to confirm the accuracy of that information. (New Haven 56.1 ¶ 6.) White confirmed Hamilton's whereabouts through Alphonso Dixon, a confidential informant and Hamilton's relative who co-owned a beauty parlor with Hamilton. (New Haven 56.1 ¶ 7.)

White reported to Ponzi that Hamilton was in New Haven, and Ponzi in turn relayed that information and White's contact information to Scarcella. (New Haven 56.1 ¶¶ 8–9.) White was provided with a New York warrant charging Hamilton with murder. (New Haven 56.1 ¶ 10.) A Connecticut warrant was applied for and granted based on the New York warrant, and arrangements were made for certain New York officers to participate in the arrest. (New Haven 56.1 ¶¶ 11–12.)

On March 21, 1991, Hamilton was arrested in New Haven by officers from the New Haven Police Department for violating the terms of his parole by leaving New York. (NYC 56.1 ¶ 44;

New Haven 56.1 ¶ 14.) White and Scarcella were present at or near the arrest. (New Haven 56.1 ¶ 14.) Hamilton was arraigned on the fugitive warrant in Connecticut Superior Court, waived extradition, and returned to New York to be arrested on the New York murder warrant. (New Haven 56.1 ¶ 16.)

On March 25, 1991, Smith went to the office of George Sheinberg, plaintiff's criminal defense counsel, and provided a statement—handwritten by Sheinberg and signed by Smith—stating that she witnessed Cash get shot, Hamilton "was not there" when Cash was shot and "did not shoot" Cash, and she did not know who shot Cash. (NYC 56.1 ¶¶ 54–55; D.E. # 92-30 ("NYC Ex. BB").) Beginning at the latest in June 1991, Smith began sending letters and pictures to Hamilton while he was incarcerated and visiting him at Rikers Island. (NYC 56.1 ¶¶ 59–60; D.E. # 92-32 ("NYC Ex. DD") at 130:21–23.)

In July 1992, White assisted Scarcella in arranging a meeting with Taseem Douglas, who was then incarcerated in New Haven, regarding Cash's murder. (New Haven 56.1 ¶ 17; D.E. # 89-5 ("New Haven Ex. B") at 75:3–76:24; D.E. # 90-4 Ex. I ("Scarcella Ex. I") at 189:19–95:5.) The parties dispute whether any meeting ever took place between Taseem Douglas and law enforcement. According to Hamilton, Taseem Douglas spoke with police several times and each time, he told police that Hamilton did not commit the crime. (D.E. # 92-38 ("NYC Ex. JJ") at 2–3; Pl. 56.1 ¶ 25; D.E. # 94-7 ("Pl. Ex. 7") at 35:9–16; D.E. # 94-8 ("Pl. Ex. 8") at 1–2.) By contrast, Scarcella and White both maintain that they never interviewed Taseem Douglas. (NYC Ex. JJ at 3–4; Scarcella Ex. I at 189:19–95:5; New Haven Ex. B at 75:3–76:24.)

### C. The Evidence at Trial

Hamilton's trial took place in July 1992 before Judge Edward M. Rappaport in the Supreme Court, Kings County, Criminal Term, Part I. (NYC Ex. DD at 1.) Gutmann was the prosecutor

and Sheinberg represented Hamilton. (NYC Ex. DD at 1.)  Smith initially did not want to return from North Carolina to testify, (Scarcella 56.1 ¶ 43; D.E. # 90-4 Ex. Y ("Scarcella Ex. Y") at 93:2–9), but ultimately became the prosecution's main witness and the only eyewitness to testify at trial, (D.E. # 92-35 ("NYC Ex. GG") at 2; CRU Rpt. at 7.)

Smith testified that she was with Cash when he was shot and that she saw Hamilton shoot Cash. (NYC 56.1 ¶ 64.)  On cross-examination, she explained that in her letters to Hamilton, she told him "what he wanted to hear" and that "[she] loved him for sparing [her] life."  (NYC 56.1 ¶ 67; NYC Ex. DD 127:13–15, 129:24–130:7.)

When asked about the recantation statement she gave to Sheinberg, she explained to the court that Sheinberg wrote down what she said, but she did not read the statement before she signed it. (NYC Ex. DD 140:5–25.)  Smith further explained that Hamilton sent an acquaintance to take her to Sheinberg's office, and that she told Sheinberg "what Derrick told me to tell him"—that she "was mistaken; that it wasn't him.  It was his brother Ulysses because they look so much alike." (NYC Ex. DD 141:2–25.)  Smith testified that she signed the statement because she "didn't have any choice in the matter," because if she "didn't comply, [she] knew that something would have happened to [her] brothers."  (D.E. # 94-30 ("Pl. Ex. 30") at 243:9–14.)

After Smith's testimony, and off the record, Sheinberg twice approached Gutmann regarding DeLouisa's spiral notebook and asked whether "Jewel Smith was Karen Smith," to which Gutmann responded either "no" or that she did not know.  (NYC Ex. GG at 6.)

Sheinberg filed a notice of alibi listing three alibi witnesses—Kim Freeman, Alphonso Dixon, and James Hamilton.  (NYC 56.1 ¶ 72; New Haven 56.1 ¶ 22; D.E. # 92-34 ("NYC Ex. FF").)  However, Hamilton ultimately did not call any witnesses at trial.  (NYC 56.1 ¶ 72.)

In an affidavit dated June 24, 1992, Alphonso Dixon stated his doctor had advised him not to travel to New York to testify based on his health problems.  (New Haven 56.1 ¶ 24; D.E. # 89-14 ("New Haven Ex. K").)  Dixon further averred that Hamilton attended a party he threw at a hotel in New Haven on the night of January 3, 1991, and Hamilton stayed with him at the hotel from January 3 until January 5, 1991.  (New Haven Ex. K.)

On July 17, 1992, the jury convicted Hamilton of second-degree murder.  (NYC 56.1 ¶ 73; CRU Report at 13.)

On July 12, 1993, the court sentenced Hamilton to a prison term of twenty-five years to life imprisonment.  (CRU Report at 18.)

### D. Post-Conviction Evidence

Before sentencing, Hamilton filed a motion to set aside the jury verdict and vacate his conviction pursuant to N.Y. C.P.L. § 330.  (NYC 56.1 ¶ 74.)  The Supreme Court (Rappaport, J.) denied that motion after a six-day hearing.  (NYC Ex. GG at 1, 16–17.)  While incarcerated, Hamilton filed several post-conviction motions seeking to vacate his conviction, most of them pursuant to N.Y. C.P.L. § 440.  (NYC 56.1 ¶ 81–87, 88; CRU Report at 18.)  Each of Hamilton's post-conviction motions was denied.  During these post-conviction proceedings, and in depositions in this matter, the following pieces of evidence emerged.

#### 1. Jewel Smith

First, in affidavits and in testimony at post-conviction proceedings, Smith represented that her testimony implicating Hamilton as Cash's shooter before the grand jury and at trial was false, and that she was coerced into delivering that testimony by police officers.

In a 1993 sworn statement to Robert Holt, Hamilton's private investigator, Smith said that her testimony was false, the recantation statement she gave to Sheinberg was true, and she never

11

saw Hamilton fire a gun at Cash on January 4, 1991. (D.E. # 94-56 ("Pl. Ex. 56").) She also said that she told DeLouisa, Scarcella, and Gutmann that her testimony was untrue, and that to make her testify, "[t]hey threaten me; gave me ultimatum, they would put me in jail for the murder until I was ready to testify, take my kids from me and I would never see them again and get me violated for being with a known felon." (Pl. Ex. 56.)

In testimony during Hamilton's N.Y. C.P.L. § 330 proceedings, while asserting her privilege against self-incrimination at several points, Smith testified that she told DeLouisa that she did not witness the crime and was at the store. (D.E. # 94-17 ("Pl. Ex. 17") at 20:4–8.) Smith further testified that she told Gutmann and Ponzi that what she planned to testify to at the grand jury was not true, and that she testified falsely before the grand jury because she was pressured and threatened. (Pl. Ex. 17 at 60:2–13, 65:21–66:11).

During the same proceedings, Felicia Shuler said she encountered Smith on the street on January 4, 1991, accompanied Smith to the supermarket, left with Smith to meet Smith's boyfriend, Cash, and saw that Cash was shot upon arriving at Cash's home. (D.E. # 94-19 ("Pl. Ex. 19") at 46:14–48:21.) Shuler testified that when police arrived several minutes later, Shuler heard Smith give her name as "Karen Smith," say she was at the supermarket, and say Cash had already been shot when she returned. (Pl. Ex. 19 at 48:21–25.).

In her deposition in this matter, Smith said that, at the scene of Cash's murder, she told both Scarcella and another detective, possibly DeLouisa, that she did not see anything and had gone to the store. (Pl. Ex. 2 at 190:18–191:25.) She also said that, at the precinct, she told both DeLouisa and Scarcella that she was at the store and did not see the shooting. (Pl. Ex. 2 at 209:2–5.) The statements she made at the precinct implicating Hamilton were fabricated by DeLouisa and Scarcella: "That's what they came up with. They put their heads together, not mine." (Pl. Ex.

12

2 at 207:3–14.) In particular, Scarcella coerced her into making certain statements by "threatening me, by intimidating me, wanting to strip me from my freedom and my kids and place me in jail for a crime that I had nothing to do with it." (Pl. Ex. 2 at 209:11–15.)

She also stated that she did not "willingly" testify before the grand jury, and the prosecution's strategy was to "call Scarcella, you know, get him down here. Like, that's his witness, and let him deal with it kind of—kind of thing." (Pl. Ex. 2 at 234:2–10.) She said that she was threatened by both Ponzi and Scarcella, and that "Ponzi is going to repeat the same thing that Scarcella did, because they always was both on the set." (Pl. Ex. 2 at 235:16–22.)

Smith further testified that her testimony at trial was "scripted," and that "Scarcella scripted all of this into play." (Pl. Ex. 2 at 246:13–24.) She said she was repeatedly told to "[s]tick to the script" by Gutmann, Ponzi, and "[e]verybody," but Scarcella was "the main honcho." (Pl. Ex. 2 at 270:5–20.) She said, "If I come out and try to feel something different, they would threaten me to call him and get him there to straighten me out because this is going through, basically." (Pl. Ex. 2 at 270:20–23.) In particular, Ponzi "repeated" the threats leveled by Scarcella: that if she failed to testify, she would "go to jail, be charged with accessory to murder, and lose [her] kids." (Pl. Ex. 2 at 271:5–16.) Although Gutmann did not say the "same things," Gutmann did tell her "you need to stick to the script or you're going to jail." (Pl. Ex. 2 at 271:19–22.)

## 2. Taseem Douglas

Second, in an affidavit dated September 10, 1993, Taseem Douglas stated that he, "Money" Will Dawson, Amir "Yaya" Johnson, and an individual Douglas knew only as "Daquan" were the only people present at the shooting. (NYC Defs. 56.1 ¶ 82; Ex. # 92-37 ("NYC Ex. II") at 1–2.) The four of them went to Cash's apartment to mediate a dispute between Cash and Johnson. (NYC Ex. II at 1.) At some point, Cash slapped Johnson, and Johnson and Dawson began shooting Cash.

(NYC Ex. II at 1.)  Although the other three left after the shooting, Dawson stayed behind, and Dawson later told Douglas that "he made it look like 'BUSH' Derrick Hamilton, killed Nate, because everyone in the neighborhood knew that they had a dispute recently and Derrick was already convicted for a murder."  (NYC Ex. II at 1.)  Douglas also stated that he told the law enforcement officers who questioned him that Hamilton was innocent and that Johnson and Dawson murdered Cash.  (NYC Ex. II at 1–2.)

At a post-conviction hearing in 1995, Douglas testified that he spoke with police several times and that each time, he told police that Hamilton did not commit the crime.  (NYC Ex. JJ at 2–3; Pl. Ex. 7 at 35:9–16.)  Although his testimony is not entirely clear, Douglas testified that police came to see him on several different occasions, including once at a hospital, twice at his house, and twice in one day when he was jailed in Connecticut.  (See Pl. Ex. 7 at 38:1–47:10.)  During the first interview at the Connecticut jail, during which his lawyer was not present, Douglas testified that detectives offered to drop his charge from murder to manslaughter if he testified against Hamilton.  (Pl. Ex. 7 at 45:18–46:9.)  During the second interview at the Connecticut jail, during which his lawyer was present, Douglas declined to speak through his lawyer.  (Pl. Ex. 7 at 46:12–25.)

In his deposition, Douglas testified to an incident "when Billy White and the two detectives came," and someone offered to drop his case to a lower charge if he testified against Hamilton, but he said he did not agree to testify to something that never happened.  (D.E. # 94-14 ("Pl. Ex. 14") at 135:11–21.)  At another point, although it is not clear to what meeting he is referring, Douglas testified, "I don't remember if Billy White was there, but the same ones from New York were there.  But he may have been there?"  (D.E. # 89-11 ("New Haven Ex. H") at 131:5–7.)  When Douglas was asked about the names of the detectives at the 1995 post-conviction hearing, he said

14

he could not remember their names, but he thought they were from the 79th Precinct and that one individual's name was "Wally." (Pl. Ex. 7 at 36:12–23). When asked about Scarcella's name, he said, "It sounds familiar. I can't recall. It sounds familiar." (Pl. Ex. 7 at 49:25–50:4.)

Both Scarcella and White maintain that they never interviewed Douglas, but both admit that they went to the Connecticut jail. White testified that he went to the jail where Douglas was being held one day and attempted to make arrangements to speak with Douglas through his attorney, albeit unsuccessfully. (New Haven Ex. B at 75:3–76:13.) Scarcella also said that he traveled to Connecticut to see Douglas and intended to see him, but could not. (Scarcella Ex. I at 191:18–192:6.) The record contains no evidence that Douglas ever met DeLouisa, or that DeLousia went to the Connecticut jail. (See Pl. Ex. 3, Pl. Ex. 7, Pl. Ex. 14, Pl. Ex. 16, Pl. Ex. 33.)

### 3. Alphonso and Mattie Dixon

Third, in an affidavit dated October 31, 2009, Mattie Dixon attested to various pieces of information regarding her husband, Alphonso Dixon. She averred that her husband—who died in 2003—threw a party for Lee Marvin in New Haven on January 3, 1991, and Hamilton attended that party with Kim Freeman. (D.E. # 94-37 ("Pl. Ex. 37") ¶¶ 3–5.) Mattie Dixon also averred that White came to her home early one morning in 1992 and "was very angry with my husband for being Derrick's alibi. Detective White became forceful by handcuffing Alphonso and searched his pockets finding drugs and threatened Alphonso with jail. Detective White calmed down after my husband agreed not to be Derrick's alibi." (Pl. Ex. 37 ¶ 17.) In her deposition, although Mattie Dixon admitted that she did not see the drugs herself, she also maintained that she was in the room when the interaction took place, she knew her husband sold cocaine, "Billy White said he found drugs" during the interaction, and she saw her husband "start crying when [White] went to put the handcuffs on." (New Haven Ex. C at 207:2–21.) Mattie Dixon also said that "Billy White and

[Alphonso Dixon] had a relationship where my husband was scared of him. Very scared." (D.E. # 94-42 ("Pl. Ex. 42") at 130:13–14.) She explained that, in her presence, White told Alphonso, "If you go to court I've got the handcuffs as soon as you walk out the courthouse." (Pl. Ex. 42 at 148:7–13; see also id. at 120:25–121:3, 178:4–6.) She also saw White dangle handcuffs before her husband. (Pl. Ex. 42 at 146:12–18, 153:21–154:12.)

Mattie Dixon further averred in her affidavit that, when her husband told White that Hamilton's lawyer could subpoena him to testify, "Detective White instructed my husband to call his doctor for a letter about his heart condition and began drafting an affidavit for my husband to send to Derrick's lawyer." (Pl. Ex. 37 ¶ 19.) When asked whether she heard that conversation, Mattie Dixon said: "Briefly. I just heard about his heart condition and that he had better not go to court. That's pretty much all I can remember, like, at this time." (New Haven Ex. C at 211:12–20.) Mattie Dixon also saw White writing, although she did not know what he was writing, and she understood that "the whole conversation was about this situation with Derrick." (New Haven Ex. C at 212:4–25.) She also said she never actually saw her husband's affidavit. (New Haven Ex. C. at 129:10–13, 130:15–25, 211:17–20.) Hamilton testified in his deposition that he received the letter, as well as a telephone call from Alphonso Dixon indicating that he was in the hospital. (See New Haven Ex. K; D.E. # 89-4 ("New Haven Ex. A") at 136:1–17.)

#### 4. Other Alibi Witnesses

Fourth, Hamilton submitted a series of affidavits from alibi witnesses that corroborated his account of his whereabouts on January 4, 1991.

In a 1992 notarized statement, Freeman—who was also the mother of Cash's children—explained that she attended a party with Hamilton on January 3, 1991 in New Haven and stayed with him there for the weekend. She said it was "impossible" for Derrick to have killed Cash

because she "was with him the entire time," and that she was not willing to testify because she had been threatened by Cash's friends.  (D.E. # 94-49 ("Pl. Ex. 49").)

In a 1995 affidavit, Kelly Turner said that she met Hamilton the evening of January 3, 1991; she drove to the Quality Inn to pick him up sometime between 11:00 and 11:15 am on January 4, 1991; and that they drove to her talent agency in New Haven for a meeting that lasted until around 12:00 pm.  (D.E. # 94-46 ("Pl. Ex. 46").)

In a 1995 affidavit, Davette Mahan, an employee at the talent agency, said she observed Turner and Hamilton in conversation at the talent agency on the morning of January 4, 1991.  (D.E. # 94-47 ("Pl. Ex. 47").)

In a 2010 affidavit, Tashameaka Watson, Alphonso Dixon's daughter, said that she saw Hamilton at the party on January 3, 1991, and that she saw Hamilton again around 12:30 pm at her father's house the next day.  (D.E. # 94-48 ("Pl. Ex. 48").)

### E.  The Second Department's Decision

On December 7, 2011, Hamilton was released to parole supervision.  (NYC 56.1 ¶ 89; CRU Report at 24.)

On January 15, 2014, following the lower court's denial of Hamilton's most recent motions pursuant to C.P.L. § 440.10, the Appellate Division, Second Department remanded Hamilton's motion for a hearing based on actual innocence.  As an issue of first impression, the Second Department held that a "'freestanding' claim of actual innocence is cognizable in New York, and that a defendant who establishes his or her actual innocence by clear and convincing evidence is entitled to relief under the statute."  People v. Hamilton, 979 N.Y.S.2d 97, 100 (2d Dep't 2014). In Hamilton's case, the Second Department concluded that Hamilton had made a prima facie

showing of actual innocence "based upon evidence of a credible alibi and manipulation of the witnesses, and the fact that the witness against him has recanted." Id. at 109.

### F.  Vacatur of Hamilton's Conviction

The Conviction Review Unit ("CRU") of the King's County District Attorney investigated Hamilton's case.  As part of its investigation, the CRU reviewed several witness affidavits supplied by Hamilton and interviewed certain witnesses, including Turner, Mahan, Watson, and Shuler. (CRU Report at 25–30.)  The CRU also reviewed and summarized the initial investigation, trial proceedings, and post-conviction proceedings.  (CRU Report at 1–24.)  The Supreme Court held the actual innocence hearing ordered by the Second Department in abeyance pending the results of the CRU investigation.  (CRU Report at 24.)

On January 9, 2015, the King's County District Attorney joined Hamilton in his motion to vacate his conviction and dismiss his indictment.  (D.E. # 94-12 ("Pl. Ex. 12") at 4:5–5:20.)  In a motion before the Supreme Court, Assistant District Attorney Mark Hale said that the Conviction Review Unit had determined that the sole eyewitness against Hamilton at trial was "as a whole, unreliable, incredible and for the most part untruthful."  (Pl. Ex. 12 at 4:19–20.) Because the District Attorney needed to depend on Smith's credibility to convict Hamilton, Hamilton's "due process rights were violated by the use of this witness at trial because of the nature of her inconsistency and incredibility," and accordingly, Hamilton's conviction should be "vacated on the basis of that due process violation." (Pl. Ex. 12 at 4:20–5:5, 5:14–16.)  Further, "since she was the sole eyewitness against Mr. Hamilton, there [was] no other basis to hold him for further proceedings," and therefore the District Attorney also asked that the indictment against him be dismissed. (Pl. Ex. 12 at 5:16–20.)

18

The Supreme Court (Guzman, J.) granted Hamilton's motion, vacated the judgment of conviction, and dismissed the indictment. (D.E. # 90-5 Ex. EE ("Scarcella Ex. EE") at 16.)

On August 5, 2015, Hamilton filed the instant action. (See D.E. # 1 ("Compl.").)

## STANDARD OF REVIEW

"Summary judgment is appropriate only if the pleadings, the discovery and the disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Dufort v. City of New York, 874 F.3d 338, 347 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" when it "might affect the outcome of the suit under the governing law." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson, 477 U.S. at 248).

In applying the summary judgment standard, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Dufort, 874 F.3d at 347 (quoting Estate of Gustafson ex rel. Reginella v. Target Corp., 819 F.3d 673, 675 (2d Cir. 2016)). The Court's role is not to assess the credibility of witnesses or to choose between conflicting versions of events, but to determine whether there is a genuine issue for trial—that is, "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Jeffreys, 426 F.3d at 553–54 (quoting Anderson, 477 U.S. at 252). At the same time, however, "nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" Id. at 554 (citations omitted).

## PRELIMINARY EVIDENTIARY MATTERS

Before turning to the merits of defendants' motion, the Court addresses the evidentiary objections raised to the parties' statements of undisputed material facts.

Under Rule 56.1 of the Local Civil Rules of the Eastern District of New York, the moving party must submit a numbered statement "of the material facts as to which the moving party contends there is no genuine issue to be tried," followed by citation to admissible evidence. Local Rule 56.1(a), (d); Giannullo v. City of New York, 322 F.3d 139, 142 (2d Cir. 2003). The non-moving party must submit a correspondingly numbered response, and if necessary, a statement "of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b), (d). A fact set forth by the movant "will be deemed to be admitted . . . unless specifically controverted" by the non-movant. Local Rule 56.1(c).

Although the "purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions," the court must still assure itself that the assertions made by the parties are supported by admissible evidence in the record. Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001). An affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Hamilton objects to paragraphs describing statements made by the following individuals as inadmissible hearsay: Edwardo Vargas, (Pl. 56.1 Counterstatement to NYC 56.1 ¶ 22); the witness whose identity remains protected by the King's County District Attorney's Office, (Pl. 56.1 Counterstatement to NYC 56.1 ¶ 23, Scarcella 56.1 ¶ 26); the anonymous caller, (Pl. 56.1 Counterstatement to NYC 56.1 ¶¶ 33–34, Scarcella 56.1 ¶ 27); Jerry Douglas, (Pl. 56.1 Counterstatement to NYC 56.1 ¶¶ 37–41, Scarcella 56.1 ¶¶ 22–24); and unknown sources who

informed DeLouisa and Ponzi that Hamilton was in New Haven, (Pl. 56.1 Counterstatement to NYC 56.1 ¶¶ 42–43, New Haven 56.1 ¶¶ 5–6).

Hamilton's hearsay objections are without merit. The Court may consider the statements, because Defendants are not offering those statements to prove the truth of the matter asserted—in essence, that the events took place as those witnesses described—but to prove that Defendants had probable cause to prosecute Hamilton. (See NYC Mem. at 22–24; Scarcella Mem. at 38–39; White Mem. at 24–25.) There is "clear authority" in the Second Circuit "allowing the use of hearsay to establish probable cause." United States v. Parcel of Prop., 337 F.3d 225, 236 (2d Cir. 2003); see also Tuccio v. Papstein, 307 F. App'x 545, 547 (2d Cir. 2009) (certain statements in affidavit, including voice identification, were not inadmissible hearsay and were properly before the "fact finder charged with determining whether, in light of the then-available information, a police officer had probable cause to seek an arrest warrant").

Defendants object to certain statements in Mattie Dixon's affidavit, as well as the summary of Mattie Dixon's affidavit in the CRU Report, as inadmissible hearsay. (See NYC Defs.' 56.1 Counterstatement ¶¶ 23, 24; New Haven Mem. at 13 n.6; D.E. # 89-21 ("New Haven Reply Mem.") at 8, 9 n.2.) The Court agrees that Mattie Dixon's descriptions of conversations that took place between White and Alphonso Dixon, as relayed to her by Alphonso Dixon, are inadmissible hearsay for the purpose of establishing that such conversations took place as described. See Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered "to prove the truth of the matter asserted in the statement"); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment"). The Court also cannot rely on certain averments in Mattie Dixon's affidavit as to specific threats made by White, (see, e.g., Pl. Ex. 37 ¶ 20), to which Mattie

Dixon has attested she has no personal knowledge, (see, e.g., D.E. # 89-6 ("New Haven Ex. C") at 215:22–216:12). See Fed. R. Civ. P. 56(c)(4) (affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988) (explaining that a summary judgment motion must be "supported with affidavits based on personal knowledge . . . and a hearsay affidavit is not a substitute for the personal knowledge of a party"). Accordingly, the Court does not rely on factual statements made in Mattie Dixon's affidavit, and recounted in the CRU Report,[1] that are hearsay or to which she has admitted she has no personal knowledge.

## DISCUSSION

Hamilton brings the following claims against the following defendants: (1) denial of the right to a fair trial against all defendants; (2) malicious prosecution against Scarcella, DeLouisa, and Ponzi; (3) conspiracy against Scarcella and White; and (4) negligent hiring, retention, and supervision against the City of New York. (Compl. ¶¶ 85–94, 129–33, 136–37, 142–47.)

On the record, Hamilton withdrew his false arrest claims, his claims against the New York City Police Department, and his claims against the John and Jane Doe defendants. (D.E. dated 1/31/2018.) The parties also agreed to reserve the issue of municipal liability under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), until this Court resolves the issues of individual liability. (D.E. # 28.)

---

[1] The New Haven defendants appear to also object generally to the CRU Report as inadmissible hearsay, without identifying specific statements other than its "wholesale adoption of Ms. Dixon's affidavit as unadulterated truth." (See New Haven Reply Mem. at 9 n.2.) As described supra, the Court agrees that certain statements in Mattie Dixon's affidavit are inadmissible hearsay. But the Court may rely on the CRU Report to establish, for example, the scope of the CRU's investigation and the CRU's analysis.

All individual defendants now move for summary judgment on all remaining claims, and the City of New York moves for summary judgment on the claim of negligent hiring, retention, and supervision. Ponzi asserts a defense of absolute immunity and White asserts a defense of qualified immunity. The Court first addresses Ponzi's absolute immunity defense and then addresses each claim in turn.

## I.   Absolute Immunity: Defendant Ponzi

In determining whether an official is entitled to absolute immunity, courts "take a 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.'" Simon v. City of New York, 727 F.3d 167, 171 (2d Cir. 2013) (quoting Buckley v. Fitzsimmons, 50 U.S. 259, 269 (1993)). Absolute immunity applies when an official is engaged in "prosecutorial actions that are 'intimately associated with the judicial phase of the criminal process.'" Van de Kamp v. Goldstein, 555 U.S. 335, 341 (2009) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). Such "functions include deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas," but not "'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings,'" for which an official is only entitled to qualified immunity. Simon, 727 F.3d at 171–72 (quoting Buckley, 509 U.S. at 273). When it attaches, absolute prosecutorial immunity "extends to those performing functions closely associated with that process," shielding "not only officials performing discretionary acts of a judicial nature, but also individual employees who assist such an official and who act under that official's direction in performing functions closely tied to the judicial process." Hill v. City of New York, 45 F.3d 653, 660 (2d Cir. 1995) (citation omitted); see also O'Neal v. Morales, 679

23

F. App'x 16, 19 (2d Cir. 2017) (affirming grant of absolute immunity to New York City Housing Authority Police Department detective who "investigated what could be seen from the victim's apartment only because the ADA requested that he do so shortly before trial, and only to obtain a specific piece of information relevant to anticipated trial testimony" (emphasis in original)). The official bears the burden of showing that he is entitled to absolute immunity for the function in question. Simon, 727 F.3d at 172.

Ponzi argues that he is entitled to absolute immunity because his involvement in Hamilton's criminal prosecution is limited to meeting with Smith prior to her testimony before the grand jury and at trial. (NYC Mem. at 7–10.) Hamilton contends that Ponzi is a detective-investigator, not a prosecutor, and that there is no basis to shield his intentional misconduct through absolute or qualified immunity. (Pl. Mem. at 62–68.)

The Court concludes that Ponzi is entitled to absolute immunity. At the C.P.L. § 330 hearing and in her deposition in this case, Smith testified that Ponzi coerced her into testifying before the grand jury and at trial with threats that she would be arrested for Cash's murder, sent to jail, and lose her children. (Pl. Ex. 17 at 58:5–60:13; Pl. Ex. 2 at 235:14–22, 270:5–23, 271:3–16.) Ponzi, an employee of the Kings County District Attorney's office, testified that he spoke with Smith at the request of Gutmann, the prosecutor. (NYC Ex. P. at 8:10–25.) Although there is some uncertainty in the record around the timing of Smith's conversation with Ponzi, Hamilton does not dispute—and indeed, he contends—that Smith's interactions with Ponzi were geared toward procuring her false testimony before the grand jury and at trial. The functions of "presenting a case to a grand jury or a court" and "witness preparation" are emblematic prosecutorial actions covered by absolute immunity. Simon, 727 F.3d at 171–72.

Contrary to Hamilton's argument, Ponzi is not ineligible for absolute immunity simply because he himself is not a prosecutor.  Absolute immunity covers not just prosecutors, but also "individual employees who assist" prosecutors and "who act under [their] direction in performing functions closely tied to the judicial process."  Hill, 45 F.3d at 660.  Similarly, Ponzi does not lose absolute immunity because—viewing the evidence in the light most favorable to Hamilton—he engaged in intentional misconduct by coercing a witness to testify falsely.  The fact that Ponzi "may or may not have engaged in questionable or harmful conduct . . . is irrelevant," because "[t]he immunity attaches to his function, not to the manner in which he performed it."  Barrett v. United States, 798 F.2d 565, 573 (2d Cir. 1986); see also Imbler, 424 U.S. at 427 (absolute immunity may, in some instances, "leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty"); Collins v. City of New York, 923 F. Supp. 2d 462, 472 (E.D.N.Y. 2013) ("No reasonable prosecutor could think it acceptable to submit false evidence or suborn perjury, yet prosecutorial immunity attaches to such acts.").  The nature of absolute immunity is that it affords protection from judicial scrutiny of the motive for, and reasonableness of, virtually all acts associated with an official's function as an advocate.  Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005).  Applying these principles, Ponzi is entitled to absolute immunity because the evidence of his purported misconduct relates solely to his performance of a prosecutorial function—procuring Smith's testimony in judicial proceedings.

Accordingly, the Court grants Ponzi's motion for summary judgment on all claims.

## II.    Denial of Right to a Fair Trial

A plaintiff may bring a due process claim under § 1983 asserting "the right to have one's case tried based on an accurate evidentiary record that has not been manipulated by the

prosecution." Dufort, 874 F.3d at 355. As to the remaining three defendants, Hamilton's fair trial

claims fall into three general categories: (A) the fabrication and coercion of Smith's inculpatory

statements; (B) the intimidation of Alphonso Dixon and other New Haven defense witnesses; and

(C) the failure to disclose exculpatory evidence related to Jewel Smith, Taseem Douglas, and

Alphonso Dixon. (See Compl. ¶¶ 85–94; Pl. Mem. at 15–25.)[2]  The Court addresses each category

in turn.

### A. Fabrication of Jewel Smith's Statements: Defendants DeLouisa and Scarcella

Hamilton alleges that Scarcella and DeLouisa fabricated evidence and suborned perjury by

coercing Smith to make false inculpatory statements and deliver false testimony implicating

Hamilton in Cash's murder, depriving him of his constitutional right to a fair trial.

"When a police officer creates false information likely to influence a jury's decision and

forwards that information to prosecutors, he violates the accused's constitutional right to a fair

trial." Bellamy v. City of New York, 914 F.3d 727, 745 (2d Cir. 2019) (quoting Ricciuti v. N.Y.C.

Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)).  To prevail on a § 1983 claim for denial of the

constitutional right to a fair trial based on fabricated information, a plaintiff must demonstrate that

"(1) [an] investigating official (2) fabricates information (3) that is likely to influence a jury's

verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of

life, liberty, or property as a result." Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d

Cir. 2016).[3]

---

[2] In moving for summary judgment, Defendants Scarcella and Ponzi contended that there is no
independently cognizable claim under 42 U.S.C. § 1983 based on failure to investigate. (Scarcella Mem. at
39; NYC Mem. at 18–19.)  At oral argument, Hamilton confirmed that he does not seek to press an
independent § 1983 claim based on failure to investigate. (2/1/19 Tr. at 9:2–4.)  Counsel also confirmed
that he does not seek to assert a Brady claim based on failure to disclose the ballistics evidence. (2/1/19 Tr.
at 9:5–8.)
[3] The Court does not opine on whether this right "is rooted in the Sixth Amendment or Fifth and Fourteenth
Amendments, or both," because "the constitutional harm resulting from the falsified information at issue is

Scarcella and DeLouisa contend that Hamilton's claim is time-barred; that decisions made by Hamilton and defense counsel (not to raise the issue) and the prosecutor (to go forward with the prosecution), all of whom were aware of the alleged fabrication, constitute superseding causes of Hamilton's conviction; and that the evidence that they coerced Smith is insufficient to create a genuine issue of material fact. The Court rejects Defendants' statute of limitations and causation arguments, concludes that Hamilton has raised genuine factual disputes, and denies Defendants' motion for summary judgment on this fair trial claim.

### 1. Statute of Limitations

The statute of limitations for a § 1983 claim is generally "borrowed from the statute of limitations for the analogous claim under the law of the state where the cause of action accrued." Spak v. Phillips, 857 F.3d 458, 462 (2d Cir. 2017). The parties do not dispute that the applicable law is New York's three-year statute of limitations for personal injury claims. See McDonough v. Smith, 898 F.3d 259, 265 (2d Cir. 2018), cert. granted, 2019 WL 166879 (2019); N.Y. C.P.L.R. § 214(5).

The accrual date of a § 1983 claim is governed by federal law, and it "is the standard rule that accrual occurs when a plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." McDonough, 898 F.3d at 265 (quoting Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015)). In McDonough, the Second Circuit recently clarified that a fabrication of evidence claim "accrues (1) when a plaintiff learns of the fabrication and it is used against him, and (2) his liberty has been deprived in some way." Id. at 266 (citations omitted). In that case, the plaintiff was tried twice—the first time resulting in a mistrial, and the second time resulting in an acquittal—and subsequently sought to hold officials liable for fabricating evidence

---

in any event redressable in an action for damages under 42 U.S.C. § 1983." Garnett v. Undercover Officer C0039, 838 F.3d 265, 276 n.6 (2d Cir. 2016).

and using it before the grand jury and in his two trials. Id. at 263–64. The Second Circuit rejected the reasoning of the Third, Ninth, and Tenth Circuits, which each held that a fabrication of evidence claim accrues only after criminal proceedings have been terminated, explaining as follows: "Because the injury for this constitutional violation occurs at the time the evidence is used against the defendant to deprive him of his liberty, whether it be at the time he is arrested, faces trial, or is convicted, it is when he becomes aware of that tainted evidence and its improper use that the harm is complete and the cause of action accrues." Id. at 267 (emphasis added). "Indeed, the harm—and the due process violation—is in the use of the fabricated evidence to cause a liberty deprivation, not in the eventual resolution of the criminal proceeding." Id. In doing so, the court rejected the plaintiff's argument that his claim was timely because it could not accrue until he was acquitted under Heck v. Humphrey, 512 U.S. 577 (1994). Id. at 264, 268–69. The court explained that "the Heck rule for deferred accrual is called into play only when there exists a conviction or sentence that has not been invalidated, that is to say, an outstanding criminal judgment." Id. at 268–69 (quoting Wallace v. Kato, 549 U.S. 384, 393 (2007)). "McDonough was never convicted, so Heck is not 'called into play.'" Id. (quoting Wallace, 549 U.S. at 393). As it had no occasion to reach the issue, the Second Circuit did not address the interaction between McDonough and Heck for plaintiffs like Hamilton, who were convicted based on the alleged fabricated evidence.

This Court is now presented with that issue. Defendants contend that McDonough did not limit its holding to plaintiffs who were never convicted, and that under McDonough, Hamilton's claims are time-barred and should not be equitably tolled. (NYC Opp'n to Amicus, Scarcella Opp'n to Amicus.) Hamilton knew of Smith's fabricated statements and suffered a liberty deprivation when he was arrested based on those statements in 1991, and thus he was required to commence his claim no later than 1994. (NYC Supp. Mem. at 3–5; Scarcella Supp. Mem.)

28

Hamilton and amicus curiae the Innocence Project argue that McDonough is limited to litigants who were never convicted in criminal proceedings, contending that a more expansive reading would undermine the remedial purpose of § 1983. (Pl. Supp. Mem. at 1–13; Amicus Br. at 3–12.) Because Hamilton's fabrication of evidence claim would necessarily impugn the validity of his conviction under Heck, they contend it did not accrue until his conviction was overturned in 2015. (Pl. Supp. Br. at 6.) Alternatively, if the Court concludes that Hamilton's claim is time-barred under McDonough, the Innocence Project urges the Court to apply equitable tolling. (Amicus Br. at 12–19.)

To resolve this issue, the Court must reconcile the principles enunciated in McDonough and Heck, which are in some tension in this case. Under a straightforward application of McDonough, Hamilton's claim is time-barred: Smith's fabricated and coerced testimony was used to deprive Hamilton of his liberty when he was arrested and subsequently convicted, and he became "aware of that tainted evidence and its improper use" at the very latest at trial, when his attorney presented Smith's recantation statement attesting that her inculpatory statements were fabricated. McDonough, 898 F.3d at 266–67. Hamilton's claim thus accrued by 1992, and the three-year statute of limitations has long since passed. But the Second Circuit explicitly recognized in McDonough that "the Heck rule for deferred accrual" was not "called into play" because McDonough was never convicted. Id. at 269 (quoting Wallace, 549 U.S. at 393). In this case, however, Heck is "called into play": unlike McDonough, Hamilton was subject to "a conviction or sentence that [had] not been invalidated, that is to say, an outstanding criminal judgment," from 1992 to 2015. Id. (quoting Wallace, 549 U.S. at 393.)

Under Heck, "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."

29

Heck, 512 U.S. at 489–90 (emphasis added); see also Hadid v. City of New York, 730 F. App'x 68, 71 (2d Cir. 2018) ("where a § 1983 claim would be factually inconsistent with an extant criminal conviction, the claim does not accrue until the conviction is overturned.") Thus, "the Heck rule for deferred accrual . . . . delays what would otherwise be the accrual date of a tort action until the setting aside of an extant conviction which success in that tort action would impugn." Wallace, 549 U.S. at 393. Under Heck, therefore, "a prisoner-plaintiff may not assert a civil damages claim that necessarily challenges the validity of an outstanding criminal conviction." Amaker v. Weiner, 179 F.3d 48, 51 (2d Cir. 1999). In this case, the issue is whether Hamilton's fabrication of evidence claim accrued only once his conviction was invalidated in 2015—rendering his claim timely—because it necessarily challenged the validity of his outstanding conviction under Heck.

"Unlike malicious prosecutions, many violations of constitutional rights, even during the criminal process, may be remedied without impugning the validity of a conviction." Poventud v. City of New York, 750 F.3d 121, 132 (2d Cir. 2014) (en banc). For example, § 1983 claims alleging excessive force, unlawful arrest without probable cause, or unreasonable searches may accrue before any conviction and "exist independent of the termination of the criminal proceedings." Id. By contrast, the Second Circuit has held that Brady-based § 1983 claims "necessarily imply the invalidity of the challenged conviction," because establishing a Brady violation requires a plaintiff to demonstrate prejudice, the "'touchstone'" of which is a "'reasonable probability of a different result'" at trial. Id. at 133 (quoting Leka v. Portuondo, 257 F.3d at 89, 104 (2d Cir. 2001)). A Brady violation warrants a "vacatur of the judgment of conviction and a new trial in which the defendant now has the Brady material available to her." Id. at 133. In addition, a § 1983 claim may "necessarily imply that the plaintiff's criminal

conviction was wrongful" if, "[i]n order to prevail in this § 1983 action, [the plaintiff] would have to negate an element of the offense of which he has been convicted." Heck, 512 U.S. at 486 n.6.

In applying these principles, the Court concludes that Hamilton's fabrication of evidence claim would have necessarily implied the invalidity of his conviction, and under Heck, and it did not accrue until his conviction was invalidated in 2015. The gravamen of Hamilton's claim is that Defendants coerced Smith—the sole eyewitness against him at trial—into falsely identifying him as the perpetrator of Cash's murder and testifying to that effect in judicial proceedings, thereby depriving him of his right to a fair trial. This fabrication claim requires Hamilton to prove, among other things, that the fabricated testimony was "likely to influence a jury's decision," Ricciuti, 124 F.3d at 130, a showing that—by definition—would cast doubt on the jury's conclusion and "necessarily imply the invalidity of his conviction or sentence," Heck, 512 U.S. at 487. See Warren v. Fischl, 674 F. App'x 71, 73 (2d Cir.), cert. denied, 138 S. Ct. 123 (2017) (finding that appellant's claims alleging that defendants "conspired to fabricate evidence and testimony against him and introduced such fabricated evidence and perjury at trial," if proved, "would demonstrate the invalidity of his conviction," and were therefore barred by Heck); Bailey v. City of New York, 79 F. Supp. 3d 424, 455 (E.D.N.Y. 2015) (finding that plaintiff's claims were not time-barred under Heck, because had plaintiff "raised his fair trial claim—premised on the fabrication of evidence, which resulted in his arrest and subsequent conviction—prior to the date his conviction was invalidated, his complaint would have been dismissed because it would have necessarily implied the unlawfulness of his conviction"); cf. Poventud, 750 F.3d at 132–33 (a Brady-based § 1983 claim necessarily implies the invalidity of the challenged conviction because, among other things, it requires plaintiff to show a "reasonable probability of a different result" at trial).

The Court recognizes that this conclusion is in some tension with the Second Circuit's decision in McDonough. Although defendants contend that McDonough employs no limiting language and, in fact, specifically contemplates the application of its accrual rule to litigants who were convicted, (NYC Supp. Mem. at 2–3), McDonough also explicitly recognized that Heck was not "called into play" in that case. Moreover, its reasoning was drawn principally from Veal v. Geraci, 23 F.3d 722 (2d Cir. 1994), a decision that pre-dated the Supreme Court's decision in Heck. Therefore, McDonough's applicability to a litigants who fall within Heck's ambit is debatable. See Shabazz v. Kailer, 201 F. Supp. 3d 386, 395 & n.3 (S.D.N.Y. 2016) ("It is plain that Veal had no opportunity to consider Heck and its progeny and that Heck makes it clear that when a § 1983 claim challenges the validity of a conviction, as the fair trial claim does in this case, the claim accrues only when the conviction is reversed or otherwise vacated.").

Heck is undoubtedly "called into play" in this case, and the Court is not at liberty to ignore governing and applicable Supreme Court precedent. Indeed, much as the Second Circuit declined to address Heck because the plaintiff was never convicted, citing Wallace, Wallace compels this Court to consider Heck, because Hamilton was convicted. See Wallace, 549 U.S. at 393 ("[T]he Heck rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has not been . . . invalidated,' that is to say, an 'outstanding criminal judgment.'"); see also In re CBI Holding Co., Inc., 529 F.3d 432, 469 (2d Cir. 2008) (noting that the court does not "have the discretion to ignore Supreme Court precedent"). As explained above, under Heck, the Court concludes that Hamilton's claim did not accrue until his conviction was invalidated in 2015, because his fabrication of evidence claim—if brought earlier—would have necessarily implied the invalidity of his 1992 conviction. Accordingly, Hamilton's claim is timely.

32

## 2. Causation

"A § 1983 action, like its state tort analogs, employs the principle of proximate causation."

Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999). Under traditional tort principles,

"[a] superseding cause is an act of a third person or other force which by its intervention prevents

the actor from being liable for harm to another which his antecedent negligence is a substantial

factor in bringing about." Id. at 147 (quoting Restatement (Second) of Torts § 440 (1965))

(alteration in original). Thus, an official is not liable for his misconduct under § 1983 if there is a

"superseding cause" of the plaintiff's conviction, such as the "intervening exercise of independent

judgment" by a later party—like the prosecutor, the judge, or the jury—at least "in the absence of

evidence that the police officer misled or pressured the official who could be expected to exercise

independent judgment." Id.

At the same time, an intervening decision-maker will not absolve a defendant of liability if

the defendant "misled or coerced the intervening decision-maker such that the decision-maker's

conduct was tainted," Bermudez v. City of New York, 790 F.3d 368, 374 (2d Cir. 2015) (quoting

Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)), or if the intervening decision-maker

"was simply not informed of the alleged problems with the evidence," id. The Second Circuit has

also suggested that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or

judge) is not misled or coerced, it is not readily apparent why the chain of causation should be

considered broken where the initial wrongdoer can reasonably foresee that his misconduct will

contribute to an 'independent' decision that results in a deprivation of liberty." Higazy v.

Templeton, 505 F.3d 161, 177 (2d Cir. 2007) (quoting Zahrey v. Coffey, 221 F.3d 342, 352 (2d

Cir. 2000)); see also Shabazz, 201 F. Supp. 3d at 397 ("Where a police officer deceives subsequent

decision makers with false information, the chain of causation need not be considered broken

33

because the officer can reasonably foresee that his misconduct will contribute to the subsequent decisions that result in a deprivation of liberty.").

In this case, Scarcella and DeLouisa contend that there were two superseding causes of Hamilton's conviction: (1) the strategic decision by Hamilton and his defense counsel not to attack the validity of Smith's identification, even though they knew about the alleged fabrication, and (2) the independent decision by prosecutors to proceed with Hamilton's prosecution, even though they knew about the alleged fabrication. (NYC Mem. at 11–14.)

As for the first superseding cause, this Court is not aware of any decision in this Circuit, nor have Defendants cited any, in which an independent decision by a defendant or defense counsel—rather than by a judge, grand jury, or a prosecutor—was held to be a superseding cause of a defendant's conviction, shielding an officer from an otherwise viable fabrication of evidence claim. But see Higazy, 505 F.3d at 182 (Jacobs, J., concurring) ("Higazy would have been aware that his confession was coerced and could tell his lawyer; causation would be interrupted if he failed to do so, or if he told his lawyer who then failed to raise the issue . . . ."). The "superseding cause doctrine 'was intended to relieve a party of responsibility for injuries which he could not have foreseen and ultimately did not cause—injuries arising from a force or actor wholly outside of the circumstances of the original negligence.'" In re Sept. 11 Litig., 621 F. Supp. 2d 131, 147 (S.D.N.Y. 2009) (quoting Rawl v. United States, 778 F.2d 1009, 1016 (4th Cir. 1985)). In this case, however, Scarcella and DeLouisa could "reasonably foresee that [their] misconduct [would] contribute to an 'independent' decision that results in a deprivation of liberty." Zahrey, 221 F.3d at 352. For example, Scarcella and DeLouisa could have foreseen that, even if Hamilton knew that Smith's testimony was fabricated or coerced, it would have been difficult if not impossible for Hamilton to prove that fact. Defense counsel may have deployed scarce trial

34

resources differently, or defense counsel may not even have believed his client.  Moreover, a "proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury." Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir. 2000).  On this record, the Court cannot rule out the inference that the claimed coercion and fabrication of Smith's statements by Scarcella and DeLouisa were a "substantial factor" in bringing about Hamilton's conviction.

As for the second superseding cause, the Court concludes that genuine issues of material fact exist regarding knowledge of the alleged coercion by the prosecutor.  Smith said in her deposition that Gutmann told her, "you need to stick to the script or you're going to jail."  (Pl. Ex. 2 at 271:20–21.)  But she also denied that Gutmann said the "same things" as Ponzi and Scarcella— namely, that she would "go to jail, be charged with accessory to murder, and lose [her] kids," (Pl. Ex. 2 at 271:3–22)—and she testified in post-conviction proceedings only that Gutmann "heard" Ponzi's threats, (Pl. Ex. 17 at 59:4–17).  Gutmann testified that she was not aware that Smith did not want to testify.  (Scarcella Ex. Y at 92:18–22.)  A reasonable jury could conclude that Scarcella and DeLouisa misled Gutmann about the circumstances surrounding Smith's inculpatory statements, which prevented her from "making an informed decision about the reliability of that evidence."  Bermudez, 790 F.3d at 376.  Moreover, even if Smith told Gutmann that she was coerced, a jury could conclude that Scarcella and DeLouisa could "reasonably foresee that [their] misconduct [would] contribute to an 'independent' decision that results in a deprivation of liberty," Zahrey, 221 F.3d at 352, perhaps because Gutmann would be inclined to credit their accounts rather than Smith's account of her willingness to testify.

Accordingly, the Court rejects Defendants' argument that any decisions made by Hamilton, his defense counsel, and Gutmann were, as a matter of law, superseding causes of Hamilton's conviction.

### 3. Credibility of Smith's Testimony

The Court rejects Defendants' contention that Smith's recantation testimony and story of coercion is too incredible to create a genuine issue of material fact. (NYC Mem. at 14–15; Scarcella Mem. at 22–33.)  This is not the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," rendering summary judgment appropriate. Jeffreys, 426 F.3d at 554. Smith's testimony is undoubtedly self-contradictory, and in moving to vacate Hamilton's conviction, the Brooklyn District Attorney's Conviction Review Unit "determined that she is, as a whole, unreliable, incredible and for the most part untruthful." (Pl. Ex. 12 at 4:19–20.)  But Smith is a third-party witness, not the plaintiff, and has no apparent vested interest in the outcome of this case.  And her story of fabrication is supported by the fact that, although Smith's initial exculpatory statement was recorded in DeLouisa's notebook, it was not mentioned in DeLouisa's subsequent official interview report. (Compare NYC Ex. E, with NYC Ex. H.)  And more broadly, Hamilton's version of events is supported not only by Smith's testimony, but by the affidavits and testimony of additional third-party witnesses, including Shuler, (Pl. Ex. 19), Taseem Douglas (NYC Ex. II, Pl. Ex. 7), Alphonso Dixon, (New Haven Ex. K), Mattie Dixon, (Pl. Ex. 37), Turner, (Pl. Ex. 46), and Mahan (Pl. Ex. 47).  There has been no showing that Hamilton "manufactured a sham issue of fact" by proffering the testimony of a witness whose contradiction "is not only unequivocal but is left unexplained." In re Fosamax Prod. Liab. Litig., 707 F.3d 189, 194 (2d Cir. 2013).  Hamilton's explanation for

Smith's self-contradictory testimony is that defendants coerced her into identifying Hamilton as the perpetrator of Cash's murder after she told them that Hamilton was not involved.

A reasonable jury could credit Smith's recantation of her inculpatory statements to the grand jury and at trial, as well as her story that she was coerced into implicating Hamilton. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Jeffreys, 426 F.3d at 553–54 (quoting Rule v. Brine, 85 F.3d 1002, 1011 (2d Cir. 1996)).

*　　*　　*

Having rejected Defendants' statute of limitations and causation arguments, the Court concludes that Hamilton has adduced sufficient evidence to allow the reasonable inference that Scarcella and DeLouisa fabricated evidence, depriving him of the right to a fair trial. A jury could conclude that both Scarcella and DeLouisa coerced Smith into identifying Hamilton as the perpetrator of Cash's murder, even though she told them that she did not witness anything; those statements by the sole eyewitness were likely to influence the jury verdict; the reports were forwarded to the prosecutor; and Hamilton was convicted as a result of that fabricated testimony. Garnett, 838 F.3d at 279.

Accordingly, the Court denies Scarcella's and DeLouisa's motions for summary judgment on Hamilton's fair trial claim alleging that they fabricated evidence and suborned perjury by coercing Smith to make false inculpatory statements and deliver false testimony.

### B. Intimidation of Defense Witnesses: Defendant White

Hamilton contends that White intimidated and threatened Alphonso Dixon, precluding Alphonso Dixon and other "New Haven witnesses" from testifying at Hamilton's trial in his

defense and thereby depriving him of the right to a fair trial.[4]  (Compl. ¶ 86c; Pl. Mem at 15–25.)

As an initial matter, it is unclear whether Hamilton's claim should be evaluated as a claim for

fabrication of evidence, (see New Haven Mem. at 12–16, New Haven Supp. Mem. at 1–5), or as a

distinct fair trial claim, (see 2/1/19 Tr. at 47:13–15 (Hamilton's counsel characterizing claim as a

"fair trial related claim because . . . by preventing a witness from testifying properly, that would

be a violation of fair trial rights.").  The Court need not decide which framework applies, however,

because under either framework, the Court concludes that Hamilton has raised genuine factual

disputes that preclude summary judgment, and White is not entitled to qualified immunity.

### 1. Fabrication of Evidence Framework

Under the fabrication of evidence framework, the Second Circuit has held that

"government officials may be held liable for fabricating evidence through false statements or

omissions that are both material and made knowingly." Morse v. Fusto, 804 F.3d 538, 547 (2d

Cir. 2015) (emphasis added).  That is because "[i]nformation may be 'false' if material omissions

render an otherwise true statement false." Id. at 548.  In this case, Hamilton has adduced sufficient

evidence to allow the reasonable inference that, by intimidating Alphonso Dixon and preventing

him from testifying as an alibi witness, White failed to forward information that was likely to

influence a jury's verdict and thereby violated Hamilton's right to a fair trial. See Garnett, 838

F.3d at 279; Ricciuti, 124 F.3d at 130.

According to her deposition, Mattie Dixon personally heard White tell Alphonso Dixon

that if he went to court to testify for Hamilton, White would be outside with handcuffs, (Pl. Ex. 42

at 120:25–121:3, 148:7–13, 178:4–6), and she watched White dangle handcuffs before her

husband, (Pl. Ex. 42 at 146:12–18, 153:21–154:12).  She also observed White forcefully handcuff

---

[4] At oral argument, counsel for Hamilton clarified that Hamilton is not asserting that Scarcella was involved in the witness intimidation.  (2/1/19 Tr. at 51:23–52:4.)

Alphonso Dixon, say he found drugs (although she did not see the drugs herself), and threaten Alphonso Dixon with jail, only to calm down when her husband agreed not to testify as an alibi witness. (Pl. Ex. 37 ¶ 17; New Haven Ex. C at 207:2–21.) A reasonable jury could infer, based on this evidence, that White threatened Alphonso Dixon in relation to serving as Hamilton's alibi witness.

But it is not sufficient for Hamilton to show that White intimidated Alphonso Dixon: Hamilton must also show that White's intimidation caused Alphonso Dixon not to testify, thereby depriving him of his liberty. See Zahrey, 221 F.3d at 349 (cognizable fabrication-of-evidence claim requires that "the deprivation of liberty of which [plaintiff] complains can be shown to be the result of [defendant's] fabrication of evidence"); Townes, 176 F.3d at 146 (Section 1983 "employs the principle of proximate causation"). As Defendants point out, the record contains evidence that Alphonso Dixon suffered from a serious health problem at the time of Hamilton's trial: Alphonso Dixon's affidavit says his doctor had advised him not to travel to New York to testify based on his health problems, and Hamilton testified in his deposition that he received the letter, as well as a telephone call from Alphonso Dixon indicating that he was in the hospital. (See New Haven Ex. K, New Haven Ex. A at 136:1–17.) But Mattie Dixon averred that "Detective White instructed my husband to call his doctor for a letter about his heart condition and began drafting an affidavit for my husband to send to Derrick's lawyer." (Pl. Ex. 37 ¶ 19.) She admitted that her knowledge of that interaction was limited and that she did not actually see her husband's affidavit. (New Haven Ex. C. at 129:10–13, 130:15–25, 211:17–20.) But she "heard about his heart condition and that he had better not go to court," saw White writing something (although she did not know what he was writing), and she understood that "the whole conversation was about this situation with Derrick." (New Haven Ex. C at 211:17–212:25.) While sparse, the Court

concludes that, based on this evidence as well as the admissible evidence of White's threats to Alphonso Dixon that Mattie Dixon personally observed, a reasonable jury could conclude that White's intimidation—and not his health condition—caused Alphonso Dixon not to testify. And this testimony was likely to influence a jury's verdict: no alibi witnesses testified in Hamilton's defense, (see NYC 56.1 ¶ 72), and Alphonso Dixon's testimony would have supported Hamilton's version of events, (see Def. Ex. K.) Although Hamilton listed Freeman and James Hamilton as alibi witnesses, neither actually testified—and even if they had, it is by no means clear that their testimony would have been a comparable substitute to that of Alphonso Dixon, a key player in Hamilton's version of events. See Washington v. Smith, 219 F.3d 620, 634 (7th Cir. 2000) (the fact that one witness testified consistent with defendant's alibi "did not render additional testimony cumulative" where additional witnesses were potentially more credible).

Finally, contrary to White's contention, Hamilton's witness intimidation claim would not be time-barred under McDonough, for substantially the reasons that his fabrication of evidence claim based on Jewel Smith's testimony is not time-barred. Proving his claim could have necessarily implied the invalidity of Hamilton's conviction. See Zarro v. Spitzer, 274 F. App'x 31, 34–35 (2d Cir. 2008) (in §1983 suit, affirming dismissal under Heck of "Counts 4 and 8, which accuse the defendants of tampering with evidence and intimidating a witness," because they "would also implicate the validity of [plaintiff's] conviction"). Thus, Hamilton's intimidation claim was barred by Heck and did not accrue until Hamilton's conviction was overturned in 2015.

### 2. Separate Intimidation Claim

Hamilton has not cited, and the Court is not aware of, authority within this Circuit establishing a § 1983 fair trial claim based on witness intimidation. But the Second Circuit has indicated in the context of a direct appeal that "[u]nder certain circumstances, intimidation or

threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights." United States v. Pinto, 850 F.2d 927, 932 (2d Cir. 1988). It has also evaluated a witness intimidation claim in the context of a habeas petition. See Buie v. Sullivan, 923 F.2d 10, 11–13 (2d Cir. 1990). To establish a due process violation based on witness intimidation, a defendant must generally show that (1) "he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means," (2) "bad faith on the part of the government," and (3) "'that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" United States v. Williams, 205 F.3d 23, 29–30 (2d Cir. 2000) (quoting Buie, 923 F.2d at 12). Thus, a due process violation does not arise "merely because . . . the government warns a defense witness of the consequences of committing perjury." Id. at 29. Finally, a plaintiff would need to demonstrate that the intimidation was the proximate cause of a defense witness's failure to testify. Townes, 176 F.3d at 146 (Section 1983 "employs the principle of proximate causation").

In this case, assuming that a witness intimidation claim is cognizable under §1983, Hamilton has adduced sufficient evidence to allow a reasonable jury to conclude that his due process rights were violated by White's intimidation of Alphonso Dixon. Williams, 205 F.3d at 29–30; see also Pinto, 850 F.2d at 932. First, as described supra, the record supports the reasonable inference that White intimidated Alphonso Dixon in relation to serving as Hamilton's alibi witness, and that the intimidation—not his health problems—caused Alphonso Dixon not to testify. Alphonso Dixon's alibi testimony could not have been reasonably obtained through other means, such as through documentary evidence or the testimony of another witness, and it is not clear that the testimony of other proffered alibi witnesses would have been a comparable substitute. Second, White acted in bad faith by threatening Alphonso Dixon with jail, if he chose to testify.

41

See Webb v. Texas, 409 U.S. 95, 98 (1972) (judge's "threatening remarks" about perjury "directed at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment"). Third, the deprivation of his right to present Alphonso Dixon's alibi testimony necessarily prevented a fair trial: he was convicted based largely on the testimony of one eyewitness and was unable to present a key witness in his own defense.

### 3. Qualified Immunity

White contends that, even if this Court concludes that a genuine factual dispute precludes summary judgment for White, he is entitled to qualified immunity on the witness intimidation claim because the alleged intimidation occurred before the Second Circuit first recognized a fair trial claim in Ricciuti. (White Mem. at 33.) Thus, the constitutional right at issue was not clearly established before the events at issue in this case.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). To be clearly established, "a legal principle must have a sufficiently clear foundation in then-existing precedent" such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. at 590. The Court concludes that White is not entitled to qualified immunity, given the disputed facts and the nature of the allegations against him in this case. The Supreme Court has long recognized the right of a defendant to present witnesses in his own defense:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of

challenging their testimony, he has the right to present his own witnesses to establish a
defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967). The Supreme Court also recognized in 1972 that
such a right can be violated when a judge's "threatening remarks, directed only at the single
witness for the defense, effectively drove that witness off the stand." Webb, 409 U.S. at 98.
"Although Webb dealt only with judicial misconduct, wrongful conduct by prosecutors or law
enforcement officers can also constitute 'substantial government interference' with a
defense witness's choice to testify." Soo Park v. Thompson, 851 F.3d 910, 919 (9th Cir. 2017).

In Ricciuti itself—the case in which White contends that the Second Circuit first
recognized a fair trial claim based on fabricated evidence—the Second Circuit denied qualified
immunity to the officers on summary judgment. After pronouncing the standard, the court found
that a reasonable jury could find that defendants "violated the plaintiffs' clearly established
constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession
almost certain to influence a jury's verdict," concluding that qualified immunity was "unavailable
where, as here, the action violates an accused's clearly established constitutional rights, and no
reasonably competent police officer could believe otherwise." 124 F.3d at 130. And in Morse,
the Second Circuit concluded that the officers were not entitled to qualified immunity on a
fabrication of evidence claim, although there was "no prior decision of ours precisely equating the
fraudulent omission of factual information from a document with the affirmative perpetration of a
falsehood," because "there is no plausible legal distinction between misstatements and omissions
that we can perceive in this context" and the right not to be deprived of liberty as the result of a
defendant's knowing fabrication of evidence was clearly established. 804 F.3d at 550; see also
Zahrey, 221 F.3d at 357 (denying qualified immunity where the clearly established right at issue
was not limited to the "right not to be deprived of liberty as a result of an investigating

43

prosecutor's fabrication of evidence," but "appropriately identified as the right not to be deprived of liberty as a result of <u>any government officer's</u> fabrication of evidence").

When these principles are applied to the facts of this case, viewed in the light most favorable to Hamilton, the Court concludes that qualified immunity is not appropriate: any reasonably competent officer would have concluded that it was unlawful to threaten to incarcerate a potential alibi witness in order to keep that witness from testifying on behalf of Hamilton. It may well be that White is entitled to qualified immunity under the version of facts found by the jury. But White has not met his burden of proving that he is entitled to qualified immunity at this juncture.

\*       \*       \*

The Court further notes that the record is devoid of any evidence that White intimidated any other witness from testifying, including Mattie Dixon, Freeman, Turner, Mahan, and Watson. Indeed, Mattie Dixon testified only to White's threatening demeanor, (New Haven Ex. C at 157:1–7), and admitted that she had no personal knowledge of White's alleged intimidation of Freeman, (<u>compare</u> Pl. Ex. 37 ¶ 20, <u>with</u> New Haven Ex. C at 215:22–216:12). The other three witnesses explicitly denied that they ever interacted with White in relation to Hamilton's trial. (D.E. # 89-8 ("New Haven Ex. E") at 135:4–6, 137:2–5; D.E. # 89-7 ("New Haven Ex. D") at 90:2–7, 91:23–92:6; D.E. # 89-12 ("New Haven Ex. I") at 52:3–53:2.)

Accordingly, the Court denies White's motion for summary judgment on Hamilton's fair trial claim alleging that he intimidated Alphonso Dixon and prevented him from testifying as an alibi witness at Hamilton's trial, but grants White's motion for summary judgment as to the intimidation of any other "New Haven witnesses."

### C. Failure to Disclose Exculpatory Evidence under <u>Brady</u>: Defendants DeLouisa, Scarcella, and White

Hamilton argues that he was entitled to exculpatory evidence that can be broadly classified into three categories: (1) evidence related to Jewel Smith; (2) evidence related to Taseem Douglas; and (3) evidence related to Alphonso Dixon.  (Pl. Mem. at 21.)

"When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)."  <u>Bellamy</u>, 914 F.3d at 751; <u>see</u> <u>Bermudez</u>, 790 F.3d at 376 n.4 ("Police officers can be held liable for <u>Brady</u> due process violations under § 1983 if they withhold exculpatory evidence from prosecutors."); <u>see also</u> <u>Fappiano v. City of New York</u>, 640 F. App'x 115, 118 (2d Cir. 2016) (a fair trial claim "where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant" is "essentially a civil claim seeking damages for a <u>Brady</u> violation").

To establish a <u>Brady</u> violation, a plaintiff must generally meet three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>United States v. Rivas</u>, 377 F.3d 195, 199 (2d Cir. 2004) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999)).[5]

In general, "police satisfy their obligations under <u>Brady</u> when they turn exculpatory evidence over to the prosecutors," because "prosecutors, who possess the requisite legal acumen,

---

[5] The parties do not dispute that Hamilton's <u>Brady</u>-based claims are timely.  The Second Circuit held "that <u>Brady</u>-based § 1983 claims necessarily imply the invalidity of the challenged conviction in the trial (or plea) in which the <u>Brady</u> violation occurred."  <u>Poventud v. City of New York</u>, 750 F.3d 121, 132 (2d Cir. 2014) (en banc) (emphasis omitted).  As such, they are barred by <u>Heck</u>, meaning that "the statute of limitations begins to run upon the invalidation, not the time of the alleged government misconduct."  <u>Amaker v. Weiner</u>, 179 F.3d 48, 52 (2d Cir. 1999).

[are] charged with the task of determining which evidence constitutes Brady material that must be disclosed to the defense." Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992). And "as long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001). Whether a disclosure has been made in time for its "effective use" requires a court to assess the "sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001). Thus, "a disclosure made on the eve of trial (or after trial has begun) may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage." Id. at 101. In addition, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." Leka, 257 F.3d at 100 (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)).

Prejudice requires a plaintiff to show "materiality." Poventud, 750 F.3d at 133. The "touchstone of materiality is a reasonable probability of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (quoting Leka, 257 F.3d at 104) (emphasis omitted). Said differently, "materiality does not depend on factual innocence, but rather what would have been proven absent the violation." Id. at 134. "For example, a § 1983 plaintiff proceeding on a Brady theory can succeed on his claim if, had the withheld information been disclosed prior to trial, 'he would have been acquitted based on reasonable doubt or convicted on a lesser charge.'" Bellamy, 914 F.3d at 751 (quoting Poventud, 750 F.3d at 134–35.)

### 1. Jewel Smith: Defendants DeLouisa and Scarcella

Hamilton argues that DeLouisa and Scarcella failed to disclose two primary pieces of evidence related to Jewel Smith: (1) her initial exculpatory statements, including her statement to DeLouisa under the alias "Karen Smith," and (2) their misconduct in coercing Smith to provide a fabricated inculpatory account.  (Pl. Mem. at 15–25.)

### a. Exculpatory Statements: Defendants DeLouisa and Scarcella

As to the first category, the Court concludes that genuine factual issues preclude summary judgment on Hamilton's claim that defendants failed to disclose Smith's initial exculpatory statements.  In particular, Hamilton has adduced evidence that Smith told DeLouisa and Scarcella that she was at the store and did not witness the murder.  She made such statements at the scene, including as memorialized in DeLouisa's spiral notebook.  (See NYC Ex. E; Pl. Ex. 2 at 191:2–10 ("Q: . . . Did you speak to Scarcella at the scene? A: Upstairs in the house, I did. . . . Q: What did you tell him? A: He asked me my name, and I told him my alias, and I told him I didn't see anything. I told him I went to the store . . . .").)  She also made such statements at the precinct. (See Pl. Ex. 2 at 209:2–7 ("Q: So it's your testimony now that, at the precinct, you told Detective DeLouisa and Detective Scarcella that you were at the store and never saw the shooting?  A. I did. If I told the first police on the scene,  why would I not tell the homicide? I told them the same thing.").)    Hamilton has the right to argue to a jury that, with the only eyewitness against him impeached—an eyewitness who the Brooklyn District Attorney has explicitly recognized was central to the case against Hamilton, (Pl. Ex. 12)—"he would have been acquitted based on reasonable doubt . . . ."  Poventud, 750 F.3d at 135; see United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (government's duty to disclose "includes information that could be used to impeach government witnesses, so-called Giglio material").

Defendants contend that there is no <u>Brady</u> violation because no evidence was actually suppressed: DeLouisa's spiral memo book, containing entries describing his interviews with "Karen Smith" and "Jewel," was turned over to Hamilton before trial. (<u>See</u> NYC Ex. E at 12–13; Scarcella Mem. at 35–36; D.E. # 91 ("Scarcella Reply Mem.") at 12–14; NYC Mem. at 15–17; D.E. # 92-39 ("NYC Reply Mem.") at 4–5.) DeLouisa argues that, "from the contents of the note, it should be clear that Jewel Smith and Karen Smith are the same person, or, at the very least, that Jewel Smith told Detective DeLouisa that she went to the store," and defense counsel "could have called Detective DeLouisa to ask him about the note or he could have asked Jewel Smith about the memobook entry on cross examination, but instead chose to do neither." (NYC Mem. at 17.) In addition, in a decision denying Hamilton's post-conviction motion pursuant to C.P.L. § 330, the state court cited an affidavit—not contained in the record before this Court—in which Hamilton "admits that he knew that Karen Smith and Jewel Smith were one and the same, and that he even told defense counsel of his beliefs." (NYC Ex. GG at 4.) These arguments do not persuade the Court that the defendants are entitled to summary judgment on the <u>Brady</u> claims.

First, the disclosure of DeLouisa's notebook would not affect Scarcella's liability as to exculpatory statements Smith made to him directly. And the record contains evidence that such statements were made. (<u>See, e.g.</u>, Pl. Ex. 2 at 209:2–7 ("Q: So it's your testimony now that, at the precinct, you told Detective DeLouisa and Detective Scarcella that you were at the store and never saw the shooting? A. I did. If I told the first police on the scene, why would I not tell the homicide? I told them the same thing.")

Second, although the pages from DeLouisa's notebook were turned over to the defense, the Court does not agree with Defendants that the relevant entry makes clear that "Karen Smith" and "Jewel" were the same person. Indeed, even the prosecutor in Hamilton's case, Gutmann, did not

understand that to be the case. (NYC Ex. GG at 6, 9–10.) And if the prosecutor "was not informed about this evidence," then the defendant officers "could be found to have been a proximate cause" of the government's failure to disclose that exculpatory evidence. Bermudez, 790 F.3d at 376 n.4.

Finally, as for the affidavit referenced in the state court's decision in which Hamilton apparently "admit[ted] that he knew that Karen Smith and Jewel Smith were one and the same" and told defense counsel of his belief, (NYC Ex. GG at 4), unfortunately, the affidavit itself is not before the Court.

Under these circumstances, the Court cannot conclude, as a matter of law, that Scarcella or DeLouisa satisfied their Brady obligation to disclose that Smith initially gave exculpatory statements. That includes DeLouisa's failure to disclose facts related to the conversation memorialized in his notebook: that Smith gave an exculpatory statement under the alias "Karen Smith," and that "Karen Smith" and "Jewel" were the same person.

### b. Coercion: Defendants DeLouisa and Scarcella

The Court concludes, however, that defendants are entitled to summary judgment on Hamilton's claim that defendants failed to disclose that they coerced Smith into implicating Hamilton, because the record shows that Hamilton "knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." Leka, 257 F.3d at 100 (quoting LeRoy, 687 F.2d at 618). When Smith was asked at her deposition whether Hamilton "would have known the circumstances of [her] coercion and why [she] did what [she] did" based on her communications with him before trial, Smith answered, "Yes." (Pl. Ex. 2 at 88:9–13.) When Hamilton was asked at his deposition, "Did you talk to your attorney about cross-examining Jewel Smith about the fact that she had been coerced into implicating you in this crime?," Hamilton answered, "Yes." (Pl. Ex. 15 at 141:9–25.)

49

Although Sheinberg indicated in his deposition that he had "no recollection" of being told that a witness had been tampered with in Hamilton's case, (NYC Ex. CC at 99:10–100:1), Hamilton's and Smith's testimony, taken together, establish that Hamilton himself "knew . . . of the essential facts" surrounding Smith's alleged coercion by police officers, and thus the evidence was not "suppressed" under Brady. Leka, 257 F.3d at 100; see also Nnodimele v. Derienzo, No. 13-CV-3461 (ARR), 2016 WL 337751, at *16 n. 7 (E.D.N.Y. Jan. 27, 2016) (granting summary judgment on Brady claim against officers who suppressed the fact that plaintiff's self-identification statements were fabricated, because "plaintiff knew that he had not made the self-identification statements to either detective and, therefore, knew that the detectives had fabricated evidence"); Vaknin v. United States, No. 08-CV-2420 (DGT), 2010 WL 3394659, at *12 (E.D.N.Y. Aug. 23, 2010) ("[T]here is no Brady violation because the alleged 'Brady' material simply would have confirmed what [defendant] already knew."). "The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." LeRoy, 687 F.2d at 619. On this record, the fact that Smith's statements and testimony were coerced do not, by Hamilton's and Smith's own admissions, fall into the category of evidence "only known to the Government." Id.

*     *     *

Accordingly, the Court grants Scarcella's and DeLouisa's motions for summary judgment on Hamilton's claim alleging that they failed to disclose their misconduct in coercing Smith, but denies their motions on Hamilton's claim alleging that they failed to disclose her initial exculpatory statements, including that DeLouisa failed to disclose that Jewel Smith gave an

50

exculpatory statement as "Karen Smith" and that "Karen Smith" and "Jewel" were the same person in the context of those statements.

### 2. Alphonso Dixon: Defendant White

Hamilton appears to argue that White failed to disclose that, by intimidating and threatening Alphonso Dixon, he inhibited the New Haven witnesses from testifying at Hamilton's trial. (Pl. Mem. at 21.)  White does not separately address any Brady claim.  As discussed supra, there is no evidence that White intimidated any witness other than Alphonso Dixon, including Mattie Dixon, Freeman, Turner, Mahan, and Watson. (See New Haven Ex. C at 157:1–7, 215:22– 216:12; New Haven Ex. E at 135:4–6, 137:2–5; New Haven Ex. D at 90:2–7, 91:23–92:6; New Haven Ex. I at 52:3–53:2.)  As for his intimidation of Alphonso Dixon, however, the Court concludes that Hamilton has adduced sufficient evidence to allow the reasonable inference that White failed to disclose the intimidation under Brady.  See Bermudez, 790 F.3d at 376 n.4 (the "same disputed issues of material fact" that exist regarding the faulty identification procedures and coercion of witnesses also exist for plaintiff's separate Brady claim alleging that those facts should have been disclosed).

In this case, viewing the evidence in the light most favorable to Hamilton, a reasonable jury could conclude that White failed to disclose evidence under Brady.  First, the fact that White intimidated a key alibi witness from testifying is exculpatory.   Second, the evidence was suppressed, because White did not disclose to Hamilton or to Gutmann that he intimidated Alphonso Dixon by threatening him with jail if he testified on Hamilton's behalf.  Nor does it appear that Hamilton was aware of this intimidation before trial. (See New Haven Ex. A at 251:17–252:1.)  Third, there was prejudice, because had Hamilton been able to establish that an

alibi witness had been intimidated from appearing, it would have seriously undermined the integrity of the prosecution. <u>See</u> <u>Rivas</u>, 377 F.3d at 199.

### 3.  Taseem Douglas: Defendants Scarcella and White

Hamilton also alleges that Defendants suppressed and failed to investigate leads related to Taseem Douglas and the actual perpetrators, Dawson and Johnson.  Hamilton argues that Douglas repeatedly told New York City police officers that Hamilton did not commit the crime—because Douglas witnessed Cash's shooting and knew that the actual perpetrators were Dawson and Johnson—but the substance of these interviews were not disclosed to him under <u>Brady</u>. (NYC Ex. JJ at 2–3; NYC Ex. II; Pl. Ex. 7 at 35:9–16; Pl. Ex. 8 at 1–2.)

The Court concludes that the record contains sufficient evidence to support the reasonable inference that Scarcella and White interviewed Douglas and failed to disclose such exculpatory evidence under <u>Brady</u>.  Douglas referred to an interview at the Connecticut jail at which detectives induced him to name Hamilton as the shooter by offering to drop his charge from murder to manslaughter.  (Pl. Ex. 7 at 45:18–46:9.)  When asked, he said that Scarcella's name "sounds familiar." (Pl. Ex. 7 at 49:25–50:4.)  In his deposition in this case, Douglas refers again to a time "when Billy White and the two detectives came" and someone offered to drop his case to a lower charge if he testified against Hamilton.[6] (Pl. Ex. 14 at 135:10–16.)  Finally, although both White and Scarcella maintain that they never interviewed Douglas, they do admit to traveling to the Connecticut jail to try and see him.  (New Haven Ex. B at 75:3–76:13; Scarcella Ex. I at 191:18–192:6.)

---

[6] At oral argument, counsel cited evidence in the record that Taseem Douglas said he could not remember for a fact whether White was present at a meeting where the alleged coercion occurred.  (2/1/19 Tr. at 23:12–25.)  The Court was only provided with four pages of the deposition transcript, (see New Haven Ex. H, Pl. Ex. 14), and it is not clear which meeting Douglas was referring to when he said, "I don't remember for a fact" whether White was there. (New Haven Ex. H at 131:4–12.)  But Douglas testified that multiple meetings occurred, (New Haven Ex. H at 90:1–23), and he unequivocally referred to a meeting in which White was present, (Pl. Ex. 14 at 135:6–16.)

In light of Douglas's testimony recognizing the names of White and Scarcella and the testimony of White and Scarcella that they did in fact visit the Connecticut jail, the Court cannot rule out the reasonable inference that a meeting occurred between Douglas, White, and Scarcella at the Connecticut jail as Douglas describes.   The fact that Scarcella and DeLouisa recorded the names of Douglas and Johnson in their spiral notebooks does not absolve them of liability.  (NYC Ex. E at 11, 19 ("Will Johnson" and "Tasweem Douglas"); NYC Ex. F at 9–10 ("Money Will Johnson" and "Taseem Douglas"); NYC Reply Mem. at 6.)  The recording of names in a notebook is not a sufficient basis for the Court to determine that Hamilton "knew . . . of the essential facts permitting him to take advantage of any exculpatory evidence," LeRoy, 687 F.2d at 618, and a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process," Banks v. Dretke, 540 U.S. 668, 696 (2004).

However, given the lack of any testimony connecting DeLouisa with this meeting, no reasonable jury could conclude that DeLouisa "was personally involved—that is, he directly participated—in the alleged constitutional deprivations," in this case the alleged suppression of exculpatory evidence. Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005).

Accordingly, the Court denies Scarcella's and White's motions for summary judgment on Hamilton's claim that he failed to disclose exculpatory evidence related to Taseem Douglas, but grants DeLouisa's motion on the same claim.

## III.   Malicious Prosecution: Defendants DeLouisa and Scarcella

Federal law defines the elements of a § 1983 malicious prosecution claim, with New York law serving as a source of persuasive authority in defining the elements. Lanning v. City of Glens Falls, 908 F.3d 19, 25 (2d Cir. 2018).  To prevail on a § 1983 claim for malicious prosecution, a

plaintiff must show "'a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment,'" and that "criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor." Id. at 24 (alteration in original) (quoting Washington v. Cty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004)).

Hamilton brings malicious prosecution claims under § 1983 and New York law against DeLouisa and Scarcella.[7] (Pl. Mem. at 25–38.) DeLouisa and Scarcella contend that there was probable cause to prosecute Hamilton, (Scarcella Mem. at 36–39; NYC Mem. at 19–24), and DeLouisa also contends that there is insufficient evidence to prove he initiated Hamilton's prosecution, (NYC Mem. at 20). The Court denies Scarcella's and DeLouisa's motions for summary judgment.

### A. Initiation as to DeLouisa

To initiate a prosecution, the defendant must have "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Rohman v. New York City Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000). Police officers may play an active role by filing charges or preparing an allegedly false confession and forwarding it to prosecutors. Manganiello v. City of New York, 612 F.3d at 149, 163 (2d Cir. 2010); see also Akinnagbe v. City of New York, 128 F. Supp. 3d 539, 554 (E.D.N.Y. 2015) (noting that "false information conveyed by police to prosecutors can support a claim for malicious prosecution"). An officer may also be held liable where the officer "withholds relevant and material information." Mitchell v. Victoria Home, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006). It is not enough, however, for an officer to

---

[7] At oral argument, counsel for Hamilton confirmed that he does not assert a malicious prosecution claim against defendant White. (2/1/19 Tr. at 46:20–25.)

simply "disclose to a prosecutor all material information within his knowledge . . . ." <u>Rohman</u>, 215 F.3d at 227 (quoting <u>Present v. Avon Prods., Inc.</u>, 687 N.Y.S.2d 330, 335 (1st Dep't 1999)).

DeLouisa argues that he did nothing more than provide the District Attorney's Office with the New York City Police Department's investigative reports and his spiral notebook containing his investigation notes, and that such disclosure is insufficient to show that he initiated the criminal proceeding. (NYC Def. Mem. at 20.) The Court concludes that Hamilton has adduced sufficient evidence to allow the reasonable inference that DeLouisa initiated the prosecution against him. In this case, the undisputed evidence shows that Smith initially told DeLouisa under the alias "Karen Smith" that she was at the store and did not witness Cash's murder, and that Gutmann was not aware of this relevant exculpatory evidence until after trial. (NYC Ex. E at 12–13; NYC Ex. GG at 6, 9–10.) Although DeLouisa did disclose his spiral notebook with notes of his conversation with "Karen Smith," however, a reasonable jury could conclude that this reference was too obscure and ambiguous without an explicit disclosure. In fact, the prosecutor herself failed to make that connection. In other words, a jury could conclude that DeLouisa did not "disclose to a prosecutor all material information within his knowledge," <u>Rohman</u>, 215 F.3d at 227 (quoting <u>Present</u>, 687 N.Y.S.2d at 335)—instead, DeLouisa withheld "relevant and material information," <u>Mitchell</u>, 434 F. Supp. 2d at 227.

In addition, a jury could conclude that DeLouisa knew that Smith's testimony was false, and nonetheless prepared Smith's inculpatory statement and forwarded it to Gutmann. (Pl. Ex. 2 at 207:3–14; 209:2–5.) Conveying a false inculpatory statement is sufficient to support a claim for malicious prosecution. <u>Manganiello</u>, 612 F.3d at 163; <u>Akinnagbe</u>, 128 F. Supp. 3d at 554.

## B. Lack of Probable Cause

The existence of probable cause "is a complete defense to a claim of malicious prosecution." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003). Three principles are implicated by this case.

First, probable cause for the initial arrest may be sufficient, but it can be "nullified by information establishing [a defendant's] innocence" and "can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant[.]" Kinzer v. Jackson, 316 F.3d 139, 143–44 (2d Cir. 2003); see also Akinnagbe, 128 F. Supp. 3d at 554 (probable cause to arrest is generally sufficient to defeat a malicious prosecution claim, "unless the plaintiff can demonstrate mitigating facts to vitiate probable cause which were first uncovered after the arrest" (citation omitted)). Thus, even if the initial arrest is supported by probable cause, factual issues may remain as to "whether the commencement and continuation of [a plaintiff's] prosecution was similarly supported." Weiner v. McKeefery, 90 F. Supp. 3d 17, 35 (E.D.N.Y. 2015). In addition, "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) (quoting Colon v. City of New York, 455 N.E.2d 1248, 1250 (N.Y. 1983)). In other words, "probable cause to prosecute not only dissipates when police officers uncover new evidence after an arrest, but in certain cases it can also dissipate when police officers fail to examine evidence already available to them." Weiner, 90 F. Supp. 3d at 34.

Second, the existence of probable cause independent of the allegedly tainted evidence may foreclose a plaintiff's malicious prosecution claim. In Bermudez, for example, the Second Circuit

concluded that, even if the prosecutor had been "misled" by police officers about an overly suggestive photo identification and array procedure and the coercion of one witness, the prosecutor's interviews with two other witnesses who identified the plaintiff provided probable cause to indict the plaintiff. See 790 F.3d at 377; see also Morse v. Spitzer, No. 07-CV-4793 (CBA), 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012) (noting that "the existence of probable cause independent of the allegedly falsified evidence is a defense" to a malicious prosecution claim).

Third, an "indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Savino, 331 F.3d at 72 (quoting Colon, 455 N.E.2d at 1251). Thus, if defendants "misled the grand jury and the prosecutors by either withholding or misrepresenting evidence in order to sustain the case"—for example, by failing to disclose the "limited nature of [a witness's] identification and the highly suggestive manner in which it was procured"—such actions "break the chain of causation." Dufort, 874 F.3d at 353; see also DaCosta v. Tranchina, 281 F. Supp. 3d 291, 304 (E.D.N.Y. 2017), reconsideration denied, 285 F. Supp. 3d 566 (E.D.N.Y. 2018) ("[W]hen evidence of known dubious value—whether a potentially falsified confession, or an unreliable eyewitness identification—is presented to the grand jury, and the grand jury is not apprised of its limited probative value, the presumption of probable cause created by the indictment is rebutted."). In general, a plaintiff may overcome the presumption with evidence showing that "police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney." Rothstein v. Carriere, 373 F.3d 275, 283 (2d Cir. 2004) (quoting Colon, 455 N.E.2d at 1248).

Defendants contend that (1) Smith's statements to police provided probable cause, and her testimony that those statements were coerced is too incredible to be believed by reasonable minds; (2) even excluding Smith's testimony, there was independent probable cause to support Hamilton's prosecution based on the identifications by Jerry Douglas, the anonymous source, and the protected witness; and (3) Hamilton failed to rebut the presumption of probable cause arising out of the grand jury indictment.  (See NYC Mem. at 14–15, 21–31; Scarcella Mem. at 22–32, 38–39.)

The Court concludes that there are genuine factual issues as to whether Defendants lacked probable cause to prosecute Hamilton.  For the reasons stated supra, the Court rejects Defendants' argument that Smith's recantation testimony and account of coercion is too incredible to create a genuine issue of material fact.

The Court is also not persuaded by Defendants' argument that there was independent probable cause to prosecute Hamilton, as a matter of law, based on the identifications by Jerry Douglas, the anonymous source, and the protected witness.  "Probable cause may be based on a tip from a confidential or anonymous informant, provided that the tip is sufficiently reliable," such as when the tip is "corroborated by subsequent investigation or observations of police officers." United States v. Herron, 18 F. Supp. 3d 214, 225 (E.D.N.Y. 2014).  But while the evidence cited by defendants may have provided probable to arrest, "[p]robable cause to arrest differs from probable cause to prosecute because the evidentiary standard is higher for the latter than for the former." Hoyos v. City of New York, 650 F. App'x 801, 802 (2d Cir. 2016); see Boyd, 336 F.3d at 76 (concluding there was probable cause to arrest but genuine factual issues precluded summary judgment on probable cause to prosecute).

In this case, the relevant determination is not simply whether the information was "sufficient to warrant a person of reasonable caution in the belief that an offense has been

58

committed by the person to be arrested." Boyd, 336 F.3d at 75–76 (quoting Golino v. City of New Haven, 950 F.3d 864, 870 (2d Cir. 1991)). The relevant determination is whether "the facts and circumstances . . . would lead a reasonably prudent person to believe the plaintiff guilty"—in other words, whether "the prosecution of [the defendant] could succeed." Boyd, 336 F.3d at 76 & n.7; see also Hoyos v. City of New York, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) ("In a malicious prosecution case, 'the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced.'" (citation omitted)). Absent Smith's inculpatory statements, a reasonable jury could conclude that the remaining evidence—an identification from an anonymous caller, the statement of an unidentified witness that Cash was worried "Bush" would kill him, and the statement of Jerry Douglas, who saw Hamilton pass a gun to someone else from the corner the day of the incident—would not cause them to believe Hamilton was guilty of second-degree murder. Boyd, 336 F.3d at 76. Unlike Smith, none of these three witnesses purported to witness the actual moment of shooting. Indeed, none of those three witnesses testified at trial, and Defendants do not assert that any of these three witnesses testified before the grand jury or spoke with the prosecutor. Cf. Bermudez, 790 F.3d at 377 (finding probable cause to prosecute, despite faulty identification procedures and a coerced witness, where the prosecutor interviewed the two eyewitnesses who testified at the grand jury hearing).

Finally, Hamilton has also raised sufficient factual issues to rebut the presumption of probable cause arising from the grand jury indictment. In this case, there is evidence suggesting that both DeLouisa and Scarcella knew that Smith initially said she was not at the scene of Cash's murder and did not witness Hamilton shoot Cash. (NYC Ex. E; Pl. Ex. 2.) Nonetheless, both officers coerced her into fabricating a statement implicating Hamilton by threatening to charge her

with the crime and take her children away.  (Pl. Ex. 2 at 207:3–209:19.)  And Gutmann was apparently unaware that "Karen Smith" was Smith. (NYC Ex. GG at 6.)

In light of this evidence, a reasonable jury could conclude that DeLouisa and Scarcella "misled the grand jury and the prosecutors by either withholding or misrepresenting evidence in order to sustain the case" against Hamilton, thus "break[ing] the chain of causation" that arose from the grand jury's indictment. Dufort, 874 F.3d at 353.

### C. The Remaining Elements

To show a constitutional deprivation of liberty, a plaintiff may show that he was "taken into custody, imprisoned, physically detained or seized within the traditional meaning of the Fourth Amendment." Washington, 373 F.3d at 316 (citing United States v. Mendenhall, 446 U.S. 544, 553–54 (1980)).  It is also sufficient to show that a plaintiff was obligated to appear in court in connection with ongoing criminal charges. Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013). In this case, there is no doubt that Hamilton suffered a Fourth Amendment liberty deprivation because he was obligated to appear in court throughout his prosecution for Cash's murder and was ultimately incarcerated in connection with his conviction for more than two decades.  See Washington, 373 F.3d at 316.

To establish favorable termination, under federal law, a plaintiff must show that "criminal proceedings against him were terminated in a manner indicating his innocence."  Lanning, 908 F.3d at 29.  Under New York law, a plaintiff need only show that "the circumstances surrounding the termination are not inconsistent with the innocence of the accused."  Id. at 27 (quoting Cantalino v. Danner, 754 N.E.2d 164, 164 (N.Y. 2001)).  In this case, there is no doubt that the criminal proceedings against Hamilton were terminated in a favor affirmatively indicating Hamilton's innocence. Lanning, 908 F.3d at 29.

Malice need not be "actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" Lowth, 82 F.3d at 573 (quoting Nardelli v. Stamberg, 377 N.E.2d 975, 976 (N.Y. 1978)). A plaintiff may also show that the prosecution was undertaken "in reckless disregard of the rights of the plaintiff." Manganiello, 612 F.3d at 163 (citation omitted). "A lack of probable cause generally creates an inference of malice." Boyd, 336 F.3d at 78. In this case, Hamilton has adduced sufficient evidence to raise genuine issues as to whether defendants prosecuted him without probable cause, creating "an inference of malice." Id. In addition to the inference, there is evidence that would allow a reasonable jury to conclude that Scarcella and DeLouisa continued the prosecution "in reckless disregard" of Hamilton's rights. Manganiello, 612 F.3d at 163 (citation omitted).

Accordingly, the Court denies DeLouisa's and Scarcella's motions for summary judgment on the malicious prosecution claim.

## IV.    Conspiracy: Defendants Scarcella and White

Hamilton asserts a conspiracy claim against Scarcella and White under 42 U.S.C. § 1983 for conspiring to frame Hamilton and prevent defense witnesses from testifying on Hamilton's behalf at trial. (See Pl. Mem. at 52–56.) However, Hamilton only pleaded conspiracy claims under 42 U.S.C. § 1985(2) and (3) in his Complaint, (see Compl. ¶¶ 85–94, 129–33), and Scarcella and White both moved for summary judgment on those claims, (see White Mem. 25–29; Scarcella Mem. 43–46). At oral argument, however, counsel for Hamilton represented that Hamilton does not intend to pursue a § 1985 conspiracy claim, but a § 1983 conspiracy claim, and urged this Court to consider Hamilton's § 1983 claim under the doctrine that allows pleadings to conform to the proof. (2/1/19 Tr. at 1:12–19.)

In general, courts need not consider new claims or theories raised for the first time in opposition to summary judgment. See Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (agreeing with district court that certain claims "'need not be considered' because plaintiff raised them for the first time in opposition to summary judgment"); Casseus v. Verizon N.Y., Inc., 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010). Under Federal Rule of Civil Procedure 15(b)(2), however, "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings," and "[a] party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." The Second Circuit has authorized the use of Rule 15(b) at summary judgment. See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 569–70 (2d Cir. 2000) (under Rule 15(b), plaintiff's "failure explicitly to plead a hostile work environment claim . . . did not preclude the district court's consideration of that issue on summary judgment"); Clomon v. Jackson, 988 F.2d 1314, 1323 (2d Cir. 1993) ("[T]he undisputed facts as presented on the summary judgment motion served as a basis to deem the complaint amended to conform with the proof pursuant to [Rule] 15(b).").

The decision on whether to allow parties to "amend their pleadings to conform to the proof" lies within the district court's sound discretion. Vermont Plastics, Inc. v. Brine, Inc., 79 F.3d 272, 279 (2d Cir. 1996). There are two key considerations under Rule 15(b). First, "the crucial test is whether the parties have consented to litigation of the issue; it must have been tried by their express or implied consent." Luria Bros. & Co. v. All. Assur. Co., 780 F.2d 1082, 1089 (2d Cir. 1986). Second, "a motion should be granted . . . only 'if the party against whom the amendment is offered will not be prejudiced by the amendment.'" Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94 (2d Cir. 2000); see also New York State Elec. & Gas Corp. v. Sec'y of

62

Labor, 88 F.3d 98, 104 (2d Cir. 1996) (under Rule 15(b), "the pivotal question is whether prejudice would result").

The Court concludes that Rule 15(b) is not an appropriate vehicle to allow Hamilton to assert a § 1983 conspiracy claim, because defendants Scarcella and White have not provided their "express or implied consent" to litigate the issue.  Luria Bros. & Co., 780 F.2d at 1089.  "Where there is no express consent, consent often may be implied from the opposing party's failure to object to the admission of evidence relevant to the unpleaded issue."  Silverstein v. Penguin Putnam, Inc., 522 F. Supp. 2d 579, 604 (S.D.N.Y. 2007).  In this case, the Court cannot infer defendants' express or implied consent.  In his reply memorandum, Scarcella contends that Hamilton "cannot simply graft a § 1983 conspiracy claim into this action now by insinuating it in his motion papers." (See Scarcella Reply Mem. at 20 n.10.)  Moreover, the addition of a § 1983 conspiracy claim now would prejudice defendants: conspiracy under § 1983 and conspiracy under § 1985 are distinct causes of action with different elements.  Scarcella and White did not make arguments regarding § 1983 conspiracy—defendants treated this claim as though it were brought, as pleaded, under § 1985.  (See New Haven Mem. at 25–29, New Haven Reply Mem. at 11–12, Scarcella Mem. at 43–46, Scarcella Reply Mem. at 19–20 (arguing, inter alia, that they were entitled to summary judgment because Hamilton has failed to adduce evidence of class-based animus, as required under § 1985).)  "[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion," because claims must be set forth in the pleadings "in order to give defendants fair notice of the nature of the plaintiff's claim." Thomas v. Egan, 1 F. App'x 52, 54 (2d Cir. 2001).

Because there is no basis to conclude that either Scarcella or White have consented to litigate Hamilton's § 1983 conspiracy claim, and defendants would be prejudiced by the late

addition of such a claim now, the Court will not allow Hamilton to amend his complaint to add it at this stage.  See Myers v. Moore, 326 F.R.D. 50, 62 (S.D.N.Y. 2018) (Rule 15(b) did not authorize amendment where "Defendants' repeated, vigorous, and explicit opposition to litigating Plaintiff's deficient malicious prosecution claim" showed a lack of express or implied consent).

Accordingly, the Court grants Scarcella's and White's motions for summary judgment on Hamilton's § 1983 conspiracy claims.

## V.      Negligent Hiring, Supervision, and Retention: City of New York

"To maintain a claim against a municipal employer for the 'negligent hiring, training, and retention' of a tortfeasor under New York law, a plaintiff must show that the employee acted 'outside the scope of her employment.'" Velez v. City of New York, 730 F.3d 128, 136–37 (2d Cir. 2013) (citation omitted).  "If the employee acted within the scope of her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of respondeat superior."  Id. at 137.  An act falls within the scope of employment if it is in furtherance of, or reasonably necessary or incidental to, the employer's business or interest.  See Selmani v. City of New York, 984 N.Y.S.2d 114, 115–16 (2d Dep't 2014).  An act falls outside the scope of employment if it is "taken for wholly personal reasons, which are not job related."  Id. at 116.

Hamilton asserts a claim for negligent hiring, supervision, and retention against the City of New York based on the employment of Scarcella and Ponzi. (Pl. Mem. at 56; Compl. at ¶¶ 142–47.)  Although Hamilton argues that such claims are "permissibly pled in the alternative," Hamilton has not alleged any misconduct by Scarcella or Ponzi that occurred outside the scope of their employment, as required to plead his negligent hiring, supervision, and retention claim. Velez, 730 F.3d at 136–137.  All of his allegations are based on acts taken by Scarcella and Ponzi

in their capacity as employees of New York City—not based on acts "taken for wholly personal reasons." Selmani, 984 N.Y.S.2d at 116.  Nor is it dispositive that, as Hamilton argues, "the City has taken the affirmative position in the litigation that Scarcella was acting outside the scope of his employment" by declining to represent him.  (Pl. Mem. at 56.)  Therefore, Hamilton's claim cannot succeed.  See Bouet v. City of New York, 5 N.Y.S.3d 18, 20 (1st Dep't 2015) ("[S]ince it is undisputed that the officers were acting within the scope of their employment when they failed to record the information regarding the vehicle that struck [plaintiff] and its operator, the claim of negligent hiring, training and supervision must fail." (citation omitted)); Ruiz v. Cope, 989 N.Y.S.2d 211, 213 (4th Dep't 2014) ("[T]he undisputed fact that defendant was acting within the scope of his employment should have precluded plaintiff as a matter of law from bringing a claim that the City was liable for the negligent training and supervision of defendant . . . .").

Accordingly, the Court grants summary judgment in favor of the City of New York on Hamilton's claim for negligent hiring, supervision, and retention.

## VI.    Remaining Matters

### A. Municipal Liability: City of New York and City of New Haven

The parties agreed to reserve the issue of municipal liability under Monell until this Court resolves the issues of individual liability, (D.E. # 28), and neither the City of New York nor the City of New Haven has moved for summary judgment on Hamilton's Monell claims.  Under Second Circuit case law, "Monell does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006).  Accordingly, unless Hamilton can prove that one or more named Defendants violated his

constitutional rights, he has no claim against either the City of New York or the City of New Haven. Hamilton's argument that Defendants have effectively conceded municipal liability as a matter of law is belied by the record in this case. (Compare D.E. # 28, with Pl. Mem. at 39.) The Court therefore does not consider Hamilton's arguments regarding municipal liability at this juncture. (See Pl. Mem. at 39–52.)

### B. Request to Unseal Exhibits

Hamilton requests that this Court order the public filing of all summary judgment exhibits, subject to ordinary redaction requirements, based on the presumption of access to judicial records. (Pl. Mem. at 68.) None of the defendants has expressed a position on this issue. Upon review, it does not appear to the Court that any of the exhibits submitted in connection with this motion were sealed, and Hamilton has not pointed to any specific exhibits that are sealed. Accordingly, Hamilton's request is denied as moot.

### C. Defendant White's Motion to Dismiss Official Capacity Claims as Duplicative

White moves to dismiss claims against him in his official capacity as duplicative of claims against the City of New Haven. (New Haven Mem. at 11–12; New Haven Reply Mem. at 7.) Hamilton does not respond to this argument.

"An official capacity suit against a public servant is treated as one against the governmental entity itself." Reynolds v. Giuliani, 506 F.3d 183, 191 (2d Cir. 2007). Therefore, courts routinely dismiss as redundant claims asserted against a defendant in his official capacity when the government entity is also named in the suit. See Castanza v. Town of Brookhaven, 700 F. Supp. 2d 277, 284 (E.D.N.Y. 2010) (collecting cases); Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001) (dismissing claim against municipality and concluding that, "because the claim against defendants [] in their official capacity is essentially a claim against the village, it was also properly dismissed for the reasons" the claim against the village was dismissed (citation omitted)).

Because the City of New Haven is named as a defendant in this suit, the Court grants White's motion to dismiss all claims against him in his official capacity as duplicative.

## CONCLUSION

For the reasons stated above, the Court grants summary judgment in favor of the following defendants on the following claims:

**SCARCELLA**, on the claims for (1) conspiracy and (2) failure to disclose evidence that Jewel Smith was coerced;

**DeLOUISA**, on the claims for (1) failure to disclose evidence that Jewel Smith was coerced, and (2) failure to disclose Taseem Douglas's exculpatory statements;

**WHITE**, on the claims for (1) conspiracy and (2) intimidation of New Haven witnesses other than Alphonso Dixon, and on (3) all claims in his official capacity;

**PONZI**, on all claims against him;

**CITY OF NEW YORK**, on the claim of negligent hiring, supervision, and retention.

Therefore, Hamilton may proceed to trial against the following defendants on the following claims:

**SCARCELLA**, on the claims for (1) malicious prosecution, (2) fabrication of Jewel Smith's inculpatory statements and testimony, (3) failure to disclose Jewel Smith's initial exculpatory statements, and (4) failure to disclose Taseem Douglas's exculpatory statements;

**DeLOUISA**, on the claims for (1) malicious prosecution, (2) fabrication of Jewel Smith's inculpatory statements and testimony, and (3) failure to disclose Jewel Smith's initial exculpatory statements;

**WHITE**, on the claims for (1) intimidation of Alphonso Dixon, and (2) failure to disclose intimidation of Alphonso Dixon, and (3) failure to disclose Taseem Douglas's exculpatory statements.

The parties are directed to submit a Joint Pretrial Order within 30 days of the issuance of this Memorandum and Order.

SO ORDERED.

Dated: March 18, 2019
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

68