# Exhibit C

To:  **Independent Review Panel**

From:  **Conviction Review Unit by ADA Tamara Edelstein**

Re:  <u>**People v. Derrick Hamilton**</u>, **Indictment Number 142/1991**

## The Crime

On January 4, 1991, at approximately 10:45 a.m., Nathaniel Cash, an ex-convict aged 26, was shot to death inside and/or in front of 215 Monroe Street Brooklyn.

## Police/Prosecution Investigation

On Friday January 4, 1991 at approximately 11:00 a.m., a woman called 911 reporting a male shot on Monroe Street between Marcy and Nostrand Avenues in Bedford-Stuyvesant. Police Officers Fuentes and Kinloch of the 79th Precinct received the radio call and responded to the location. They found Nathaniel Cash, already dead, lying on the sidewalk face down in front of 215 Monroe Street with his head toward the street near the curb line. The deceased was wearing pajamas, a robe and slippers. P.O. Fuentes observed that deceased had multiple gunshot wounds to his body. He also observed shell casings and bullets on the ground near the body. The first responding officers secured the crime scene, but conducted no further investigation or interviews at the scene. Detective DeLouisa of the 79th Squad was the first detective on the scene and was the assigned lead investigator. Detectives Chmil and Scarcella from the Brooklyn North Homicide Squad arrived shortly thereafter and assisted in the investigation.

Detective Hickey and Detective Ahearn of the Crime Scene Unit processed the crime scene, which was expanded to include the interior vestibule of 215 Monroe Street and collected physical evidence. They documented and recovered fifteen pieces of ballistic evidence consisting of seven deformed bullets and eight discharged shell casings.[1] A deformed, copper-jacketed bullet was recovered from the street, a discharged shell casing was found on the sidewalk next to the body and two deformed bullets were entangled in the deceased's clothing. A deformed, copper-jacketed bullet and a discharged shell casing were on the concrete exterior steps of 215 Monroe Street. Two deformed copper-jacketed bullets, one piece of lead and six discharged shell casings were documented on and recovered from the floor of the interior vestibule of 215 Monroe.[2] The Crime Scene investigators also identified two possible area of ballistic damage inside the location; one near the front (street) side of the vestibule and the other in a hallway area beyond the vestibule in the building's interior. No blood spatter, transfers or drops were observed

---

[1] All of the discharged shell casings were stamped '9mm' (nine-millimeter) on the rear of the casing

[2] The recovered ballistic evidence was forwarded to the Firearms Analysis Section of the N.Y.P.D. Laboratory for testing and comparison. Another piece of deformed lead was removed from the deceased's body at autopsy. It also went to the police lab.

KCDA CONFIDENTIAL MATERIAL 1084

inside or outside the location, except where it had pooled on the sidewalk at the deceased's body. No weapons were recovered.

Detective DeLouisa arrived at the scene and met Jewel Smith, a twenty-year-old single mother and ███ [3] standing on the sidewalk in front of 215 Monroe Street and interviewed her relative to the homicide. Smith identified herself as "Karen" Smith, but also told DeLouisa another first name, "Jewel." Detective DeLouisa wrote a summary of the interview in his spiral notebook:

> Karen Smith bailed Nate out of jail. "Jewel", in bedroom, 215 Monroe. 1/4/91, 1230 hours. I was here to see Nate. Went to store on corner. Came back, he was on floor. Two people were by him. They said get an ambulance. I stood the night with him. Around 10:25 I went to the store. It was going on 11.[4]

DeLouisa did not tell the other investigators that Smith had told him she was not present at the time of the shooting.[5]

Detective Scarcella and Detective Chmil arrived at the scene after Detective DeLouisa. Detective Scarcella first interviewed Smith upstairs at the deceased sister's apartment at 215 Monroe Street. According to Scarcella, Smith said she was present during the shooting and it was the defendant who shot the deceased.[6] A short while after the shooting, the deceased's two sisters arrived at the apartment at 215 Monroe Street, and confronted Smith, claiming that she was responsible for the deceased's death. ████████████████████████████████████████

████████████████ At the post-trial hearing DeLouisa testified that he attempted to calm Smith down because she was hysterical amid the chaotic scene in the deceased sister's apartment caused by the deceased sisters screaming accusations at Smith and attempting to assault her.

---

[3] At the time of the incident Smith was single and had two very young children.

████████████████████████████████████████████████

Detective DeLouisa did not memorialize this conversation in an official DD5 complaint follow-up report. When police reports were turned over to the defense as part of discovery, ADA Gutmann did not hand over the detective's memo book, because the memo book was not considered, by Gutmann an official police report. The memo book containing the Smith statement was handed over as part of a Rosario packet immediately before jury selection. She never identified the document as Brady material, nor acknowledged the source of the information as Jewel Smith. The issue regarding Smith's initial statement was only uncovered and first litigated at the post-trial CPL 330 hearing.

[5] Detectives Scarcella and Chmil arrived at the scene after Detective DeLouisa. At the 330 hearing Detective Scarcella testified that he had no idea that Detective DeLouisa had already spoken to Smith when he arrived. Detective DeLouisa also testified at the 330 hearing that he did not tell anyone about his first conversation with Smith.

[6] Detective Scarcella did not memorialize this conversation with Smith in the apartment in either his memo book, or in a DD5 report. This conversation was only first referenced in Scarcella's testimony at the CPL 330 hearing.

KCDA CONFIDENTIAL MATERIAL 1085

DeLouisa recalled no further substantive conversations with the 'hysterical' Smith at the scene before bringing her to the 79th Precinct where he interviewed her again.

At the precinct, according to the investigating detectives, Smith said, in substance, the following: In November 1990, the deceased was released from prison, after she posted his bail. Soon thereafter, the deceased started dating Smith. The night before the shooting, (January 3, 1991) Smith and the deceased spent the night at the deceased's sister's apartment at 215 Monroe Street in Brooklyn, New York.  On the morning of the incident, at approximately 10:30 a.m., Smith asked the deceased to call her a cab. Upon hearing the honk from the cab outside, Smith and the deceased went downstairs.  When they arrived downstairs, Smith saw three boys hanging around outside of the building before she saw the defendant. The defendant and the three boys entered the vestibule at 215 Monroe Street.  (Smith knew the defendant since she was ten years old because she had lived in the same building as defendant in the Lafayette Gardens Housing Project for many years.) Two of the accomplices blocked the front entrance door and the third accomplice stood next to the defendant. The defendant then asked Smith, "Jill, where's Nate at?" The defendant then noticed the deceased in a corner of the vestibule, and asked the deceased whether he had been "looking to talk to him about something". When the deceased replied, "Yeah I was looking for you," one of the accomplices, known to Smith as Saquan[7], reached into his waistband, and passed a handgun to the defendant. The defendant stood several feet away from the deceased, and shot the deceased numerous times all over his body. The four men/boys then ran down the block toward Nostrand Avenue and made a right. The deceased started to run after them but collapsed on the sidewalk.  Smith then ran upstairs and called 911.

At 1:15 p.m., Smith identified the defendant, at the time aged 25, from one of the photo books at the precinct.  Smith knew the defendant by name, told the detectives that the defendant was also known as "Bush" in the streets, and that she has known the defendant all her life. Smith also told the detectives that one of the males who was with the defendant and Saquan was Taseem Douglas, age fifteen.[8]

At approximately 2:00 p.m., Smith gave a written statement at the precinct, detailing the incident and implicating the defendant as the shooter. Her statement was as follows:

> I slept with Nate overnight at 215 Monroe. We woke up about 10 AM. I was getting washed up. Nate was cleaning up.  I asked him to call him [a car]. He called Black Pearl, 773–0020. He said five minutes.  We heard a car horn and went downstairs. The car was

---

[7] A.K.A. Gregory Moore, twenty years of age at the time..

[8] Taseem Douglas was arrested for a shooting that he committed with the defendant's brother, JR, in New Haven, Connecticut at 340 Whalley Avenue in May 1991. 340 Whalley Avenue was (and still is) a beauty parlor called "Ultimate Appearance".  It was owned by the defendant and was a known drug sale location. In December 1991, a joint state, local and federal DEA task force conducted a raid of the location, arresting the defendant's half-brother, Alphonso Dixon, and others. Despite Smith's positive identifications of Moore and Douglas, neither was ever arrested, charged or prosecuted concerning this incident. In her trial testimony Smith denied knowing the identity of any of the men/boys with the defendant at the time of the shooting in contravention of her statements to the police and her grand jury testimony.

KCDA CONFIDENTIAL MATERIAL 1086

gone.[9] I observe three little guys standing in front of the building. I told Nat one of the guys looks like this guy we know but it wasn't him. Then Bush saw me looking and said where is Nate at? Then the guys pushed the door open and Nate said I'm right here. Bush said you wanted to speak to me. Nate said yeah I want to speak to you. That's when Sakuan passed Bush the gun. Bush said well I'm here and he started firing. He fired a lot of shots. Two guys were standing in front of the door. Sakuan [sic] was standing by Bush. Nate was standing by the mailbox. I was standing by the door. We were all at close range in between both doors in the hallway. They all ran out down the block toward Nostrand Avenue and made a right. Nate ran out as if to chase them and then collapsed. I asked Nate what I should do and he said tell. [sic]

On January 4, 1991 at approximately 4:30 p.m., A.D.A Thomas Luzio from the Kings County District Attorney's Office, was present at the 79th Precinct Detective Squad along with Detective DeLouisa and A.D.A. Jeff Mueller, in order to interview Smith on audio tape. Smith gave essentially the same statement that she gave earlier (where she admits to witnessing the shooting) and provided some more detail about the crime. When Smith was asked about a possible motive for the shooting (e.g. why the deceased and the defendant were "at odds"), she replied that "what I guessed was from back in the days when, um, [the deceased's] friend "Ron Kay". . . got killed in the projects." Smith went on to say that Ron Kay got killed in 1988 in Lafayette Gardens and when the deceased was incarcerated. She indicated that the word on the street was that the defendant and his brother had killed Ron Kay, and that the defendant was concerned that when the deceased got out of prison and came home he was going to start "flipping". "Start, you know killing them and whatever, so they tried, so I guess they tried to make up any little reason to do him before they think he was going to do them, you know what I'm saying." Smith also indicated the deceased had told her that there was friction between him and the defendant because the defendant had been dating the deceased's "baby mama" [Kim Freeman] beginning when the deceased was incarcerated, and the deceased would avoid going to Lafayette Gardens to see his daughter when he knew the defendant and his friends were going to be there.[10]

██████████████████████████████████████████████████████████████████████████

██████████████████████████ he told me that Bush was going to kill him and that he had to watch his back. He also said that Saquan and JR (the defendant's brother) and Bush tried to get him into a car about two weeks ago. He mentioned this a few times." Detective Scarcella memorialized that conversation in a DD5.

---

[9] ████████████, neither the police nor the prosecutors ever checked with the identified car service in an attempt to locate witnesses or to corroborate Smith's version of events.
[10] Due to the fact that the defendant was dating the deceased's baby's mother, tensions were high between the two men, and their respective groups.

KCDA CONFIDENTIAL MATERIAL 1087

On January 6, 1991, two days after the murder, Smith contacted Detective Scarcella and told him that she could not testify in the grand jury because she was afraid that the defendant would kill her and her family. (She and her family lived in the same housing project as the defendant in Lafayette Gardens.) Smith characterized the defendant as a "killer" and informed Detective Scarcella that she planned to leave New York City for her own safety. Detective Scarcella took Smith to talk to Detective Investigator Joseph Ponzi and A.D.A. Dan Saunders at the Kings County District Attorney's Office (hereinafter "KCDA"). Smith met with Detective Ponzi, A.D.A. Saunders and A.D.A. Anne Gutmann, who had been assigned as the case prosecutor, and then testified in the grand jury. KCDA then relocated Smith to live with her sister out of state, in North Carolina.[11]



At the time of the Grand Jury presentation there were no other known witnesses to the murder. The Grand Jury returned a true bill on the counts of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree and Criminal Possession of a Weapon in the Third Degree.

On January 14, 1991, Jerry Douglas, an off-the books, driver's helper for a Pepsi-Cola delivery man, was arrested in the 79th Precinct for Criminal Possession of a Controlled Substance in the Seventh Degree (crack cocaine). Douglas indicated he knew something about the January 4 homicide on Monroe Street. Det. DeLouisa was present in the precinct and Douglas gave the following statement to him as recorded in a DD5:

> We pulled up in front of the Keyfood on Nostrand and Monroe. My boss got out of the truck and he went into Keyfood. I sat in my boss's seat reading the newspaper. I heard 6-7 very loud shots. I saw four guys coming out of the building, walking. The light skinned guy passed the gun to the guy on his right. That guy tucked the gun in his waist. He zipped up the jacket the rest of the way and fixed his hood. All four were walking toward me. I was looking at the light skinned guy because I saw him pass the gun. As he came up he told me to mind my business three times. The light skinned guy with the two

---

[11] This relocation was not made contingent upon her testifying.

[12] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

KCDA CONFIDENTIAL MATERIAL 1088

others walked towards Gates Avenue west bound from Nostrand Avenue. The light skinned guy looked older than the other three. He had chinky eyes[13] and gold teeth. As they passed me I was able to see a body laying [sic] on the floor where they had just come from. I walked over and the guy was bleeding from the mouth. He had big lips. He was wearing slippers and pajamas. His glasses were crooked on his face.[14]

Douglas then identified the defendant in a photo array consisting of six individuals including the defendant. Douglas stated, "this is definitely the guy I saw pass the gun and told me to mind my business. I seen this guy before at Lafayette Gardens while I was working on the Pepsi truck."

On May 27, 1992, a few weeks before Douglas was to testify for the prosecution against the defendant, he was shot to death by Damien Edwards on the street near 760 Franklin Avenue, in Brooklyn.[15]

On March 21, 1991, Detectives Scarcella and Chmil went to New Haven, Connecticut to apprehend the defendant. At approximately 12:40 p.m., members of the New Haven Police Department (NHPD) entered 340 Whalley Avenue in New Haven and escorted the defendant out of the location. Detective Scarcella then went up to him and asked him his name, to which he replied, "Derrick Hamilton" and that he was also known as "Bush". Detective Scarcella also asked him if he was okay to which he replied, "man you and your partner are some determined men". At 1:20 p.m., the defendant was in the NHPD special investigation unit and Detective Scarcella advised him of his rights. After been given his rights, the defendant stated,

> George Sheinberg is my lawyer, I want to wave [sic] extradition, I have no reason to be in Connecticut. The case is in New York, that's where I want to be. I know you were after me. You know I was in New York yesterday. I did think of giving myself up at one time. Say hello to Wally [Det. Walter Wilzar] he is a good dude. I remember you; you locked up Victor, Sam and Johnny Ray for killing my father and Shirley.[16]

---

[13] Narrow eyes, almost Asian-like.

[14] One of the deceased's close friends, Willie "Money Will" Dawson was killed on June 1, 1991 a few months after this incident. No arrest was ever made for Dawson's killing.



Damien Edwards was convicted for Douglas's murder and

[16] On March 31, 1988, "Baby" Sam Edmonson, sent his gang to shoot up the Glamorama Beauty Salon on Franklin Avenue in Bedford-Stuyvesant. The defendant's father ) who owned the salon was killed in the attack along with the defendant's father's girlfriend, Shirley. The Defendant was referring to Sam Edmonson, Victor Breeland and Johnny Ray Robinson who, eventually, were convicted of the Glamorama murders in addition to other murders committed in furtherance of their narcotics enterprise. Detective Scarcella was the detective who made the arrests on those murders twelve years before arresting the defendant in

KCDA CONFIDENTIAL MATERIAL 1089

The defendant did in fact waive extradition and was returned to Brooklyn's 79th Precinct where the arrest was processed by Detective DeLouisa.

## The Trial

In July of 1991, the trial began in Supreme Court, Criminal Term, Part 1, Judge Edward Rappaport, presiding. A.D.A. Gutmann was the trial prosecutor and George Sheinberg was the represented the defendant.

### The Prosecution's Case

#### *Jewel Smith*

Jewel Smith, while living in North Carolina (after being relocated), was the prosecution's main witness, and only eyewitness to testify against the defendant. However, Smith refused to voluntarily come to Brooklyn for trial testimony. An interstate material witness order with an attendant arrest warrant was obtained. Smith was arrested in North Carolina pursuant to the order and involuntarily produced to Brooklyn for testimony.

Before she testified, Smith met with A.D.A. Gutmann and Detective Ponzi.[17] The prosecutor and detective claim this meeting was only for the purpose of allaying Smith's fear of the defendant and to prepare Smith for her testimony. Smith claims this meeting was to coach her on a story which was not reality and had been formulated by Detective Scarcella on the day of the homicide. Smith's testimony was, for the most part, consistent with her prior statements.

An exception occurred in Smith's testimony concerning the men/boys with the defendant. When she and the deceased came downstairs, Smith looked through the vestibule glass and saw "three guys standing like on the right by the bannister down the stoop. . . Black. They were short guys, young. . . About fourteen, fifteen and the big one was like seventeen. . . At first I thought I did [recognize] but I was wrong[18]

Smith described the gun as "it wasn't really big but it was like about this big [seven or eight inches], silver and black." "[Derrick] then started shooting at Nathaniel." Smith described the distance from the defendant to the deceased as being about four feet, and that as the defendant was shooting his arm was bent, and he fired about seven shots.



this case. Because of his previous involvement in the aforesaid murder investigations, Scarcella was well acquainted with the defendant and his criminal connections.

[17] At the 330 hearing, both A.D.A. Gutmann and Detective Ponzi testified that they never threatened Smith in order to get her to testify. Conversely Smith now claims Ponzi and Gutmann threatened her with a perjury charge and a parole violation if she did not testify consistently with her prior statements.

[18] In all of Smith's prior statements, (when she gave a statement to the police, to the A.D.A. ████████ she stated that she recognized one of the accomplices as "Saquan" aka Gregory Moore, and he was the one who passed the gun to the defendant. ████████ When asked about it on cross examination, she ████████ and stated that she did not know Saquan personally but got the name from the deceased while they saw the defendant and the accomplices approaching the vestibule.

KCDA CONFIDENTIAL MATERIAL 1090

The prosecutor asked Smith:

Q:      When you fell down behind the door, did you hear anything?

A:      Shots

Q:      And at that time could you see who was shooting?

A:      No, I couldn't[19]

Near the conclusion of A.D.A. Gutmann's direct examination, the prosecutor had Smith utilize the crime scene photographs of the vestibule to illustrate the relative positions of the described parties at the time of the shooting.  While testifying, Smith approximated the distance between the defendant and the deceased to be about four feet apart (by the court's estimate). However, the markings made by Smith on the photographic exhibits, with full knowledge of the tight dimensions of the vestibule, which were not testified to by any witness and which the trial jury never knew, the defendant and the deceased were, in Smith's claimed version of the event, much, much closer.

Smith's criminal history was elicited on direct examination and expanded upon in cross-examination. The defense then confronted Smith with the following recantation which had been memorialized in the form of a sworn affidavit executed by defense counsel in his offices:

My name is Jewel Smith. I live at 316 Carlton Avenue, Brooklyn, New York. I am twenty-one years old. I am single and I have two children. On the day Nathaniel Cash was killed, I spent the night with him at his home on Monroe Street, Brooklyn, New York. Nathaniel was walking me to a cab in the hallway. Four people came up to me and Nathaniel and a guy with him. During the argument he was shot by one of the boys. I owe Derrick Hamilton my life. He was not there when Mr. Cash was shot. He did not shoot Mr. Cash. I don't know who shot Nathaniel Cash.

As explained by Smith on redirect examination, on March 25, 1991, a few days after the defendant was arrested, and while Smith was staying at 316 Carlton Avenue in New York (in violation of her relocation agreement with KCDA), Smith received a phone call from a nameless woman who knew the defendant, and informed Smith that the defendant had been arrested, and that the defendant wanted Smith "to go to his lawyer's office downtown and give a statement saying that he was not there at the scene." Smith was instructed by the woman to tell the defendant's attorney that Smith had witnessed the deceased's murder, that the shooter was actually the defendant's brother Ulysses, and that Smith had mistakenly told the police that the defendant was the shooter because the defendant and his brother strongly resembled each other. Later that day, the defendant's friend met Smith in front of Smith's building and took Smith in a taxicab to Mr. Sheinberg's office.  The woman lingered in the area outside of the attorney's

---

[19] This is inconsistent with her prior statements stating that she saw the defendant, and only the defendant, shooting the deceased.

KCDA CONFIDENTIAL MATERIAL 1091

office, while the office door remained open, during Smith's interview with the attorney. Smith recited to Mr. Sheinberg all that she had been instructed to say by defendant's friend. The attorney wrote out a statement, which Smith signed, stating that Smith had witnessed the shooting and that defendant had not been there.

At trial Smith testified that she signed the statement because she "didn't have any choice in the matter" in light of the fact that her brothers still lived in the Lafayette Gardens Housing Project, and that she feared that they would be harmed if she did not comply with the defendant's instructions.[20]  The Court asked Smith:

> Q:   What did you tell Mr. Sheinberg?
>
> A:   What Derrick told me to tell him.
>
> Q:   Tell us what that was
>
> A:   That I was mistaken, that it wasn't him. It was his brother Ulysses because they look so much alike.

Mr. Sheinberg also elicited in cross examination of Smith that during the days and weeks that followed, Smith began receiving telephone calls at her undisclosed out-of-state residence from the defendant.[21]  Smith testified:

> I said I was shocked to hear his voice. I said, "How did you find out my number?" He said, "How you think?" And then he said that he knows where I'm staying at, he can prove it to me in a couple of days, you know, I will soon see.

Shortly thereafter, Smith began receiving numerous letters and photographs in the mail from the defendant. In his letters, the defendant claimed that he had always loved and respected Smith, that he had always liked Smith since "back in the days," that he "cared" about Smith because Smith "had kids," and that Smith "shouldn't act like that with him". When asked if she could produce the letters from the defendant, Smith claimed that she retained all of the correspondence, but her then current boyfriend discovered the letters and burned them all.

---

[20]Smith testified that it was her signature on the paper but that she really didn't read what she was signing because as she was speaking the defense attorney was writing her statement down. So she signed it believing that it was verbatim what she was telling the attorney but she seemed confused while testifying when she looked at the actual statement. As trial counsel, Mr. Sheinberg was precluded from making himself a witness as to the statement given to him by Smith.

[21]Despite the fact that Smith had been relocated for her safety, Smith subsequently revealed her new address and telephone number to several of her friends, some of whom knew the defendant. Additionally, Smith repeatedly visited people in New York City, each time staying at her Brooklyn address at 316 Carlton Avenue.

KCDA CONFIDENTIAL MATERIAL 1092

Further testimony revealed that the defendant continued to telephone Smith almost on a daily basis, calling Smith collect, or placing a local telephone call from jail to a friend who would patch the long-distance call through to Smith via a conference call. The defendant would instruct Smith to "keep in touch with him," which Smith interpreted as an "ultimatum" to write letters and mail photographs of herself to him.  Smith complied with defendant's instructions and corresponded with him.  Smith wrote to defendant that she loved him and that she was sorry for what she had done to him by causing him to be arrested. Smith also attached photographs of herself to several of the letters. Smith elaborated that she had written letters and had mailed photographs of herself to the defendant only because he had instructed her to do so.  Smith wrote to the defendant that she loved him because she knew that "these are the things he wanted to hear from me." Smith made it clear that she had accepted the defendant's collect telephone calls and had mailed letters and photographs of herself to the defendant solely as a means to protect herself and her brothers. Her brothers, she testified, still lived in the Lafayette Gardens Housing Project, and the defendant knew both Smith stated that she feared that her brothers "would be hurt by people in the street that he [defendant] knows".  As Smith explained, "I was just playing his game, and I was scared for my life and my brothers' life because they still lived in the projects, and that I knew the type of person that [defendant] was, because I seen it for myself".  Smith also clarified that when she wrote to the defendant that she loved him, she meant that she was grateful to the defendant "for sparing my life, for not killing me".  Similarly, Smith visited the defendant in prison several times before the trial because he had told her to visit him, and because the defendant "kept reminding me that like I owed him something" for sparing her life during the shooting murder of the deceased.

After the conclusion of Smith's testimony,[22] Mr. Sheinberg, approached A.D.A. Gutmann regarding Detective DeLouisa's memo book and the entry now known to memorialize an interview of Smith at the scene. This was done in the courtroom and off the record and did not come to light until the C.P.L. § 330.30 hearing. Mr. Sheinberg asked A.D.A. Gutmann if Jewel Smith was Karen Smith. A.D.A. Gutmann responded "no".  Before the conclusion of trial testimony, (also off the record), Mr. Sheinberg asked A.D.A. Gutmann if she knew who Karen Smith was and A.D.A. Gutmann replied that she "had no idea, or, she did not know." (Gutmann confirmed the conversations in her testimony at the C.P.L. 330 hearing) Sheinberg's inquires of the prosecutor were never made part of the court record, and Sheinberg, relying on the representation of the prosecutor, never questioned Smith on the subject. Additionally Detective DeLouisa did not testify at trial so defendant's counsel was never afforded an opportunity to cross examine him on the issue.  Defense counsel did not pursue the issue further nor did he request Detective DeLouisa's appearance at trial.

---

[22]When asked about this at the 330 hearing, Mr. Sheinberg stated that the witness was still present but that she was done testifying.

KCDA CONFIDENTIAL MATERIAL 1093

*Medical Examiner*

The Medical Examiner who conducted the post-mortem examination of the deceased and prepared the autopsy report, Dr. Virani, was no longer employed by the Office of the Chief Medical Examiner, and was not available to testify.  Dr. Jonathan Arden, then the Chief Deputy for the Brooklyn branch of the OCME, testified using the report generated by Dr. Virani.  He testified that there were a total of nine gun-shot wounds to the deceased's body. He was unable to give an opinion as to the order of the infliction of the gun-shot wounds. Dr. Arden testified to the location, directionality, path and injuries caused by each of the sustained wounds and the cause of death. He was not questioned by way of hypothetical scenarios as to the plausibility of Smith's account of the shooting in relation to the medical findings. In fact, the defense did not cross-examine the doctor at all.

*Crime Scene Unit/Ballistics*

Detective Ahern testified during the trial, relying upon the report of Detective Hickey who had passed away before trial.  Dr. Ahern testified that there were fifteen pieces of ballistic evidence recovered from the scene as noted *supra at page 1*. Detective Ahern also testified that all the discharged shell casings were identifiable as nine-millimeter by virtue of the '9mm' head stamp on the shells. Ahearn also testified as to the presence of two bullet impact marks on the vestibule floor,[23] and a bullet hole on the door wall, as well as a bullet hole in the wall.[24]

Detective Natale of the Firearms Analysis Unit (Ballistics) concluded in his expert opinion that two firearms were used in the commission of the crime. Upon microscopic examination Natale opined discharged shells, marked by Crime Scene as 2 and 15 and recovered from the sidewalk and exterior steps, respectively, were fired from the same nine-millimeter firearm, while discharged shells, marked 6, 8, and 11-14, all recovered from the vestibule floor, were fired from the same nine-millimeter firearm, but distinct from the gun which discharged the shells marked 2 and 15. Of the eight remaining pieces of ballistic evidence recovered, consisting of deformed bullets and bullet fragments, the detective could make no opinion as to what firearm discharged

---

[23] Ahearn made this opinion entirely on the appearance of the marks on a crime scene photograph and not upon his own personal observation at the scene. CRU has examined the photographic exhibit ████████. The marks on the floor are two in number, perfectly parallel one to the other and both about two inches in length. ███████████████████████████████████████████████████████████████████ CRU has examined the vestibule in which the original floor is still intact. No damage appears at the site of the purported bullet impact marks.

[24] The crime scene detectives never probed either hole or preserved the wall material to confirm if the defects in the photographs were, in fact, bullet holes. CRU has inspected the vestibule and no hole, nor any evidence of the patching of a hole, is present at the scene.

KCDA CONFIDENTIAL MATERIAL 1094

the rounds due to the deformed nature of the evidence. Natale could only testify that some of the bullets were consistent were consistent with nine-millimeter caliber ammunition.

*Detective Scarcella*

Detective Scarcella testified that when he arrived at the scene, he observed the deceased's body lying on the sidewalk face up with various bullet fragments, a spent shell and a bullet on his bathrobe. He also testified that he spoke to Smith upstairs in the deceased's sister's apartment at 215 Monroe Street, and that he also spoke to her at the 79th Precinct (along with Detective DeLouisa), and that an A.D.A. also came to the precinct to interview Smith. He also testified that on March 21, 1991, he was in Connecticut when he observed the defendant being escorted out of the beauty shop at 340 Whalley Avenue in handcuffs by NHPD.


The Defense Case

The defendant did not present any evidence at trial.

After the close of the People's case, Mr. Sheinberg stated:  "Your Honor, defense was going to call alibi witnesses.  I have to make a record with respect to two witnesses that we had, and my client wishes me to do that".  Mr. Sheinberg stated that he had spoken with one alibi witness, Alphonso Dixon, by telephone, and that Mr. Dixon indicated that he was in Connecticut and too ill to travel.

Mr. Sheinberg further stated that the night before, a second alibi witness, Kim Freeman, had come to his office. Mr. Sheinberg stated that Ms. Freeman had told him that she wanted to testify and that she was the mother of the deceased's child, but she had received threats and she was afraid that she would be harmed if she testified. Mr. Sheinberg stated that Freeman "wouldn't elaborate". The Court then offered to issue a warrant for her arrest, but the Mr. Sheinberg stated that he did not want to "force" any of his witnesses, but just wanted to make a record that he had given alibi notice. Mr. Sheinberg asked for a continuance to speak with Freeman, but the court denied the application.[25]

---

[25] Mr. Sheinberg did not mention James Hamilton, defendant's brother, who was noted in defendant's pre-trial alibi notice. Nor did Mr. Sheinberg mention Kelly Turner or Davette Mahan, the alleged alibi witnesses whom the defendant wanted to call at a subsequent C.P.L. § 440.30 hearing.

Additionally, before trial, defendant submitted affidavits from Alphonso Dixon and Kim Freeman with his pro se reply to the People's opposition to defendant's pro se speedy trial motion. The Dixon affidavit, dated June 24, 1992, stated that defendant had been in New Haven Connecticut from January 3, 1991 until January 5, 1991. Dixon stated that he was providing a letter from his doctor stating that Dixon was unable to travel due to medical problems -- a "cardiac condition," diabetes, high blood pressure, "and other physical ailments." Dixon also stated:

KCDA CONFIDENTIAL MATERIAL 1095

## The Verdict

On July 17, 1992, the defendant was convicted of Murder in the Second Degree.


## C.P.L. § 330.30

The first part of the 330 hearing took place October 19-20, 1992.  A.D.A. John Riley represented the prosecution and Howard Kirsch represented the defendant.

The second part of the 330 hearing took place June 3- 4, and June 10, 1993.  A.D.A. Michael Vecchione represented the prosecution and Howard Weisswasser represented the defendant.

Judge Rappaport presided over both parts of the hearing.

*Jewel Smith*

After trial, the defendant's private investigator, Robert Holt obtained a written statement from Smith recanting her trial testimony.  The defendant then filed a pro se motion pursuant to C.P.L. § 330.30.   The defendant was represented by new counsel. One key issue was Detective DeLouisa's memo book and notes contained therein as noted *supra at page 2.*

At the 330.30 hearing, Smith testified that she had not witnessed the shooting because she had been at the store and that she had said so to Detective DeLouisa.  Smith also testified that she changed her story at the 79th Precinct and she incriminated the defendant because she had been pressured to do so by detectives, after Money Will (real name, Willie Dawson) told the deceased's family that Smith knew who killed the deceased.[26] Smith also testified that she told A.D.A. Gutmann several times that she did not want to testify before the grand jury because the story she told the detectives was not true. Smith went on to further state that Detective Ponzi told Smith that he would send her to jail for murder and threatened her that she would not be able to see her children anymore if she did not testify before the grand jury.

---

The pressure of a trial would surely make me feel more congested than I presently am.  Having first-hand experience how mistakes can be made with a persons [sic] life in a Court Room, I am nervous and very hostile towards Judges, Prosecutors, whom in my opinion have caused me more harm than good in the past.

Dixon also stated that he was "willing to testify by phone if permissible by law."

The affidavit of Kim Freeman, dated June 29, 1992, stated that defendant had been with her in New Haven from January 3, 1991 through January 4, 1991.  She stated that the deceased had been the father of her child.  She further stated that she would not testify at a trial because she had been threatened by friends of the deceased that she would be killed if she testified for defendant.

[26] The defendant claimed that Willie Dawson ("Money Will") and Amir Johnson ('YaYa") (see Footnote 9), were the ones who killed the deceased.

KCDA CONFIDENTIAL MATERIAL 1096

Both Detective Ponzi and A.D.A. Gutmann testified at the hearing in rebuttal of Smith's recantation. Both testified that they had not threatened Smith, and that Smith had not told them that she had not seen the murder. Detective Ponzi testified that Smith had told him that she was reluctant to testify because she feared for her own well-being as well as for the safety of her children and family. Detective Ponzi and A.D.A. Gutmann both testified that Smith was very frightened before her ▇▇▇▇▇▇ and trial testimony and that Smith had to be arrested and produced as a material witness at trial.[27]

*Detective DeLouisa*

Detective DeLouisa testified that he interviewed Karen Smith/"Jewel" at the scene and that she initially told him that she was at the store at the time of the murder (as per the memo book entry). Detective DeLouisa also stated that a no point did he or a member of NYPD threaten Smith in any way, or tell Smith that she would be locked up for homicide if she didn't give a version that pointed out the defendant as the shooter, nor did Detective DeLouisa threaten Smith to insure that her testimony at trial would be consistent with her prior testimony from the grand jury. He also stated that he never told Detective Scarcella, or anyone else, that Smith had said that she had not seen the shooting.

Detective DeLouisa also testified that after her initial version, Jewel Smith then changed her story to implicate the defendant.

THE COURT: She said she knew nothing about—you usually don't go back to people who know nothing about it. What caused you to believe that you should re-interview her?

WITNESS: I established that she was there and that she knew the person that was shot...

THE COURT: Why? What happened to cause you to take a non-witness to the precinct and re-interview her?

WITNESS: Because the sister of the deceased showed up at the scene and a fight broke out and they were punching her, saying that she was responsible. And after the fight calmed down, we separated her. I got my initial interview and she was hysterical. . .

THE COURT: In other words, the sisters came and they accused her of the killing; is that what you are saying?

WITNESS: Being responsible

---

[27] Gutmann told CRU she did not know the Karen Smith of DeLouisa's note was the witness Jewel Smith until DeLouisa appeared to testify at the post-trial hearing

KCDA CONFIDENTIAL MATERIAL 1097

THE COURT: What does that mean?

WITNESS:      Having some part to do with it.. . .

THE COURT: Did you learn from that sister that this Jewel Smith was in the apartment with the deceased that night and spent the whole night there?

WITNESS:      Yes.

THE COURT: Was that the reason you then decided to take her to the precinct house and talk to her some more?

WITNESS:      That's one of the reasons.

Detective DeLouisa testified that he never threatened to charge Smith with the homicide, despite the fact that the deceased's sisters claimed she was responsible for the deceased's murder. ████████████████████████████████████████████████████████████████████████ Detective Delouisa also stated that he never asked Smith why she initially gave a different story. When asked why he did not ask her he stated, "I don't know why I didn't ask her". He did state that his initial interview was to "establish that she knew something about it enough that I could take her back to the stationhouse and give her a formal interview.  There was a lot of chaos going `on in the apartment at that time".  Mr. Weisswasser, on cross examination then asked:

Q:    Well, you were taking her to the stationhouse regardless of the sisters and her having this argument, is that what you are telling us?

A:    Once I established she was a potential witness, I was going to take her back to the stationhouse to interview her. . . .

Q:    Why didn't you ask her, is the question. . . why didn't you ask her why she gave you a different story?

A:    Because when we got back, she was hysterical. And it was very difficult to get any kind of response from her from her crying, being upset from the fight that broke out into the apartment. Once I got her back to the stationhouse and she got calm, I was able to talk to her.

Detective DeLouisa also testified that he never told anyone, including the trial prosecutor, that Smith gave him two inconsistent stories. He also stated that he believed that he gave his memo book containing the inconsistent statement to the trial prosecutor when he appeared for the grand jury in January, 1991.

---

Page 15

*Detective Scarcella*

Detective Scarcella testified at the hearing and stated that at no point in the process from incident to trial, did he ever threaten Smith in order to get her to testify. He also testified that he was never made aware of the fact that Smith had told Detective DeLouisa that she was at the store at the time of the homicide, or that Smith had ever used the name Karen at any time. Detective Scarcella stated that Detective DeLouisa arrived at the scene first from the 79th Detective Squad before he and Detective Chmil showed up from the Brooklyn North Homicide Squad, and that when he interviewed Smith at the scene he had no idea that Detective DeLouisa had done so before he arrived. He also stated that he never heard the deceased's sister accuse Smith of being responsible for the homicide, and that he did not even know who the deceased's sisters were.

*Felicia Shuler*

The defendant called several witnesses at the hearing. Felicia Shuler, was an acquaintance of Smith. On direct, she testified that she knew Smith from the neighborhood and that she knew Smith to have used the name Karen Smith (in addition to Jewel Smith) in the past. She stated that in November of 1992, she was on the train and she ran into Sharon Goodwin, the defendant's then fiancée, a close family friend of hers, and they began talking. Shuler asked Goodwin why she never got an invitation to her wedding and Goodwin told her it was because of the defendant's incarceration and the incident that happened regarding the deceased and Smith's testimony concerning that incident. Shuler immediately told Goodwin that Smith's testimony was impossible as Smith could not have witnessed the shooting because Smith was at the store (the Keyfood located at the corner of Nostrand and Monroe) with her at the time of the shooting. Shuler stated that they both left the store together, and they both happened upon the crime scene together. When asked how she remembered the specific date in question, Shuler responded that she kept a diary, and she wrote in her diary that when she and Smith arrived at the crime scene, the police arrived a few minutes later, and Shuler heard Smith give the name Karen Smith to the police. Shuler also testified that she heard Smith tell the police that she was not there, but rather that she was at the store at the time of the shooting. Shuler testified that the police tried to ask her (Shuler) questions but that she told the police that she did not want to be involved and she left. Shuler also stated that she only first learned that the defendant was charged with the deceased's murder when she ran into Goodwin on the train on November 14, 1991 (as per her diary entry). The court asked Shuler if she put an entry into her diary about seeing the deceased lying on the pavement after he was shot, and she responded that she did not, she only entered that "boyfriend was killed". When the court probed as to why not, Shuler stated that where she came from "[she] see[s] these kind of things a lot, and if we don't know the person, we really don't show any kind of feeling". On cross examination, Shuler admitted that she had heard Smith use the name Karen before the date in question, but had never put that entry into her diary.[28]

---

[28] Shuler was interviewed by the CRU ███████████████████████████████
███████████████████

KCDA CONFIDENTIAL MATERIAL 1099

*George Sheinberg*

Mr. Sheinberg testified at the hearing, that at trial, right before the People rested (in the courtroom, but off the record), he asked A.D.A. Gutmann if Jewel Smith, the People's sole eyewitness, and Karen Smith, the person in Detective DeLouisa's memobook were the same person, and A.D.A. Gutmann responded, "no". Mr. Sheinberg also testified at the hearing, that Mr. Sheinberg asked A.D.A. Gutmann if she knew who Karen Smith was and she said that she "had no idea, or, she did not know". Mr. Sheinberg stated that he later learned (through the defendant) they were the same person. He also stated that it was his understanding from A.D.A. Gutmann that Detective DeLouisa was retired or unavailable at the time of the trial.[29]

During the closing argument for the hearing, Mr. Weisswasser raised the issue as to when Detective DeLouisa's memo book was turned over to the defense. The Court asked A.D.A. Gutmann why she had waited until jury selection to turn over the memo book when she had had it since the Grand Jury stage, and the court had ordered her to turn over all the police reports as part of discovery.

> THE COURT: Didn't I order that all the police reports be turned over?
>
> A.D.A. GUTMANN: Police reports, not memo books.
>
> THE COURT: How about Rosario?
>
> A.D.A. GUTMANN: Certain Rosario, which I turned over in accordance—
>
> THE COURT: I never delineated—but whatever it was, it was turned over timely
>
> MR. KIRSCH: No. This is Brady material, not even Rosario. There is a witness with the name Karen Smith and the word Jewel on it. The District Attorney, who had this since January 1991, should have been aware that there may be some significance. The District Attorney can't say, well, I thought it was somebody else when both names are on it.
>
> THE COURT: Assuming you are right, it was Brady material, it was still turned over before the trial.
>
> MR. KIRSCH: Turned over during jury selection
>
> THE COURT: It is still before the trial
>
> MR. KIRSCH: Well I can—

---

[29] A.D.A. Gutmann testified at the hearing as well. She stated that at the time of the trial, Detective DeLouisa was not retired but she did not have him testify because she felt he did not do anything material in regard to the case. She also testified that when asked at the time of the trial who Karen Smith was, she did not know.

KCDA CONFIDENTIAL MATERIAL 1100

> THE COURT: If you came back 10 years from now with a 440, you would lose that without even going into what the merits of it were.

The court denied defendant's motion to set aside the verdict. In its order denying the motion, the court (Rappaport, J.) stated:

> It is obvious to the court from observing defendant throughout the pretrial stages, during the trial, and post-trial that he is a very bright, articulate and manipulative person, who is very involved in the defense of his case. Additionally, defendant seems to have a lot of resources available to him. This is evidenced by the letters, phone calls and many pro se motions written by this defendant and the investigations caused to be done by this defendant even while he was incarcerated.

In regard to Smith's recantation, the court went on to state:

> Whether it is defendant directly or his agents, it is clear that since his arrest there has been constant contact with the only eyewitness, Jewel Smith. It began when someone picked up Jewel and brought her to George Sheinberg's office to recant her testimony and continued with phone conversations, letters and visits. Although Jewel was called by the prosecutor as their witness during the hearing, she had already given a recantation statement to an investigator, whom she said she contacted, but who was hired by defendant.

> The Jury in this case already judged this eyewitness, Jewel Smith. They were presented with her criminal record, her recantation, and her expression of fear of defendant. This Jury found Jewel Smith's direct trial testimony to be credible and rejected the recantation.

> Similarly, this court rejects defendant's "newly discovered evidence" as being contrived and not believable.

### The Sentence

On July 12, 1993, the court sentenced the defendant to a prison term of twenty-five years to life.

### The C.P.L. § 440 Motions

The defendant filed seven post-conviction motions. Most of them were 440 motions, but some were motions for re-argument or motions seeking non-cognizable relief such as a declaratory judgment to the parole board.

KCDA CONFIDENTIAL MATERIAL 1101

<u>The First Motion to Vacate the Judgment and the Hearing Thereon</u>

By <u>pro se</u> motion dated January 5, 1994, the defendant moved to vacate his judgment of conviction pursuant to C.P.L. § 440.10 on numerous grounds. The court granted a hearing only as to the defendant's <u>Brady</u> claim which was based on the statement of Taseem Douglas that he had witnessed the shooting and had told the police that defendant was not the shooter. Douglas knew of the defendant from growing up in the projects, but he did not know him personally. He just knew that the defendant's nickname was Bush.

At the hearing, Douglas testified that on three occasions in February and March of 1991, he told detectives that he had witnessed the deceased's murder and that defendant was not the shooter. Douglas testified that he had told the detectives that "Money Will" and "YaYa", both of whom were friends with the deceased and both of who died in 1991, were responsible for the shooting. According to Douglas, the police threatened to arrest him for the shooting of a boy at school, and tried to pressure him to incriminate the defendant by saying that they would forget about the school shooting.

The People's evidence at the hearing showed that Detectives Louis Scarcella and Frank DeLouisa never spoke with Douglas before trial. In fact, on July 2, 1992, Detectives Detective Scarcella and Detective DeLouisa, accompanied by Lieutenant William White of the New Haven Police Department and Douglas's attorney Beth Merkin, went to visit Douglas ████████████████ ████████████████████████████████████████████████ However, Douglas, through defense attorney Merkin, refused to speak with the detectives.

*The Motion to Expand the Hearing to Include Alibi Witnesses*

Defendant sought to expand the scope of the C.P.L. § 440.10 hearing to include the testimony of alibi witnesses, Kelly Turner and Davette Mahan, two witnesses who were interviewed by the Conviction Review Unit (hereinafter "CRU") as part of this investigation. (Their affidavits and subsequent meeting with the CRU will be discussed below). With his motion, defendant submitted an affidavit of Kelly Turner, dated June 16, 1995, and an affidavit of Davette Mahan, dated June 14, 1995.

In support of his motion to expand the hearing, defendant stated, "Although Officer Turner was known to the defense prior to the trial, she became unavailable to the defense during the pendency of the case inasmuch as she moved and changed jobs, unbeknownst to the defense." Defendant further claimed that Davette Mahan had been unavailable to the defense at the time of trial because she had moved to Atlanta, Georgia and could not be located. In court, Mr.

KCDA CONFIDENTIAL MATERIAL 1102

Sheinberg stated that defendant had not served alibi notice as to Turner and Mahan because he had been unable to locate them. [30]

The People opposed defendant's motion to expand the hearing to include the testimony of the two alleged alibi witnesses.  The People argued that the alleged alibi witnesses were not newly discovered evidence within the meaning of C.P.L. § 440.10(1)(g) because defendant knew about the witnesses at the time of trial.  The People further argued that defendant's motion was dilatory, and that defendant did not use due diligence to bring the claim of newly discovered evidence to the Court's attention.

The People further argued that at trial, the defendant informed the court that he had two different alleged alibi witnesses, Kim Freeman and Alphonso Dixon, but that those witnesses were unavailable to testify because Dixon was too ill to travel from Connecticut and because Freeman was afraid for her safety.  The People argued that defendant did not inform the Court that Turner and Mahan existed and that their whereabouts were unknown.  The People further argued that the alleged alibi evidence would not have created a probability that the verdict would have been more favorable to defendant.  Finally, the People argued that defendant had failed to include Turner and Mahan's names in defendant's pretrial alibi notice, pursuant to C.P.L. § 250.20(1), and that, therefore, defendant's late claim regarding the alleged alibi witnesses should be rejected.

In an order dated April 2, 1996, the court (Rappaport, J.) denied defendant's C.P.L. § 440.10 motion and denied defendant's motion to expand the hearing to include the alleged alibi witnesses.  The court stated:

> Douglas has not proven to be a reliable witness.  His testimony is filled with many inconsistencies and is contradictory to all the reliable evidence.

The court further stated that at the time of the hearing, the defendant had made an oral application to expand the hearing to include the alleged alibi witnesses, but the court had rejected the motion at that time because defendant's pre-trial alibi notice failed to name the alleged alibi witnesses, Turner and Mahan, even though the witnesses were known to the defense at the time of trial.  The court reasoned that the defendant's failure to include the names in his alibi notice "could have justified their preclusion during the trial."  The court further reasoned that the

---

[30] ▮▮▮▮▮▮▮ Turner ran a talent agency with the defendant's brother, Alphonso Dixon (one of the defendant's original alibi witnesses), and that Turner's mother had continued to reside at the same location from October 1991 (when the original alibi notices were submitted) through June of 1995 (when Turner's affidavit was submitted), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

KCDA CONFIDENTIAL MATERIAL 1103

defendant failed to show that he had used due diligence to locate the witnesses prior to trial, and thus failed to meet the requirements of newly discovered evidence under C.P.L. §440.10(1)(g).

The Appellate Division granted the defendant's application to appeal from the lower court's denial of his C.P.L. § 440.10 motion, granted defendant's motion to consolidate his direct appeal with his appeal from the denial of his C.P.L. § 440.10 motion, and granted defendant's motion to file a pro se supplemental brief.  On appeal, neither defendant nor his attorney raised a claim regarding the court's order denying defendant's application to expand the C.P.L. § 440.10 hearing to include testimony by alibi witnesses Turner and Mahan.[31]

In an order dated May 22, 2000, the court affirmed defendant's judgment of conviction and affirmed the April 2, 1996 order denying defendant's motion to vacate the judgment of conviction.  People v. Hamilton, 272 A.D.2d 553 (2d Dep't), lv. denied, 95 N.Y.2d 935 (2000).]

The Second and Third Motions to Vacate the Judgment of Conviction and the Hearing Thereon

The defendant, by pro se motion dated September 3, 1998, moved again to vacate his judgment of conviction pursuant to C.P.L. § 440.10, based on a claim of newly discovered evidence, and the court conducted a hearing.  At the hearing, Darren Breeden testified on behalf of defendant.



Breeden testified that he had told Detective Ponzi and A.D.A. Gutmann that the defendant was not involved in the murder, and that two days after the deceased's murder, "Money Will" told him that he and "YaYa" had shot and killed the deceased. Breeden further testified that he had conveyed that information to Detective Joseph Ponzi and A.D.A. Gutmann.   Breeden further

---

[31] In his main brief, the defense raised seven claims, among them a claim of ineffective assistance of trial counsel.  Appellate counsel argued that trial counsel was ineffective because, inter alia, counsel failed to put on alibi witnesses at trial.  In his pro se supplemental brief, defendant raised four claims, including a claim that the lower court improperly denied his motion to set aside the sentence and improperly denied his motion to vacate the judgment of conviction.  This Court rejected defendant's claims.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  The defendant's attorney at the C.P.L. § 440.30 hearing told the court that she was calling Freeman and James Hamilton as witnesses because their testimony would show that defendant had been in New York at the time that the People claimed defendant had admitted to Breeden that he had shot the deceased (Nov. 11, 1999 Hearing at 163-67).

KCDA CONFIDENTIAL MATERIAL 1104

testified that A.D.A. Gutmann threatened that if Breeden wanted a deal on his pending murder case in Queens, he would have to say that the defendant killed the deceased.  A cooperation agreement was drawn up and executed but Breeden withdrew from the agreement. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The People's evidence at the hearing showed that Breeden had actually told Detective Ponzi and A.D.A. Gutmann that the defendant admitted to Breeden that he had killed the deceased. As a result of Breeden's information, Breeden entered into the aforesaid plea/cooperation agreement in exchange for Breeden's testimony against the defendant in addition to other criminal incidents of which he was aware. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮.[33]

### The Alibi Witnesses at the C.P.L. § 440.10 Hearing

The defendant claimed, and continues to claim, that on January 3, 1991 (the night before the murder), he was at a party thrown by his half-brother, Alphonso Dixon, at the Quality Inn in New Haven, Connecticut. Dixon was ▮▮▮▮▮▮▮▮▮▮ , and was throwing a going away party for Lee Marvin, who was about to commence serving a prison sentence for a drug conviction. The defendant's numerous alibis all claim that they either saw or were with the defendant in New Haven from the evening of January 3, 1991 thru the morning and early afternoon hours of January 4, 1991, which encompasses the time of the Brooklyn murder of Nathaniel Cash.

At the hearing on defendant's second motion, Kim Freeman and James Hamilton testified. Freeman testified that the deceased was the father of her daughter, and that the defendant had been with her at the Quality Inn Hotel in New Haven from January 4, 1991 into January 5, 1991. Freeman testified that she had not testified at defendant's trial because members of the deceased's family had threatened her that if she testified, she would be killed. Freeman further testified that it takes "[p]robably about an hour and a half, no more than 2 hours" to drive from Brooklyn to New Haven.

James Hamilton, the defendant's brother, testified that on January 4, 1991, in the evening, he went to New Haven where he attended a party, and that the defendant was at the party.  The

---

[33] Breeden and the defendant were incarcerated at Attica together from 1994-1996. Breeden submitted an affidavit on the defendant's behalf only after the defendant discovered from unsealed records that Breeden was going to testify against the defendant. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

KCDA CONFIDENTIAL MATERIAL 1105

defendant was already in New Haven at the time James arrived there. James left New Haven a day or so after the party.

While the defendant awaited the trial court's decision on his second motion to vacate the judgment of conviction, he filed a third motion to vacate the judgment of conviction pursuant to C.P.L. § 440.10, dated June 2, 2000. Defendant claimed that the alibi testimony of Kim Freeman and James Hamilton constituted newly discovered evidence, warranting a new trial.

In a November 22, 2000 opinion and order, Judge Rappaport rejected the defendant's claims raised in his second and third motions to vacate the judgment. The court stated, "The court finds that the testimony of Darren Breeden was incredible because of his demeanor in the answering of questions and the inconsistencies in his answers". The court ruled, "Since the court has found Mr. Breeden's testimony incredible, his allegations do not constitute newly discovered evidence."

The court further held, "The testimony of Kim Freeman and James Hamilton is not new evidence within the meaning of the statute since they were known to defendant and were listed as witnesses on the alibi notice. They could have been subpoenaed to testify at the trial". The court further reasoned, "Mr. [James] Hamilton testified at the hearing that he did not see defendant in the morning on January 4, 1991, the day of the murder. He saw defendant at a party in New Haven, Connecticut in the evening of that day." Accordingly, the court concluded, "Defendant's motion to vacate judgment upon the ground of newly discovered evidence consisting of the alibi witnesses Kim Freeman and James Hamilton is denied."

Subsequent Proceedings

The defendant filed four additional motions. In pro se papers, dated April 19, 2005, the defendant again moved to vacate his judgment of conviction pursuant to C.P.L. § 440.10. Relying on People v. Cole, 1 Misc. 3d 531 (Sup. Ct. Kings County 2003), the defendant claimed that he was actually innocent and that the evidence at the C.P.L. § 330.30 hearing and at the C.P.L. § 440.10 hearing showed such. In an order dated May 17, 2006, the court (Chambers, J.) denied the motion. On August 16, 2006, defendant's application for leave to appeal was denied.

In a pro se motion, dated April 1, 2008, the defendant sought "reversal" of the conviction based on Judiciary Law §2-b(3). He claimed -- as he had in a previous C.P.L. § 440.10 motion -- that Detective DeLouisa's memo book showed that Smith was not present at the time of the murder. In an order dated September 16, 2008, the Court (Konviser, J.) denied the motion.

In a motion dated May 12, 2009, pursuant to C.P.L.R. § 2221, the defendant sought renewal of his first C.P.L. § 440.10 motion. He claimed that the credibility of Lieutenant William White of the New Haven Police Department, who testified at the hearing on defendant's first C.P.L. § 440.10 motion, was called into question because Lieutenant White had been convicted of a

KCDA CONFIDENTIAL MATERIAL 1106

criminal offense.   In an order dated August 25, 2009, the Court (Goldberg, J.) denied the defendant's motion for renewal.

In a motion dated July 7, 2009, the defendant sought a hearing based on claims raised in previous motions, or a declaratory judgment informing the New York State Parole Board that defendant's claims were meritorious.  Defendant claimed, that the court's denial of his application to expand the second C.P.L. § 440.30 hearing to include the testimony of alibi witnesses Turner and Mahan "violate[d] compulsory process". The People opposed the motion. While the motion was pending, Attorney Jonathan Edelstein filed an "amicus" affirmation in support of the defendant's motion arguing that an actual innocence claim should not have any procedural bars, and that the testimony of Turner and Mahan, if believed, could prove actual innocence.

One of the arguments the People put forth in opposition to the affirmation was that the 1995 affidavits of Turner and Mahan did not show that defendant was actually innocent.  The defendant's claim that Turner and Mahan were alibi witnesses was belied by the fact that before trial, the defendant filed an alibi notice regarding Kim Freeman, Alphonso Dixon, and James Hamilton, but did not do so regarding Turner and Mahan.  Also, at trial, Mr. Sheinberg made reference to Freeman and Dixon, but made no mention of Turner and Mahan (or James Hamilton).  The defendant's alibi claim was also refuted by the fact that in his second C.P.L. § 440.10 motion, the defendant claimed that he was denied effective assistance of counsel based on counsel's failure to call Freeman and James Hamilton as alibi witnesses at trial, but did not allege that Turner and Mahan were alibi witnesses or that trial counsel had been ineffective for failing to call them.  Furthermore, at the hearing on the defendant's second C.P.L. § 440.10 motion, Mr. Sheinberg called Freeman and James Hamilton as alibi witnesses, but did not call Turner and Mahan as witnesses.  In addition, the People argued that the defendant's long delay in raising the claim showed that the claim lacked merit.

The court (J. Guzman) denied the defendant's motion to vacate the conviction.  This year, the Appellate Division reversed the lower court's decision and ordered a hearing based on actual innocence.  Currently the hearing is being held in abeyance until the conclusion of the CRU investigation.

### Defendant Status

The defendant was released to parole December 7, 2011 after having served almost twenty-one years of his life sentence. ████████████████████ the defendant was released without an admission of culpability for the Cash murder to the Parole Board. Instrumental to his release were multiple petitions on his behalf made by Jewel Smith to the Parole Board in which Smith stated that she lied in her testimony at the defendant's murder trial and that the defendant was in no way responsible for the death of Nathaniel Cash. The defendant is currently on lifetime parole.

KCDA CONFIDENTIAL MATERIAL 1107

## CRU Investigation

The defendant, in post-conviction motions, as well as through information supplied to the CRU by the defense, requested an investigation of defendant's case based on an 'actual innocence' claim.  Accordingly, the defendant supplied this office with several witness's affidavits and requested that we conduct face to face interviews with said witnesses.



The specific grounds for this recommendation follow.

*Analysis of the Crime Scene and Medial Evidence Compared to Jewel Smith's Testimony*

The vestibule at 215 Monroe Street measures 6'2" in width from wall to wall and 5'6" deep from the building from door to the lobby entrance door.  According to Smith's testimony, she and the deceased were standing inside the vestibule when the defendant and the three others entered the vestibule.  Smith testified that before the defendant starting shooting, she observed the deceased standing inside the vestibule, close to the door leading outside. She testified that a person initially identified by Smith as Saquan, handed the defendant a gun and the defendant, and only the defendant, shot the deceased multiple (Smith says seven times; the medical evidence indicates nine distinct gunshot wounds) times inside the vestibule.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Dr. Christian Roman of the Office of the Chief Medical Examiner was consulted for her opinion ▓▓▓▓▓▓  Of the nine gunshot wounds sustained by the decedent, only one was immediately fatal. This was the bullet which entered the upper right side of the defendant's back, traversed the chest cavity damaging various organs and exited the upper left front of the chest. This wound caused a catastrophic injury to the heart in which the entire top of the organ was blown off. In addition, the upper lobes of both the left and right lung were damaged by this gunshot and became immediately hemorrhagic upon infliction. Dr. Roman opined this injury would have incapacitated the deceased "within seconds" with death occurring very rapidly thereafter. According to Smith's statements and trial testimony, after the shooting ceased, the defendant

KCDA CONFIDENTIAL MATERIAL 1108

stared at her and then, along with the three other men, pushed past the still standing decedent out of the building door and fled the scene. Smith goes on to state, in substance, that the deceased turned to follow the assailants, made as if to call after them, exited the building, crossed the outdoor landing, navigated the five concrete stairs to street level and collapsed on the sidewalk near the curb line; a distance of some fifteen feet. In Doctor Roman's opinion, the post-shooting actions of the deceased, ███████████████, would be virtually impossible in light of the grave nature of the gunshot wound to the back chest and the other debilitating gunshot wounds sustained; particularly an injury to the left ankle which fractured both bones of the lower leg and which would have greatly hindered movement by foot ████████████████████.

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████ Dr. Roman confirmed the observation that the gunshot injury to the heart and lungs would have caused immediate massive bleeding. The primary egress of blood from the wounds would have been into the airway of the deceased which would have produced gushing of copious amounts of blood out of the body through the mouth and nose. Indeed, such evidence of blood gushing from the mouth of the deceased was found; but only at the location near the curb where his body came to rest. There was no blood staining found in the vestibule; no contact or transference stains, no droppings stains, no high impact, spraying-type stains as one might expect on the floor and walls if gunshots were inflicted within the very close confines of the vestibule. There was no blood drops or staining on the exterior door, the landing, or, the exterior steps, or, the sidewalk surface between the exterior steps and the location of the deceased's body.

████████████████████████████████████
████████████████████████████████████ Jewel Smith, describes in statements and testimony, a fact-to-face confrontation between the defendant and the deceased within the vestibule. ████████ of the nine gunshots wounds sustained by the deceased, six enter the posterior, or, rear aspect of the deceased's body. ████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

KCDA CONFIDENTIAL MATERIAL 1109

In her early police statements, Smith described the defendant being five to six feet away from the deceased when he commenced firing. At trial, she pointed to a location in court, estimated by the court and then stipulated to by the parties as four feet, as the distance between the defendant and the deceased. ████████ given the dimensions of the vestibule and the locations of the two men affixed to a photographic exhibit by Smith in her direct testimony, the distance must have been much, much shorter.

The wounds and clothing of the deceased were examined by the medical examiner who conducted the autopsy of the deceased, but no evidence of gunfire within close range was found,

[See, Exhibit One, a rough scale diagram prepared by CRU.] Using the measurements of the wound locations noted in the deceased's autopsy, CRU plotted the angles and paths of wounds inflicted which had a right-to-left directionality without regard to whether those wounds entered the front or back aspect of the deceased's body. The Exhibit also shows the relative position of the gun or guns if discharged at four feet, Smith's courtroom estimate, from the closest part of the deceased right side torso. As demonstrated, the diagram shows paths of both upward and downward trajectory and origin locations

Dr. Roman opined that the paths and angles of the wounds were ████████ much more consistent with the shooter and the deceased being on two different planes, such as from street level up to the vestibule, landing or steps; or, vice versa.

There was no cross-examination of the ME by defense counsel.

KCDA CONFIDENTIAL MATERIAL 1110

In the course of the prosecution, between the Grand Jury phase and trial, the ballistics evidence recovered by the Crime Scene Unit in, and in front of, 215 Monroe Street was microscopically analyzed by members of the Firearms Analysis Section of the Police Laboratory. The analysis of the discharged shell casings indicated that, even though the shells were all from nine-millimeter ammunition, two different guns had been discharged at the scene. The two outlier shells (out of eight total recovered) were found on the exterior steps and on the sidewalk near the corpse, respectively. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ two firearms were discharged during the fatal assault of the deceased; at least one of which was fired outside the building and as far away as the sidewalk near the curb.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In direct testimony at trial Smith ▮▮▮▮▮▮▮ saying that after she observed the defendant initiate the shooting, she put her head down and averted her eyes. While she had her head down, Smith said she heard more shots, but didn't see who was shooting. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Smith still placed the deceased and all four of the men previously described, in the vestibule from start to finish of the entire shooting incident. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Further establishing the presence of a second shooter is bullet damage on an interior apartment door down a hallway beyond the vestibule. ▮▮▮▮▮▮▮▮▮▮▮▮ Although documented and photographed by the Crime Scene Unit, the presence of this ballistic damage was not elicited by the trial prosecutor in direct testimony of the Crime Scene Officer, nor touched upon during cross-examination.

As mentioned above, defendant raised a number of alibi claims. The CRU conducted in person interviews with several witnesses. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The CRU offers the below only to detail the scope of its review.

*Kelly Turner*
In an affidavit dated June 16, 1995, Kelly Turner stated that at the time of the incident she ran a talent agency in New Haven, Connecticut, and was partners with Alfonso Dixon, the defendant's half-brother. Turner further stated that she first met the defendant on the evening of January 3, 1991, when she was introduced to him at a party at the Quality Inn hosted by Alfonso Dixon, for

KCDA CONFIDENTIAL MATERIAL 1111

Lee Marvin.[34]  She then stated that the morning after the party, January 4, 1991, she drove to the Quality Inn where the defendant was staying and picked up the defendant between 11 and 11:15 a.m. and brought him to her talent agency for a meeting.  The defendant was going to help her recruit talent from New York for her agency.  The meeting concluded at 12 noon when the defendant was picked up by his brother, Alfonso Dixon.  Turner became a police officer in New Haven at the end of 1991 and was a police officer when she signed her affidavit.  Therefore, her affidavit has been accorded the most weight by the defense.



When Turner was interviewed by the CRU ████████████████████████████ ████████ she was quite certain that the meeting with the defendant took place on a Saturday morning.  She also stated that because it was the weekend, there was no one else in the office except her assistant, Davette Mahan.  She forcefully insisted that the meeting occurred on a Saturday several times.  January 4, 1991, however, the date of the murder, was a Friday.  Additionally, in her interview she repeatedly referred to her partner and the defendant's half-brother, Alfonso Dixon by his nickname, "Fonz", ████████████████████████████████ ████████████████████████████████████████████████████████

Turner also denied that she had any ongoing contact with the defendant. ████████████ ████████████ she wrote a letter in 2006 to the Court on the defendant's behalf. ████████████████ the defendant sent approximately $700 from his commissary to Ms. Turner from October 2000 to May 2001.

*Davette Mahan*
Davette Mahan submitted an affidavit dated June 13, 1995, stating that she was employed by the talent agency owned by Turner, and that on January 3, 1991, she went to a party in New Haven for Lee Marvin. There she saw the defendant and Turner having a discussion.  The next morning on January 4, 1991, between 11am and 12pm, she stated that she observed the defendant and Turner at the talent agency together discussing business.



When CRU interviewed Ms. Mahan, ████████████████████████ ████████, she stated that she had seen the defendant and Turner together many times at the talent agency discussing business before the January 4, 1991 date. ████████████████████████████████ ████████████████████████████████████████████████████████

Ms. Turner's partner was the defendant's half-brother and the defendant frequented the talent agency.

---

[34] Lee Marvin was turning himself in to Federal authorities on January 4, 1991 in order to serve a sentence on a felony drug conviction.

KCDA CONFIDENTIAL MATERIAL 1112

*Mattie Dixon*

Mattie Dixon provided an affidavit dated October 31, 2009, stating that on the date in question, January 4, 1991, she was married to Alfonso Dixon, the defendant's half-brother, at the time. She stated that on the morning of January 4, 1991, at approximately 11:30 a.m., she, along with several others picked up the defendant from the talent agency owned by Turner and her husband, Alfonso. Besides providing an alibi for the defendant, she stated that her husband Alfonso was working as an informant for Detective White in the New Haven police department. She further stated that Detective White threatened to put her husband Alfonso in jail if he helped the defendant in any way. Alfonso told her that Detective White instructed him to get a letter from his doctor that he would be unable to testify at trial on the defendant's behalf because of his heart condition. Accordingly, although he was listed as an alibi witness, at trial, Mr. Sheinberg made a record that Alfonso Dixon was unable to testify due to health reasons. Alfonso Dixon died in 2003.

*Tashameaka Watson*

In an affidavit dated February 18, 2010, Tashameaka Watson (who was nineteen in January of 1991), Alfonso Dixon's daughter ,and Mattie Dixon's step daughter,  stated that she had been at the party on January 3, 1991 for Lee Marvin, and that she saw the defendant at the party. She also stated that on the next day, January 4, 1991, at approximately 12:30 p.m., she saw the defendant at her father, Alphonso's house in Connecticut.

At her CRU interview, when asked why she did not come forward until 2010 (approximately 19 years after the murder), she stated that at the time of the incident she was young and that she did not know much about the defendant's lifestyle. She claimed that it was only when she got older and inquired about the defendant (who is her uncle), that she decided to come forward. She stated that despite the fact it was almost 20 years ago, she remembered the January 4, 1991 date clearly.

*Felicia Shuler*

Felicia Shuler testified at the CPL 330 hearing. The details of her testimony are discussed above. Shuler was interviewed by the CRU. ███████████████████████████ ███████████████████████████████████ she told CRU that she had left the crime scene prior to the arrival of the police, ██████████████████████████████████████████████████ Shuler stated that she had read her testimony from the CPL 330 hearing prior to her speaking with us. Shuler also stated that she has consistently been in contact with the defendant.

KCDA CONFIDENTIAL MATERIAL 1113



Page 31

KCDA CONFIDENTIAL MATERIAL 1114



KCDA CONFIDENTIAL MATERIAL 1115



Page
33



KCDA CONFIDENTIAL MATERIAL 1117