1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - -X
3  DERRICK HAMILTON,                : 15-CV-4574 (CBA)
                                    :
4            Plaintiff,             :
                                    :
5          -against-               :
                                    :
6  THE CITY OF NEW YORK, THE        :
   NEW YORK CITY POLICE             :
7  DEPARTMENT, DET. LOUIS           :
   SCARCELLA, individually and     :
8  in his capacity as a            :
   New York City police officer;   :
9  DET. FRANK DeLOUISA,            :
   individually and in his         :
10 capacity as a New York City     :
   police officer, INV. JOSEPH     : United States Courthouse
11 PONZI, individually and in      : Brooklyn, New York
   his capacity as an              :
12 Investigator for the Kings      :
   County District Attorney's      :
13 office, JOHN/JANE DOE NOS. 1     :
   through 10, being unknown       :
14 employees of the City of New    :
   York, THE CITY OF NEW HAVEN,    :
15 POLICE OFFICER BILLY WHITE,      :
   individually and in his         :
16 capacity as a New Haven         :
   police officer, and             :
17 JOHN/JANE DOE NOS. 11            :
   through 20, being unknown       :
18 employees of the City of New    :
   Haven;                          :
19                                 : Wednesday, October 30, 2019
             Defendants.           : 10:00 a.m.
20 - - - - - - - - - - - - - - - -X

21

22

23            TRANSCRIPT OF CIVIL CAUSE
              FOR PRETRIAL CONFERENCE
24     BEFORE THE HONORABLE CAROL BAGLEY AMON
           UNITED STATES DISTRICT SENIOR JUDGE

25

2

1                    A P P E A R A N C E S:

2   For the Plaintiff:        ELEFTERAKIS, ELEFTERAKIS & PANEK
                              80 Pine Street
3                             38th Floor
                              New York, New York 10005
4                                 GABRIEL B. HARVIS, ESQ.
                                  RAYMOND PANEK, ESQ.
5                                 BAREE N. FETT, ESQ.

6   For the Defendants        NEW YORK CITY LAW DEPARTMENT
    City of New York          SPECIAL FEDERAL LITIGATION DIVISION
7   and Det. Frank           100 Church Street
    DeLouisa:                 New York, New York 10007
8                             BY:   PHILIP R. DEPAUL, ESQ.
                                    ANGHARAD WILSON, ESQ.
9                                   KIRAN ROSENKILDE, ESQ.
                                    BRIAN C. FRANCOLLA, ESQ.

10

11  For the Defendant         LAW OFFICE OF RICHARD E. SIGNORELLI
    Det. Louis                52 Duane Street
12  Scarcella:                7th Floor
                              New York, New York 10007
13                            BY:   BRYAN HA, ESQ.

14  For the Defendant         KARSTEN & TALLBERG, LLC
    Police Officer            500 Enterprise Drive
15  Billy White:              Suite 5B
                              Rocky Hill, Connecticut 06067
16                            BY:   JAMES N. TALLBERG, ESQ.
                                    DENNIS M. DURAO, ESQ.

17

18

19

20  Court Reporter:          DAVID R. ROY, RPR
                             225 Cadman Plaza East
21                           Brooklyn, New York 11201
                             drroyofcr@gmail.com

22

23  Proceedings recorded by Stenographic machine shorthand,
24  transcript produced by Computer-Assisted Transcription.

25

```
                    Proceedings                    3
```

1               P R O C E E D I N G S

2

3                    --oo0oo--

4

5        (In open court.)

6        THE COURTROOM CLERK:  Hamilton versus City of

7   New York, et al., 15-CV-4574.  We are on for a pretrial

8   conference.

9        THE COURT:  All right.  Would the parties state

10  their appearances, please.  The appearance sheet has not

11  been filled out.

12       All right.  Who is here for Plaintiff.

13       MR. HARVIS:  Gabriel Harvis for the plaintiff.

14  Good morning, Your Honor.

15       THE COURT:  And for the defendants?

16       MR. DEPAUL:  Phil DePaul, Your Honor, for

17  Defendant Frank DeLouisa.

18       MS. WILSON:  And Angharad Wilson also for

19  Defendant DeLouisa.  Good morning, Your Honor.

20       THE COURT:  Good morning.

21       MR. ROSENKILDE:  And Kiran Rosenkilde on behalf of

22  Defendant DeLouisa.

23       THE COURT:  Good morning.

24       You didn't -- I only have two people who signed in

25  here.  All right.

```
                    Proceedings                    4
```

1              But Mr. DePaul, you are speaking principally

2       for --

3              MR. DEPAUL:  I think we will -- I think we will

4       all be talking, Your Honor.

5              THE COURT:  All right.  I'm sorry, then, give me

6       your names again so I can write them down.  I just don't

7       have them.

8              MS. WILSON:  Good morning.  Angharad Wilson,

9       Your Honor.

10             MR. ROSENKILDE:  And Kiran Rosenkilde.

11             MR. FRANCOLLA:  And Brian Francolla, also on

12      behalf of Detective Frank DeLouisa.

13             MR. HA:  And Bryan Ha for Defendant Louis

14      Scarcella.  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             All right.  And I'm sorry?

17             MR. TALLBERG:  And good morning, Your Honor.  Jim

18      Tallberg, T-A-L-L-B-E-R-G, for Billy White.  And my partner

19      Dennis Durao is with me here.  Good morning, Your Honor.

20             MR. DURAO:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             Okay.

23             MR. HARVIS:  And, Your Honor, my partner is

24      Raymond Panek and Baree Fett also here with me.  Good

25      morning, Your Honor.

Proceedings                                    5

1          MR. PANEK:  Good morning, Your Honor.

2          MS. FETT:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          All right.  You all can be seated.

5          This matter is on for a pretrial conference.

6    There are unfortunately numerous outstanding issues.

7          I had requested on October 23rd that Plaintiff

8    provide an outline of the areas that he wished to

9    cross-examine Detective Scarcella about that were related to

10   other convictions.  Does the other side have that?

11         MR. HA:  No, Your Honor.  We have not received

12   any.

13         MR. DEPAUL:  No, Your Honor.

14         MR. HARVIS:  We took the -- we took the Court's

15   order just because it was asking for our cross-examination

16   topics to be something that will be submitted *in camera* to

17   Your Honor.  We didn't realize it was to be --

18         THE COURT:  Well, yes, I mean, I want argument on

19   that.

20         The reason I limited it to just the issues about

21   the other cases is because I think we need to talk about

22   that.  I wasn't asking for all your cross-examination, but I

23   do think it's important that -- to the extent that they are

24   based on other cases and findings and all, that we talk

25   about that ahead of time.  My primary objective being to

Proceedings                                          6

1    avoid, you know, breaks in the case where we are at sidebar

2    for hours.  So I did assume that you were going to provide

3    that to Counsel.

4           MR. HARVIS:  Your Honor, you know, I just -- it

5    was -- in looking at the order, it just said provide it to

6    the Court.  And I just figured because it was -- we think it

7    was work product.  We would have made the application to do

8    it *ex parte* if we thought that the Court was asking us to

9    file it.  And I -- I -- so I apologize.  There was confusion

10   on our part.

11          I -- I do have something, though, to say that may

12   be helpful, generally.

13          THE COURT:  Okay.

14          MR. HARVIS:  There have been some meaningful and

15   productive settlement discussions that have been going on

16   that we think are potentially -- you know, could potentially

17   get us in a place where we may not need to necessarily, you

18   know, go through everything on the merits; and -- and we

19   were hoping to have the opportunity to discuss that with

20   Your Honor, you know, if Your Honor is inclined to hear

21   about that?

22          THE COURT:  Does everyone want to have that

23   discussion?

24          MR. DEPAUL:  Your Honor, what I can say is there

25   have been discussions and the parties are closer than where

Proceedings                          7

1   they were during the settlement conference this past July.

2   But the defendants, from the City Defendants' perspective,

3   the plaintiff has come down to a demand.  They have made an

4   offer.  We are evaluating Plaintiff's current demand, and

5   really -- we don't have any authority based above what we've

6   already offered, so as we sit here today, we don't think

7   those discussions will be particularly fruitful because

8   there is really nothing to discuss at this point.

9          Plaintiff has also -- Plaintiff's most recent

10  demand, I believe that they have indicated that they're not

11  willing to accept anything below that demand.  And if that

12  is the case, even if the City were to get additional

13  authority, I don't think we would be able to come up with

14  that number.  So from our perspective, we don't think those

15  discussions right now would be fruitful.

16         MR. HARVIS:  What we were going to propose,

17  Your Honor, was just to bring Your Honor, perhaps in a brief

18  *ex parte* discussion with just a little bit more detail than

19  where we are, because I have a feeling that the bridge might

20  be a little bit more -- you know, it might be easier to

21  bridge the gap than perhaps, you know, an open discussion

22  would suggest.

23         THE COURT:  Well, we have a lot of work to do.  If

24  the case is going to settle, fine.  I would be -- or there

25  is a likelihood of settling, I would be very happy to have

Proceedings                                          8

1    those kinds of conversations.  And I take it that the

2    parties do not oppose the Court having those kinds of

3    conversations, *ex parte* conversations regarding settlement?

4    I understand this is a jury trial, but...

5              MR. DEPAUL:  We don't, Your Honor.

6              MR. HA:  No, Your Honor.

7              THE COURT:  Does anyone oppose the Court engaging

8    in settlement discussions?

9              MR. TALLBERG:  No, Your Honor.

10             THE COURT:  And, obviously, you don't --

11             MR. HARVIS:  We don't --

12             THE COURT:  -- want me to do it.

13             All right.  Well, why don't we just discuss that

14   issue for a few minutes, and then we will see if there's any

15   reason to pursue this any further?

16             Does everyone want to go off the record because

17   they're settlement discussions?

18             MR. DEPAUL:  Yes, Your Honor.

19             MR. HARVIS:  That makes sense.

20             THE COURT:  Okay.

21             MR. HA:  Yes.

22             THE COURT:  All right.  Do you want to just -- so

23   we will go off the record while we discuss settlement for a

24   moment.

25             (Pause in proceedings from 10:24 a.m. to

Proceedings                                                    9

1    11:45 a.m.)

2            THE COURT:  All right.  We are back on the record

3    now.

4            We had settlement discussions in this case for

5    almost two hours, and we're meeting again on this Friday,

6    November 1 at 11:00 o'clock to determine if those have been

7    successful.

8            Let me just address a couple of things.  Now, I

9    would like Plaintiff to provide Defendants with a copy of

10   the submission that they gave me about cross-examining

11   Mr. Scarcella.

12           Okay.  Just so we understand, and I've considered

13   the motion for bifurcation.  I am going to grant that motion

14   with several of the conditions that Plaintiff has requested.

15   I think since Plaintiff has to prove for their *prima facia*

16   case that there was a depravation of liberty, I think they

17   are allowed to say what that deprivation of liberty was, so

18   they can say the 21 years.

19           In terms of what the jury will be told, at the

20   outset I am going to tell them about the approximate length

21   of trial, and I will try to include in that what it would be

22   with a damages phase, simply because I do not want them to

23   not understand that.  I will tell them that it will proceed

24   in two phases, and that following the first stage, there may

25   be additional evidence presented and an additional matter

Proceedings                                                    10

1    about which they will have to deliberate.  I will not tell

2    them, If you find no liability, you can go home free.

3                MR. HARVIS:  Thank you, Your Honor.

4                THE COURT:  And I am not persuaded that the

5    criminal convictions from the 1980's would be admissible in

6    the liability phase.  If something comes up during the

7    course of the testimony that suggests that that could

8    somehow be relevant, fine.  But I don't see how it's

9    relevant at the moment.

10               There was a motion about the defenses of qualified

11   immunity, probable cause, and *res judicata*.  I don't even

12   understand what the argument about *res judicata* is.  I mean,

13   is there any *res judicata* defense?  I understand that there

14   was an issue about qualified immunity that they wanted to

15   stay in the case, depending on how the evidence develops

16   with DeLouisa.

17               MR. DEPAUL:  Yes, Your Honor.

18               THE COURT:  But I didn't understand how

19   *res judicata* fit into anything.

20               Does anybody got a clue here on that one?

21               (No audible response.)

22               THE COURT:  I guess not.  Okay.  Moving right

23   along.

24               You indicated that you had special interrogatories

25   that you would want addressed on the question of qualified

1    immunity?  When are the jury instructions due?  I forget.

2              MR. DEPAUL:  Friday, Your Honor.

3              MR. TALLBERG:  Friday.

4              MR. HARVIS:  Friday.

5              THE COURT:  Friday.  All right.

6              Do you want to provide those special

7    interrogatories by --

8              MR. HARVIS:  That's what we were anticipating,

9    Your Honor.

10             THE COURT:  Okay.  Fine.

11             Let me see if there are any other major issues

12   that I can just...

13             All right.  With regard to the question about the

14   book that was written, I'm not going to order now that all

15   of that be excluded as a matter of law.  The defendants

16   would have to lay a foundation for how portions of the book

17   comes in and how it's relevant.  So I'm not going to rule it

18   out as a matter of law, but they cannot get into the book.

19             And if the defendant [sic] testifies to something

20   inconsistent with his interview that he had with

21   Dr. Tramontin that would be relevant.  I think that a

22   videotape could be used.

23             MR. DEPAUL:  Your Honor, just a point of

24   clarification, you mean the plaintiff?

25             THE COURT:  I'm sorry.

Proceedings                                                        12

1           MR. DEPAUL:  Yes.

2           THE COURT:  Yes, excuse me.

3           I'm not inclined to preclude evidence of Innonence

4    here, because I think it bears relevance on whether, in

5    fact, Jewel Smith's testimony was false.  I mean, they are

6    two steps away from that.  First, it seems that it would be

7    important to prove that it was false.  And then, of course,

8    they have to prove that Mr. Scarcella persuaded her to

9    fabricate the -- the actual evidence of Innonence may not

10   have direct relevance to Mr. Scarcella's actions.  But as a

11   first step proving that she lied is important, so I am not

12   going to preclude all of Innocence.  I may very well limit

13   the alibi testimony.  I don't think we need 20 alibi

14   witnesses.  But, again, that will await trial and see

15   whether it becomes cumulative.

16           I wasn't clear what anyone wanted to offer about

17   the conviction review unit report.  I'm not understanding

18   what the relevance of that report is.  And perhaps, the

19   plaintiff can share with me what they think is relevant in

20   that report?

21           MR. HARVIS:  Sure.  We don't -- we don't -- I

22   don't think we plan to offer the report itself.

23           THE COURT:  Okay.

24           MR. HARVIS:  It's more that we intend to call

25   individuals who were involved in the investigation that

Proceedings                                    13

1    resulted in the creation of the report.

2            THE COURT:  All right.  And what are they going to

3    say?

4            MR. HARVIS:  So, for example, they're going to say

5    that they went into the -- the vestibule of the building and

6    they examined the location that evidence was said to have

7    been, and they made certain findings about whether or not

8    the physical condition of the vestibule was consistent.  And

9    they --

10           THE COURT:  Well, who were those people, though?

11           MR. HARVIS:  Rogelio Torres was the lead

12   investigator.  And then another important witness is

13   Dr. Christian Roman, who was consulted by the CRU about the

14   accuracy of the ballistic's testimony that was received at

15   trial.  And so that person has firsthand knowledge as to the

16   fact that --

17           THE COURT:  Go ahead.

18           MR. HARVIS:  Oh, I'm sorry.

19           -- the fact that for example, the -- it -- the

20   version of the events that was described by Jewel Smith was

21   incompatible with the evidence as it existed at the time of

22   trial.  And, you know, as Your Honor may recall, that there

23   was very little development on the defense side of that

24   testimony at trial, and so that's -- we believe that's a

25   witness with direct knowledge.  And so the -- the report is

Proceedings                                                        14

1   only relevant to the extent that it guides our examination

2   of those witnesses.

3           THE COURT:  So to the extent that there are any

4   findings in the report, you understand that you can't offer

5   the report to prove that?

6           MR. HARVIS:  Correct.  We do not -- we do not

7   intend to do that, Your Honor.  It's really just about

8   understanding the scope of the investigation and who -- who

9   did what.

10          It also may be relevant with respect to Jerry

11  Douglas, because the investigators went out and met with

12  people who -- who had knowledge about Jerry Douglas and

13  his -- you know, the circumstances surrounding his death,

14  for example.

15          THE COURT:  Why is that relevant?

16          MR. HARVIS:  Well, because they're going to want

17  to prove that Jerry Douglas -- well, they're going to

18  probably want to cast doubt about the circumstances

19  surrounding --

20          THE COURT:  Well, we are not going to get into the

21  circumstances of Jerry Douglas's death, unless there's some

22  suggestion on Defendants' side that it was caused -- you

23  know that it was caused by -- or well, we're just certainly

24  not going down that road.

25          MR. HARVIS:  Then we wouldn't be offering it,

1   Your Honor.

2           THE COURT:  All right.

3           MR. HARVIS:  That would be the only reason for

4   that.

5           THE COURT:  All right.  I think --

6           MR. ROSENKILDE:  And, Your Honor, we --

7   Defendant DeLouisa we would have a response.

8           In terms of some of the facts that Plaintiff would

9   seek to elicit that came out of the CRU report --

10          THE COURT:  Right.

11          MR. ROSENKILDE:  -- the problem with that is even

12  if Plaintiff's Counsel does not elicit the ultimate outcome,

13  the CRU report in itself, it was a later-created analysis

14  done decades after the police investigation, really with the

15  sole doubt -- with the sole purpose of casting doubt on what

16  had happened.  So some of these findings concerning, you

17  know, the blood splatter in the vestibule and the direction

18  of the bullets, none of that in any way factored into the

19  evidence that was at trail.  So that shouldn't be -- it's

20  not relevant and it's prejudicial.  It's not relevant to any

21  of Plaintiff's claims.

22          MR. HARVIS:  It's for the same reason that we're

23  allowing Innonence's evidence, Your Honor.  It tends to show

24  that Jewel Smith was coerced, and it tends to show --

25          THE COURT:  I don't know that it tends to show she

Proceedings                                           16

1    was coerced.  It tends to show that she lied, perhaps.

2            MR. HARVIS:  Well, that's fair, which we think are

3    very, you know, interconnected issues from our view.  We

4    don't think the age of the examination is particularly

5    relevant.

6            THE COURT:  Well, where we have to draw a fine

7    line here, you know, is with this -- there is no claim that

8    they failed to investigate.  There's no claim in your

9    complaint that --

10           MR. HARVIS:  Absolutely not.

11           THE COURT:  -- there was a failure to investigate.

12           MR. HARVIS:  No.

13           THE COURT:  So the fact that, you know, they

14   didn't do all of these things.  I'm thinking about the

15   Pollini report now.  I don't think it can -- I don't want

16   the argument to be made to the jury that, you know, this is

17   something that -- as Pollini suggested, this is something

18   that DeLouisa and Scarcella should have know about.  I mean,

19   the prosecutors had all of this information about the

20   ballistics and the murderer.  So, I mean, I'm having a lot

21   of problems with Pollini's testimony.

22           MR. HARVIS:  Can I -- I just want to guide

23   Your Honor to two Second Circuit reported precedential

24   cases.  It's *Manganiello v. The City of New York* -- these

25   are both in our briefing --

Proceedings                                                          17

1        THE COURT:  Okay.

2        MR. HARVIS:  -- *Manganiello* and *Lowth v. Town of*

3   *Cheektwaga*.  I don't even know how to say that word,

4   *Lowth v. Town of Cheektwaga* is, I think, the town.  And

5   those cases say, the quote is, "The failure to conduct an

6   investigation where a reasonable person would have done so,

7   may indicate a lack of probable cause."

8        THE COURT:  All right.  But precisely what is it?

9   Their probable cause was based on the witness who viewed it

10  and I guess this guy Douglas.  You may have some limited

11  inquiry you could ask an expert about that, but when they

12  have got someone who says, I was an eyewitness to a crime,

13  that is generally sufficient for probable cause, unless

14  there's some reason to not believe that's credible.  So if

15  an expert wanted to say, you know, maybe they should have

16  talked to somebody she was with or something, or police

17  protocol would have required that they interviewed the

18  person standing next to her and they didn't do that, maybe

19  you can go there.  But all of this stuff about they should

20  have examined the ballistic's report, I mean, that's outside

21  of the police officer, to some extent, and goes to the DA.

22  The DA had all of this information.

23        MR. HARVIS:  Well --

24        THE COURT:  So I have real problems with how far

25  Pollini can go.  I mean that stuff in there about "should

Proceedings                                    18

1    have gone through the trash cans and stuff," you know, what

2    are we talking about here?  I think he may be able to

3    suggest as an ex -- you know, police protocol would have

4    required you to interview everyone in the room with her or

5    something, and say they didn't do that.  Maybe you can go a

6    little bit there.  But certainly not to the extent that his

7    report --

8            MR. ROSENKILDE:  Your Honor --

9            THE COURT:  And I don't think that there ought to

10   be any argument about failing to investigate or that, you

11   know, they should have done -- or carefully read the

12   ballistic's report or the medical examiners.  I mean, this

13   is all after -- this becoming a proximate-cause issue

14   somehow, which I really hoped we were going to keep out of

15   here.  But once the prosecutor has all of that information,

16   I don't know that you lay it at the fault of the detectives.

17   So that gives me a little pause.

18           MR. HARVIS:  Yeah.  I just wanted to throw out,

19   Your Honor, just that -- you know, the beginning of what

20   Your Honor was saying, was that you have a complaining

21   victim that that generally, we agree, would provide probable

22   cause.  But by the same token, if -- if you had created that

23   statement by coercing the person who did it --

24           THE COURT:  Well, no, of course.

25           MR. HARVIS:  Yeah.

```
                        Proceedings                        19
```

1           THE COURT:  There's no problem with that.  Of

2   course, that argument --

3           MR. HARVIS:  Yeah.

4           THE COURT:  -- I'm there for that.

5           But do you also have an argument here that -- I

6   take it and perhaps I'm wrong, but are you going to argue to

7   the jury that even if he didn't fabricate her testimony,

8   they shouldn't have relied on it; that it wasn't --

9           MR. HARVIS:  We're not going to be making many

10  arguments that -- that contemplate that he didn't fabricate

11  her testimony.  We don't -- we don't expect to do that,

12  but --

13          THE COURT:  Okay.  Then why do you need all this

14  other stuff for?

15          MR. HARVIS:  Because our view is that, for

16  example -- this is just by way of an example, you know,

17  there's -- everyone agrees between Taseem Douglas and the

18  911 call that was placed that these -- that there were four

19  men who left the scene in a red car.  Now, you know, we

20  think that if you totally don't even look at that at all,

21  try to find out anything about that car, that that might

22  suggest that you did not, in fact, have probable cause.  You

23  weren't conducting a legitimate investigation, because

24  that's sort of like a baseline thing that a detective would

25  do.  That's conducting a good investigation.  We don't

Proceedings                                          20

1   intend to argue that that suffices to establish liability on

2   a claim.  But that -- as the Second Circuit said in those

3   two cases that may be evidence that probable cause was,

4   otherwise, lacking because why didn't you do that?  That's

5   as far as we plan on taking it.

6               THE COURT:  What were the facts in that case?  I

7   mean, but you can't -- I will have to look at --

8               MR. HARVIS:  I would encourage, Your Honor -- it's

9   all -- oh, by the way, Your Honor also cited that case in

10  the decision on summary judgment in this case.

11              THE COURT:  Yes, I know.

12              MS. WILSON:  Your Honor, I would just emphasize

13  again that all of this other material regarding steps that

14  the officers could have taken, clearly just goes to a claim

15  that is not in the case, which is a failure to investigate.

16  I think that it's -- there's a very -- it's very far removed

17  to say that because they didn't take X steps, that means

18  that they must have conducting a faulty investigation and/or

19  must have coerced --

20              THE COURT:  If there is something --

21              MS. WILSON:  -- and it's not relevant.

22              THE COURT:  I will look at his report again.  If

23  there is something in there that is so clear that a

24  reasonable police officer would have done, I don't know that

25  there's anything like that, but I will look.  I will review

Proceedings                                              21

1    it again to say that it's so clear that a reasonable police

2    officer would have done that, that the failure to do that

3    suggests or lends credence to the fact that maybe he told

4    her to make this story up.

5             MR. HARVIS:  Well, another -- I think an example

6    that might be more clear to Your Honor, you know, he goes

7    into this room.  These officers go into the room, there are

8    the sisters of Nathaniel Cash in the room.  There's we

9    believe -- and a person that we believe to be the actual

10   perpetrator in the room.  It's in their memo books that

11   these people are there.  And there seems to have been no

12   conversation with them, no interview of them whatsoever.

13   And I -- I just think it's -- it's common sense that a

14   reasonable police officer would have spoken to those people

15   before, you know, taking -- taking it as -- as fact that

16   Jewel Smith's account is correct or however they want --

17            THE COURT:  Well, those people at that time didn't

18   indicate to him that they were present at the scene of the

19   murder, right?

20            MR. HARVIS:  Well, they -- they didn't speak to

21   them.  I mean, that's really more of the testimony.  And so

22   we think it's appropriate to look at the testimony and if

23   the arguments are there, you get to make them.

24            MS. WILSON:  Your Honor, we would just point out

25   that there is no testimony, that nobody spoke to the other

Proceedings                                             22

1    individuals who are in the -- who were in the apartment.

2    And second, it is so plainly obvious that I don't believe

3    that an expert would be required to demonstrate that to the

4    jury.

5              THE COURT:  What do you mean, there's no

6    testimony?  Were there any interview notes of anyone else

7    being spoken to?

8              MS. WILSON:  Well, certainly they had -- certainly

9    as Mr. Harvis has pointed out, they had notes in their

10   notebooks.  They included the people's names and dates of

11   birth, which they certainly didn't just come up with out of

12   thin air.

13             THE COURT:  Well, the expert comes at the end of

14   the case.  If there's something that substantiates -- you

15   know, there could be testimony that substantiates it,

16   something that he says.  But I mean the vast majority of

17   what he says is, I think, problematic.  I mean, I think he

18   has some valid testimony that he can give, and you know, as

19   the case develops I will just have to figure out what that

20   is.

21             In terms of the similar act testimony, I will

22   permit -- it's Moses, correct?  I will permit Moses to

23   testify about alleged coercion solely on the question of

24   Scarcella's intent and state of mind.  I'm not going to

25   allow evidence that because he -- you know, any argument

Proceedings                                          23

1    that because he coerced somebody one time, he must have

2    coerced someone.  But there are levels of state of mind that

3    it could bear on.

4           All right.  There were similar act witnesses that

5    I am not going to allow to testify such as Shakur, because I

6    think he -- he didn't say his confession was coerced.  He

7    said he never confessed.  It was fabricated.  Maybe that

8    there could be cross-examination about that, but he can't

9    come and testify as a similar act answer.

10          Vanessa Gathers, again, she -- the finding of the

11   investigator was that her confession was the product of

12   permissible police procedure.  So I think in light of that

13   finding, I would do a 403 analysis, which would not permit

14   her to testify.

15          With regard to Robert Hill, as I understand it, he

16   alleges that an eyewitness against him was coerced, but he

17   doesn't have any personal knowledge of that coercion, so he

18   can't testify.

19          And the same thing is true with Alvena Jennette.

20   She doesn't have personal knowledge of any coercion, so she

21   can't testify to a similar act.  And the same is true of

22   Robert Logan.

23          With regard to permitting cross-examination about

24   prior judicial credibility findings, I think there is a

25   basis to cross-examine in connection with Rosean Hargrave,

Proceedings                                    24

1    but not with respect to any statements regarding Moses,

2    Shakur, or the postconviction hearing in Hamilton's case.

3    But it may well be that there can be cross-examination, and

4    I will make this plainer.  There may be a good-faith basis

5    to ask questions of Scarcella to the extent that there's a

6    claim that he gave false testimony about other individuals.

7    And again, I will flesh that out in more detail.

8            Okay.  So I have just outlined some of those

9    rulings.  I will issue a more lengthy opinion that lays

10   these rulings out by Friday if it appears that we're not

11   settling this case.  But I just wanted to give you some sort

12   of view of what I thought about some of these issues.

13           All right.  So some things I don't think are

14   contested, but nothing specifically was said about it,

15   Hamilton made a motion to preclude certain exhibits, the

16   plaintiff did, and I don't think the defendants objected.

17   That was the letter from Hamilton to Wyatt; the letter from

18   Hamilton to Wemo; a complaint filed in 01-CV-5579; and an

19   amended complaint and 06-CV-805; Taseem Douglas's rap sheet;

20   his conviction in 96-CR-440880; and a picture of Hamilton

21   and others.  They have moved to exclude those exhibits.  I

22   didn't see anything from Defendants objecting to those

23   exhibits being excluded?

24           MR. DEPAUL:  I don't believe those exhibits were

25   on City Defendants' list, Your Honor.

```
                         Proceedings                      25
```

1          THE COURT:  Whose exhibit list were they on?  Have

2     I gotten this backwards?

3          (Pause in proceedings.)

4          THE COURT:  Oh, these are Scarcella's, all -- but

5     these are all objections.

6          (Pause in proceedings.)

7          THE COURT:  I think these are all exhibits that

8     were on Detective Scarcella's list.

9          (Pause in proceedings.)

10         THE COURT:  And one was on White -- or three were

11    on White's.  There was no response.  They moved to preclude

12    them, and there was no objection to their being precluded.

13         MR. TALLBERG:  We're not going to press that,

14    Your Honor.

15         THE COURT:  Okay.

16         MR. HA:  And we won't either, Your Honor.

17         THE COURT:  Okay.  Very good.

18         And Hamilton moved to exclude evidence of his

19    family's ancillary suit.  No one is trying to get that into

20    evidence; is that correct?

21         MR. DEPAUL:  No, Your Honor.

22         THE COURT:  Or no one tends to make an argument

23    that he is litigious or seeking to win "the litigation

24    lottery"?

25         MR. DEPAUL:  No, not from City Defendants,

Proceedings                                          26

1    Your Honor.

2              MR. TALLBERG:  No, Your Honor.

3              THE COURT:  Okay.

4              All right.  So I will see you on --

5              MR. TALLBERG: (Indicating.)

6              THE COURT:  Oh, go ahead.  I'm sorry.

7              MR. TALLBERG:  Before we break, Your Honor.  Did

8    the Court want to address Billy White's convictions or will

9    we get into that on Friday?

10             THE COURT:  Convictions?  I thought he just had

11   one.

12             MR. TALLBERG:  There were two, the same date.

13             THE COURT:  That's unfortunate.

14             MR. TALLBERG:  Conspiracy to commit bribery and

15   theft of government services.  And we had argued in a

16   motion in *limine* that it would be tremendously prejudicial

17   to Mr. White to have anything but --

18             THE COURT:  Well, he can be cross-examined about

19   anything that is a felony and that was -- presumptively he

20   can be cross-examined about anything that was a felony where

21   ten years have not passed.  So how do you get past that?

22             MR. TALLBERG:  Yeah, well, we had argued that

23   first, it's not entirely clear that these convictions are

24   presumptively admissible as crimes of falsity.

25             THE COURT:  Well, they don't have to be.  If it's

Proceedings                                          27

1    just a felony that is within ten years, he can be

2    cross-examined about that.

3            MR. TALLBERG:  And I think the greater weight of

4    authority, Your Honor, is that it should be limited to the

5    bear essentials, the name of the offense, the date, the

6    sentence.

7            THE COURT:  Okay.

8            MR. TALLBERG:  But Plaintiff had offered -- they

9    had suggested last time they were going to put in a

10   three-page statement of offense conduct.

11           MR. HARVIS:  We don't want to put that in,

12   Your Honor.  It's about cross-examination under 608(b).

13   These are instances of conduct that go to his creditability.

14   They're about -- they're about taking money as a police

15   officer while on the job.  So we're not -- we're not trying

16   to affirmatively put the -- put before the jury the actual

17   document, but the --

18           THE COURT:  Well, no.  But you want to

19   cross-examine him about the acts --

20           MR. HARVIS:  Yeah.  I think that --

21           THE COURT:  -- underlying this?

22           MR. HARVIS:  If Your Honor takes a look at the

23   acts, I think you'll find them to be rather

24   cross-examination worthy.

25           MR. TALLBERG:  Your Honor --

Proceedings                                    28

1          THE COURT:  So do you want to cross-examine him

2   about his conviction, though?  Isn't it a fact you were

3   convicted --

4          MR. HARVIS:  Yes.

5          THE COURT:  -- of a felony?

6          MR. HARVIS:  Yes, we do.

7          THE COURT:  But you also want to go underneath

8   that and say, Didn't you --

9          MR. HARVIS:  Didn't you while you were executing a

10  search warrant find money and take it for yourself?

11         MR. TALLBERG:  And this is where, Your Honor, I

12  think you would have to do a balancing test and look at

13  impeachment value and look at remoteness in time and look at

14  any similarity between the conduct and what's at issue here.

15  And I think that on all of those, we're talking about events

16  that occurred in Connecticut 12 years ago, 15 or so years

17  after the offense conduct that's the conduct that's at issue

18  in this case.  That temporal disconnect I think is

19  significant.

20         It has no bearing on this, Your Honor.  There's no

21  suggestion that it has any relevance.  And because it's

22  related to that conviction, I think if you look at the

23  authorities on convictions, most Courts would allow just the

24  name of the conviction, the date, and the sentence and not

25  the gory details underlying that.

Proceedings                                                    29

1          MR. HARVIS:  Our view is that credibility is the

2    most important thing in this trial, and it goes directly to

3    his credibility, these actual acts, not just the fact that

4    he was convicted.  Because he could be convicted for murder,

5    it doesn't go to his credibility.

6          THE COURT:  Well, are you saying that they are

7    admissible under 608 or 609?

8          MR. HARVIS:  I'm saying that the fact of the

9    conviction that Counsel is mentioning is 609.  The Court

10   doesn't have even discretion to keep it out, the fact of the

11   conviction, you know, the date, and what he was convicted

12   for.

13         But under 608(b) I believe it's the -- the actual

14   conduct is admissible as going to his credibility, and it's

15   a prior instance -- instance, which doesn't even have a

16   temporal limitation in the rule, and it's -- it's clear as

17   day, as far as we're concerned.

18         THE COURT:  Well, is it your position that theft

19   is not probative of a character for truthfulness or

20   untruthfulness?

21         MR. TALLBERG:  There is case law that we cite in

22   our brief to suggest, Your Honor, that all criminal activity

23   involves some act of deception.  But he was not convicted of

24   perjury or false statement.  So I understand that Your Honor

25   is probably going to allow in the fact of conviction for --

Proceedings                                30

1          THE COURT:  Well, that's under a different rule.

2   That's impeachment by commission of a felony.  That's under

3   609.

4          Where you want to -- you want to ask him about the

5   specific conduct, because you say it's probative of

6   truthfulness or untruthfulness?

7          MR. HARVIS:  Yes.  We -- we don't even think it's

8   a close question, Your Honor, because it's -- he -- as a --

9   as a police officer on the job, he -- you know, under -- in

10  recorded environments, he actually took money from drug

11  transactions in a way -- I don't want to misstate the

12  precise details -- but he basically thought he could get an

13  informant killed by taking money and he still went ahead and

14  did it, just to profit himself while acting as a public

15  officer.

16         THE COURT:  Well, you cannot go into all of that.

17         MR. HARVIS:  Okay.

18         Well, to the extent that there's a good-faith

19  basis that he engaged in conduct that bears on his

20  credibility, we think we should be --

21         THE COURT:  Well, what specific questions would

22  you want to ask him about that?  He was doing a search of a

23  residence and he stole money?

24         MR. HARVIS:  No.  Isn't it true you were -- as a

25  police officer you were brought in to do a search warrant,

Proceedings                                          31

1   and instead of vouchering the money, you kept it for

2   yourself; isn't that true?

3           The answer is, "yes," because he has admitted to

4   it.

5           MR. TALLBERG:  And this is the kind of thing,

6   Your Honor, that relates -- this is the underlying conduct

7   of the conviction.

8           THE COURT:  No, it's a different rule.  He's

9   talking about -- you're right about what you -- if you are

10  just bringing out that he has a conviction, that is 609 and

11  you don't go underneath that.  You just ask him, Were you

12  convicted of whatever it was?  That is all you can do.

13          But he could be asked under 608 -- wait a minute.

14  He can be asked about it -- about instances that are

15  probative of his character for truthfulness or

16  untruthfulness.  And doesn't he have to file a

17  search warrant, file a return on an affidavit that says what

18  he took?  And my guess is that the money wasn't listed?

19          MR. PANEK:  Your Honor, we may be, in fact, kind

20  of underselling the extent of the conduct.  This is a

21  three-page document with nine paragraphs of egregious

22  behavior.  We would be happy to provide it to Your Honor

23  just to show the basis --

24          THE COURT:  Well, you can talk about -- I mean, it

25  can be egregious.  He could have murdered somebody on the

Proceedings                                                  32

1   spot, but that wouldn't be --

2          MR. PANEK:  Sure.

3          THE COURT:  -- anything related to truthfulness or

4   untruthfulness.  So the fact that it's egregious is not the

5   issue.  The fact is, Does it relate to his truthfulness or

6   untruthfulness?

7          MR. PANEK:  I'm saying egregious examples of being

8   untruthful.  For example, not only stealing money, but

9   writing on the bag that you stole it from to make it look

10  like someone else actually stole that money.  There are

11  layers of untruthful or deceptive acts that went on related

12  to this theft that go just beyond the facts of the theft.

13         THE COURT:  Well, where is all of that?  You say

14  you have a report about that --

15         MR. PANEK:  Yes, we provided it to Your Honor.

16  It's in our briefing.

17         MR. HARVIS:  We reprinted those nine paragraphs

18  for the Court.

19         THE COURT:  Oh, okay.

20         MR. HARVIS:  So you'll find it, if you --

21         THE COURT:  Nine paragraphs from where?

22         MR. HARVIS:  So this was the stipulated offense

23  conduct that Billy White agreed to in order to -- it gets

24  into the context of his --

25         It was his guilty plea?

Proceedings                                      33

1          MR. TALLBERG:  Yes, Your Honor.  And that's why

2    this was all bundled up in the conviction that goes back.

3    Again, you have to, I think, still do some kind of balancing

4    out of fairness, Your Honor, and take a look at the unduly

5    prejudicial effect it would have.  You're talking about a

6    trial within a trial about events that happened in

7    New Haven, Connecticut more than a decade ago.

8          THE COURT:  Well, it's not a trial within a trial

9    because he admitted that he -- that apparently there is a

10   stipulated thing that he admitted, so...

11         MR. HARVIS:  It's just cross-examination.  He can

12   deny it, and we don't have any extrinsic -- we're not going

13   to be offering extrinsic evidence.  It's just about asking

14   him, and we have a good-faith basis to do so.

15         THE COURT:  Well, I will look at the exhibit.

16   Where is it --

17         MR. HARVIS:  Let me tell Your Honor exactly where

18   it is.  It may take me a moment because there are so many

19   papers here.  Just give me one minute.

20         THE COURT:  Do you know where it is?

21         THE COURTROOM CLERK:  Isn't it in the opposition?

22         MR. HARVIS:  Yeah, it's in our opposition, the

23   initial opposition on the motions in *limine*.  I just need to

24   find the docket number.

25         (Pause in proceedings.)

```
                        Proceedings                    34
```

1          MR. HARVIS:  So it's our brief dated August 16 of

2    2019, and it is --

3          MR. TALLBERG:  Docket Number 160-11, and it's the

4    federal case, Your Honor.

5          MR. HARVIS:  And that's at page -- yeah, it's --

6    Exhibits 9 through 11 actually have the underlying document,

7    but they're reprinted at Pages 67 through 69.

8          THE COURT:  Do I have Exhibits 9 through --

9          MR. HARVIS:  Yeah, of course, Your Honor.

10          THE COURT:  -- 11?

11          MR. HARVIS:  Yes.

12          THE COURT:  Because I don't have a copy of all of

13    the parties' exhibits.

14          MR. HARVIS:  It's a lot of stuff.  I mean, we

15    certainly gave a courtesy copy to the Court.  I can hand --

16    I can hand up the --

17          THE COURT:  Do we have it?

18          (Pause in proceedings.)

19          MR. HARVIS:  I have the brief right there that has

20    the reprinted, if that's helpful.  And as I said, it's on

21    Pages 67 to 69 of this brief.

22          THE COURT:  Well, we have that.

23          MR. HARVIS:  Oh, you do?  Okay.

24          THE COURT:  But where is the exhibit that supports

25    what you printed in your brief?

Proceedings                                    35

1          MR. HARVIS:  Well, I know that we delivered a
2    courtesy copy.  And so if the Court doesn't have it, maybe I
3    could follow up with chambers.
4          THE COURT:  A courtesy copy?  Was it attached to
5    your --
6          MR. HARVIS:  So this was our opposition to the
7    motion in *limine*.
8          THE COURT:  And did you attach that document to
9    it?
10         MR. HARVIS:  We had -- yes, of course.  We had a
11   declaration and all the exhibits were attached.
12         THE COURT:  Oh, okay.
13         MR. HARVIS:  Great.
14         THE COURT:  All right.
15         MR. TALLBERG:  I have an extra copy here if the
16   Court wants one.
17         THE COURT:  No.  I'm sure we can find it
18   somewhere.
19         MR. HARVIS:  Perhaps we can revisit it on Friday
20   once the Court has had a change to look at everything.
21         THE COURT:  Okay.  Perhaps hopefully, we will not
22   have to revisit anything on Friday.
23         MR. TALLBERG:  That would be my hope, Your Honor.
24   Thank you.
25         THE COURT:  All right.  I will see you all then.

```
                    Proceedings                    36
```

1   Thank you.

2          MR. HARVIS:  Thank you, Your Honor.

3          MR. DEPAUL:  Thank you.

4          MR. HA:  Judge?

5          THE COURT:  Yes.

6          MR. HAD:  I have the Court a copy of the letter

7   that was faxed.

8          THE COURT:  Right.  I don't know how you fax.  We

9   have a bizarre system now.  We don't actually have a fax.

10  And you should always just do something under seal as

11  opposed to faxing, file something under seal, but don't fax

12  things.

13         MR. PANEK:  Do we have any more information about

14  this situation, just for our preparation purposes?

15         THE COURT:  May I see it?

16         MR. HA:  I should be able to provide an update

17  before the conference on Friday.

18         THE COURT:  All right.  So you'll provide an

19  update before then?

20         MR. HA:  Yes, Your Honor.

21         THE COURT:  All right.  Thank you.

22         MR. HARVIS:  Thank you very much.

23         (Matter adjourned to Friday, November 1, 2019 at

24  11:00 a.m.)

25                    --oo0oo--